**MANATT, PHELPS & PHILLIPS, LLP**
Schuyler G. Carroll (*pro hac vice* pending)
7 Times Square
New York, NY 10036
Tel: (212) 790-4500
Email: scarroll@manatt.com

**MANATT, PHELPS & PHILLIPS, LLP**
Patrick L. DuBois (SBN 350331)
12730 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (619) 205-8512
Email: pdubois@manatt.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 26-03102-JBM11 |
| CASHCALL, INC., | Chapter 11 |
| Debtor. | **REPLY IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS FOR INTERIM AND FINAL ORDERS.** |
| | Date:       July 24, 2026 <br> Time:       9:30 a.m. <br> Place:       Courtroom 2 <br> Name of Judge:   Judge J. Barrett Marum |

## I.      **INTRODUCTION**

Cashcall, Inc. (the "Debtor"), as debtor and debtor in possession in the above-captioned chapter 11 case, respectfully submits this reply (the "Reply") to the United States Trustee (the "UST") Omnibus Opposition [Docket No. 15] (the "Opposition" or "Opp.") to the Debtor's First Day Motions (the "Motions") [Docket Nos. 5, 7, 8, 9].[1]

The Court should overrule the Opposition and grant the Motions. The Opposition appears to be based on the incorrect assumption that the Debtor does not intend to take any action in this case and instead has simply commenced this case to stay litigation. In reality, however, the Debtor has installed two seasoned bankruptcy fiduciaries so that they may proactively guide the Debtor to take action to maximize recovery for creditors. The DIP Financing is necessary to ensure there is funding for these actions, as well as the costs of the other professionals engaged by the Debtor, any potential committee, and to pay the fees due to the UST.

Contrary to the UST's assumption, the Debtor intends to promptly and diligently pursue recovery on the claims asserted in the Fraudulent Transfer Action.[2] In addition, the Debtor intends to promptly determine how to best maximize the value of its other significant assets: (a) the existing loan portfolio, (b) its customer list, and (c) its lending license. At the same time, the Debtor will explore whether it is possible to restart its business in a profitable manner. All of these actions will inure to the benefit of creditors, but without approval of the DIP Financing, none of these actions would be possible and creditors would receive nothing.

## II.      **RELEVANT BACKGROUND**

The Debtor primarily provided unsecured loans to borrowers with poor credit histories. *See* Declaration of J. Paul Reddam ("Reddam Declaration") at ¶ 3 [Docket No. 3]. Since 2003, the Debtor's innovative loan products have given subprime borrowers better and more flexible access to cash than they might otherwise have accessed. *Id.* at ¶ 4. For many borrowers, this was the American dream, an

---

[1] The Motions are comprised of a DIP Financing Motion [Docket No. 5]; Cash Management Motion [Docket No. 7]; Lease Motion [Docket No. 8]; and Scheduling Motion [Docket No. 9].

[2] Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the respective First Day Motions.

- 1 -

REPLY IN SUPPORT OF DEBTOR'S
*FIRST DAY* MOTIONS FOR INTERIM AND FINAL ORDERS

opportunity to repair their credit history and increase their credit scores. *Id.* at ¶ 5.

Over the years, the Debtor revised its business model several times. *Id.* at ¶¶ 6-11. Each time, however, the Debtor faced high default rates (*id.* at ¶ 7), high overhead costs (*id.*), and costly regulatory hurdles (*id.* at ¶¶ 9-11). During the Debtor's peak of operations, it employed over 1,100 employees. *Id.* at ¶ 13. Today, it employs none. *Id.*

The Debtor, however, has engaged independent management, in the form of two very experienced professionals, both of whom have long histories of acting as estate fiduciaries and are also well versed in working with companies in bankruptcy. Leslie Gladstone is the Debtor's Chief Restructuring Officer ("CRO") and Craig Jalbert is the Debtor's independent director (the "Independent Director"). The Debtor made the decision to replace management with independent fiduciaries in order to ensure complete transparency and independent decision-making. On the other hand, the Debtor's former management is still available to assist—as appropriate—at the direction of the CRO and Independent Director. Importantly, however, the members of former management will no longer charge the Debtor for their services.

The Debtor is at a crossroads. Its limited operations are dedicated to this restructuring. However, the Debtor hopes to use the chapter 11 process to catch its breath and assess its options. Specifically, the Debtor aims to determine whether it can, once again, adapt to the changing regulatory landscape or if it needs to sell its assets to maximize recovery for its creditors. *See* Declaration of Leslie Gladstone ("Gladstone Declaration") at ¶ 9 [Docket No. 4]. Without the protection sought in the Motions, most significantly the DIP Financing Motion [Docket No. 5], the Debtor will be unable to proceed under chapter 11 to the detriment of both the Debtor and its creditors.

The claims in the Fraudulent Transfer Action seek recovery of $45,293,217.90, more than 10 times the total amount of the DIP Financing. If even a small portion of that is recovered, the DIP Financing will be repaid and there will be funds available for distribution to unsecured creditors. If the DIP Financing is not approved, however, there will be no ability to pursue these claims or any other efforts to maximize value.

- 2 -
REPLY IN SUPPORT OF DEBTOR'S
*FIRST DAY* MOTIONS FOR INTERIM AND FINAL ORDERS

III.   **THE UST'S OBJECTIONS DO NOT WARRANT DENIAL OF THE MOTIONS**

The UST's objections should be overruled as the Debtor will face immediate and irreparable harm if the Motions are not granted.  Gladstone Declaration at ¶ 13.  To preserve the Debtor's estate and potential recovery for creditors, the Motions must be approved.

A.   **Service Was Completed and Proof of Service Has Been Filed**

The UST first objects because "it is unclear from the docket who else has been served with all of the First Day Motions and the accompanying Declarations."  Opp. at 1-2.  The UST's concern appears to be simply because the Opposition was filed prior to the Certificate of Service.

Proper service, however, was made.  Indeed, service of each of the Motions was made twice, as demonstrated by the *Certificate of Service by Verita re First Day Motions* [Docket No. 16] (the "Certificate of Service").  On July 20, 2026, immediately after commencing this case, each of the Motions and the supporting Declarations were served upon all creditors and other parties in interest.  Once the hearing on the Motions was scheduled on July 21, 2026, service of the *Omnibus Notice of Hearing on Debtor's First Day Motions* [Docket No. 12], each of the Motions and the supporting Declarations also was served.  Of course, "failure to make proof of service does not affect the validity of the service" and "amendment of proof of service at any time [is allowed] unless it clearly appears that material prejudice would result."  *In re Cossio*, 163 B.R. 150, 156 (Bankr. 9th Cir. 1994).

B.   **The Cash Management Motion Should Be Approved**

The UST objects to the Cash Management Motion asserting that while "the two Collection Accounts could remain as is, all payments must be swept daily into DIP bank accounts" and "the Debtor should set up DIP bank accounts for the Operating Account and the Funding Account."  Opp. at 2-3.

The Debtor and the UST have conferred on this issue.  The Debtor has agreed to discontinue using the American Express cards and has proposed to continue using the existing account structure for thirty days to allow sufficient time for its Chief Restructuring Officer to establish new DIP accounts and close the current Operating and Funding Accounts.

C.   **The DIP Financing Motion Should Be Approved**

The Opposition is based on a misunderstanding about the Debtor's current estate, the

- 3 -

REPLY IN SUPPORT OF DEBTOR'S
*FIRST DAY* MOTIONS FOR INTERIM AND FINAL ORDERS

appropriateness of the amount sought, the fairness of the DIP Financing arrangement, and certain other standard terms. Opp. at 3-6. Each objection is meritless.

### 1. DIP Financing Is Appropriate As A First Day Motion

First, the UST contends because "the Debtor is not operating," its DIP Financing Motion does not need to be heard as a first day motion. Opp. at 4. The UST specifically observes that "[t]here are no employees." *Id*. Contrary to the UST's position, however, the lack of employees demonstrates why the DIP Financing is necessary. The Debtor requires the assistance of the CRO, the Independent Director, as well as its attorneys, financial advisors, and claims agent.[3] These professionals cannot provide services without sufficient funding to ensure payment. "The Debtor is [also] unable to obtain unsecured credit" to support its restructuring efforts, and after a "detailed analysis of the potential to obtain secured credit," the DIP lender represents the best option to avoid cannibalizing the limited present value of the estate. Gladstone Declaration at ¶ 16; Declaration of Matthew Dundon ("Dundon Decl.") [Docket No. 6] at ¶ 9 ("traditional DIP financing in the amount and on the terms of the proposed DIP Facility is simply not available to this Debtor, and that any lender willing to provide financing of this size would, as described above, do so only … on pricing and terms no better—and likely materially worse—than those of the proposed DIP Facility."). Relying on the minimal income from loan collections is not practical and would leave the Debtor with insufficient funds to restructure, pursue litigation recoveries, or conduct any necessary asset sale.

Contrary to the UST's position, immediate and irreparable harm in the context of DIP financing does not simply turn on whether a business is presently operating. Rather, "[t]he entire purpose of … DIP financing is to preserve the going concern value of the Debtors, such that there will be money in the future available to the Debtors." *In re DJK Residential, LLC*, 2008 WL 650389 (S.D.N.Y. March 7, 2008). Here, the Debtor has already employed highly skilled and experienced advisors and counsel in restructuring and chapter 11 matters, who are presently working to provide a framework to maximize the benefit to the Debtor's creditors. Gladstone Declaration at ¶ 9. This is particularly so, where the estate's assets are not

---

[3] The Debtor intends to file applications to retain Manatt, Phelps & Phillips, LLP, Dundon Advisors, LLC and Kurtzman Carson Consultants, LLC dba Verita Global and to approve continued employment of the Chief Restructuring Officer Leslie Gladstone in the coming days.

- 4 -

cash and require enforcement (*i.e.*, the Fraudulent Transfer Action) or further liquidation efforts. Without DIP financing to support these professionals, restructuring efforts will grind to a halt and the "going concern value of the Debtor" will be diminished, further weakening the Debtor's ability to pursue subsequent loans or potential purchasers. *DJK Residential*, 2008 WL 650389, at *3.

### 2. The Amount Being Borrowed Is Appropriate

The UST next incorrectly alleges that the DIP Financing Motion should be denied because "the Debtor is proposing to borrow more than the amount of assets it has." Opp. at 4. In this regard, the UST undervalues the Fraudulent Transfer Action and states that "there is no dollar figure assigned to the estate's fraudulent transfer claim against the Debtor's sole shareholder, Mr. Reddam." *Id.* The claims in the Fraudulent Transfer Action exceed $45 million. *See De la Torre v. CashCall, Inc.*, San Mateo County Superior Court Case No. 19-CIV-01235. Moreover, under the Bankruptcy Code, such an action is property of the estate. *See Baek v. Halvorson*, 2019 WL 13039652, at *2 (C.D. Cal. Mar. 26, 2019) ("Upon filing of the Debtor's bankruptcy petition, the Fraudulent Conveyance Claims became property of the estate."); *Fairway Rest. Equip. Contracting, Inc. v. Makino*, 148 F. Supp. 3d 1126, 1129 (D. Nev. 2015) ("Once a bankruptcy estate has been established, certain property of the debtor, such as a fraudulent transfer avoidance claim, are committed to the estate"). Thus, the debtor in possession has the right to control the prosecution of the Avoidance Action. *See Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005) (a bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" including all claims seeking to redress injuries to a debtor).

The UST further asserts, without any justification, that "it seems highly unlikely that the Debtor will pursue the fraudulent transfer claim." Opp. at 4. Except, the Debtor already laid the foundation to pursue the Fraudulent Transfer Action without raising a conflict of interest. Specifically, in anticipation of this chapter 11 proceeding, the Debtor removed all prior management and appointed a new Chief Restructuring Officer, financial advisor, and Independent Director—each of whom are entirely independent from Mr. Reddam. Together, the Debtor's new professionals will assess the merits of, and pursue, the Fraudulent Transfer Action and any other claims that might arise. The Debtor also will assess whether any other meritorious claims may be asserted against insiders or others.

Even assuming that the UST is correct and the Fraudulent Transfer Action will not be pursued, the

- 5 -

UST is mistaken when it asserts "the only tangible asset of this Debtor" other than the Fraudulent Transfer Action is "a $1.5 million loan portfolio." *Id.*  Beyond the Fraudulent Transfer Action, the Debtor has multiple potential assets that it will seek to leverage as part of its chapter 11 proceedings.  This includes the Debtor's loan portfolio (which may either be collected upon or sold wholesale), its customer list and lending license.  If anything, the UST's argument is a compelling reason for why the DIP Financing Motion should be *granted*.  If the amount of assets is truly insufficient to secure a loan of this magnitude, no equivalent financing would be available from other sources.

The UST concludes that "[t]he DIP Financing Motion fails to show how obtaining credit that is **more** than all of its assets would benefit the estate and improve the ability to reorganize."  Opp. at 4.  But this argument ignores that Debtor does not have the ability to choose from multiple avenues to pursue— it is not a matter of more versus less, it is a matter of some versus any.  Absent approval of the DIP Financing, the Debtor will be unable to take any action to benefit creditors.  In addition, the very same dire financial straits identified by the UST leave the Debtor without the luxury of competing DIP financiers.  As explained, "very few arm's-length DIP Loan funders will consider a facility that small, and those few who would be interested, would demand several hundred thousand dollars of fees and costs be paid from the advance, leaving net proceeds in the mid-six-figures."  Dundon Decl. ¶ 9.  "[T]raditional DIP financing in the amount and on the terms of the proposed DIP Facility is simply not available to this Debtor."  *Id.*; *see also* Gladstone Decl. at ¶ 16 ("The Debtor is unable to obtain unsecured credit … the Debtor's financial advisors have conducted a detailed analysis of the potential to obtain secured credit and have determined that the terms provided in the proposed DIP Financing are substantially better than any other financing that could be available.").

### 3. The DIP Financing Agreement Is Objectively Fair

The UST asserts that the DIP Financing Agreement is not objectively fair because it does not satisfy heightened "fair price" and "fair dealing" standards.  Opp. at 4-5.  As the UST's own case law confirms, its concern is misplaced.  Indeed, the economics of the DIP Financing Agreement are far better terms than could possibly be hoped for from any potential third-party DIP lender.

#### a. *Fair Price*

The UST contends that Debtor failed to show "fair price" because "the total proposed revolving

- 6 -

REPLY IN SUPPORT OF DEBTOR'S
*FIRST DAY* MOTIONS FOR INTERIM AND FINAL ORDERS

credit of $3,995,000 is more than the assets of this Debtor" and "[e]ven the proposed immediate, intermediate credit amount of $1.3 million would be unreasonable because it's not modest in size compared to the assets of this Debtor." Opp. at 5. To reach this conclusion, the UST assigns a zero-dollar value to the Fraudulent Transfer Action notwithstanding that the Fraudulent Transfer Action represents a potential recovery of over $45 million. As the court in *In re SPAC Recovery Co.* explained, "[c]ourts have approved litigation-funding DIP facilities—sometimes from insider lenders—where the debtor's principal asset is a litigation claim and granted liens on priming or superpriority basis." 676 B.R. 260, 276-77 (Bankr. S.D.N.Y. 2026); *see also, e.g.*, *In re FastShip, Inc.*, Case No. 12-10968 (Bankr. D. Del. Apr. 23, 2012) (Dkt. No. 63) (final order approving a $400,000 post-petition loan secured by superpriority and priming liens to fund prosecution of the estate's claims where non-litigation assets were de minimis); *In re The SCO Grp., Inc.*, Case No. 07-11337 (Bankr. D. Del. Mar. 5, 2010) (Dkt. No. 1084) (approving a $2 million insider-provided post-petition facility over creditor's objection to fund case administration and litigation, with superpriority liens and protective covenants); *In re LP&D, Inc.*, Case No. 12-14894 (Bankr. D. Mass. Jan. 23, 2015) (Dkt. No. 172) (approving financing to prosecute the estate's sole significant adversary proceeding and granting superpriority liens, notwithstanding objections premised on control and repayment risk). As *SPAC Recovery* helpfully explains, "[t]he absence of conventional market testing does not transform a bespoke, high-risk litigation-funding price into an unfair one," and "given the nature of litigation financing, … there were no 'cheaper' alternatives that were realistically attainable."

b.    *Fair Dealing*

The UST asserts "fair dealing does not appear to be met" because "[n]one of the declarations indicate that there were any concrete actions taken to find alternative lenders with different terms before settling on the terms set forth in the DIP Financing Motion with Lender." Opp. at 5. The UST, however, ignores the "detailed analysis" conducted by the Debtor's financial advisors of the Debtor's potential to obtain secured credit. Gladstone Decl. at ¶ 16; Dundon Decl. at ¶¶ 6-9 ("Very few arm's-length DIP Loan funders will consider a facility that small, and those few who would be interested, would demand several hundred thousand dollars of fees and costs be paid from the advance, leaving net proceeds in the mid-six-figures") (detailing portions of this analysis).

The Debtor is not, as the UST represents, required to show it "f[ou]nd alternative lenders with

- 7 -

different terms." Opp. at 5. *SPAC Recovery* compels the opposite conclusion. There, as here, the court recognized "no reasonable third-party funding alternatives were available given the absence of a true 'market' for the Debtor's asset [(its litigation claim)]." 676 B.R. at 275. "Demanding the Debtor to solicit competing bids in open markets is of limited utility and, in many instances, impracticable." *Id.* Here too, "both the Debtor and the DIP Lender were represented by separate counsel and decision-makers" and "[n]othing in the record suggests that … any … party-in-interest was excluded from the process or deprived of a chance to be heard." *Id.* So long as the Debtor "reasonably consider[s] alternatives and acquire[s] funding on reasonable terms," a fact reflected by the Dundon Declaration, fair dealing is satisfied. *Id.* The Debtor more than clears this threshold.

### 4. The Terms Of The DIP Financing Are Appropriate

The UST objects to four standard terms in the DIP Financing Agreement and Motion. Each term is typical of terms included in a DIP Financing Agreement and Motion. The UST offers no reasonable basis for objection.

#### a. *Attorney Fees*

As the UST concedes, reimbursement for "payment of Lender's [reasonable] attorney fees" are "a standard loan term." Opp. at 6. The UST, however, asserts that here, because Mr. Reddam is an insider, "this is not a standard loan." This provision only permits reimbursement for "***reasonable***" attorney fees. [Docket No. 5-3 at 8]. Though Mr. Reddam is an insider, the UST offers no basis for unfounded distrust in Debtor or Lender's counsel; each of whom is bound by Rules of Professional Conduct. To the extent that any attorney fees are found "unreasonable," they are checked by the UST's authority to object to the Lender's fees and this Court's authority to approve any fees.

#### b. *Lien On All Actions*

The UST also asserts that it would be unreasonable for the Lender "to place liens on transfer actions" when the transfer action is a "fraudulent conveyance action against the insider." Opp. at 6. Once again, the UST's argument is premised on the incorrect assumption that an Official Committee of Unsecured Creditors ("OCC") would be "the only party with any incentive to pursue such asset on behalf of the estate." *Id.* The fraudulent conveyance action likely is the largest asset of the estate. In order to address the claims, the Debtor entirely excluded all members of prior management (and Mr. Reddam) and

- 8 -

instead appointed the CRO (Ms. Gladstone), the Independent Director (Mr. Craig Jalbert), and a financial advisor (Dundon Advisers, LLC)—each of whom are entirely independent. Put simply, the Debtor could hardly be described as "controlled" by Mr. Reddam. To the contrary, the Debtor engaged multiple, established professionals as safeguards to protect the estate and is incentivized to pursue and resolve the Fraudulent Transfer Action (and any other possible claims that may have merit).

### c.    *Chapter 11 Professionals And Carveouts*

The UST further objects to the initial allocation of a $250,000 carveout for the Debtor and its Professionals and a $10,000 carveout for the OCC's counsel. [4] Opp. at 6. But the UST offers no authority suggesting that these sums need to be "equitable." It, of course, makes sense that a debtor—particularly one balancing continued restructuring efforts, exploring potential sales, and navigating twenty years of operating history and business records to identify potential sources of revenue—might have greater needs than counsel for an OCC. Even so, Debtor has agreed to raise the carveout for the OCC's counsel to $25,000 in light of the UST's concerns. To the extent that an OCC is actually formed and its future counsel requests more funds, the Debtor and the DIP Lender remain committed to further conversations to address the carveout.

### 5.    A Signed DIP Financing Agreement Is Attached

The UST argues that the DIP Financing Motion should be rejected under Bankruptcy Rule 4001(c)(1)(A) because the Debtor attached an unsigned term agreement, not a "signed agreement." Opp. at 6. Regardless of whether or not that is correct, attached as **Exhibit A** is a copy of the revised DIP Financing Agreement executed by the DIP Lender. Ms. Gladstone will fully execute the DIP Financing Agreement upon this Court's approval. Also attached as **Exhibit B** is a redline showing the changes discussed above.

### 6.    The Cash Collateral Provision Protects the Debtor From Yet Unknown Secured Lienholders

Finally, the UST contends that the request to "use cash collateral, to the extent such liens exist" is improper because "the Debtor does not have any secured debt." To be sure, the Debtor does not believe

---

[4] The UST curiously complains both that the DIP Financing should not be approved and that the funding available for a committee is insufficient. If the DIP Financing is not approved, there will be no funding at all for a committee.

- 9 -

any secured debt exists.  If a secured debtholder, however, does not appear during chapter 11 proceedings, the provision does nothing and there is no reason to remove it.  However, if a secured debtholder does appear, the Debtor simply seeks permission to continue using cash to avoid impairing the rest of the estate. The request is merely a prophylactic for a possible reality of a decades-old business experiencing restructuring.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant the Motions.

Dated:  July 23, 2026

**MANATT, PHELPS & PHILLIPS, LLP**

By:    */s/ Patrick L. DuBois*
Patrick L. DuBois (SBN 350331)
12730 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (619) 205-8512
Email: pdubois@manatt.com

Schuyler G. Carroll
7 Times Square
New York, NY 10036
Tel: (212) 790-4500
Scarroll@manatt.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

- 10 -

REPLY IN SUPPORT OF DEBTOR'S
*FIRST DAY* MOTIONS FOR INTERIM AND FINAL ORDERS