Arthur D. Levy (Cal. Bar No. 95659)
LAW OFFICE OF ARTHUR D. LEVY
610 – 16th Street, Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551
arthur@yesquire.com

Attorney for Creditor
EDUARDO DE LA TORRE

# UNITED STATES BANKRUPTCY COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CASHCALL, INC., | Case No. 26-03102-JBM11 |
| Debtor. | Chapter 11 |
| | **DECLARATION OF ARTHUR D. LEVY IN SUPPORT OF CREDITOR EDUARDO DE LA TORRE'S OPPOSITION TO DEBTOR'S MOTION TO OBTAIN POST-PETITION FINANCING** |
| | Date: August 26, 2026<br>Time: 11:00 a.m.<br>Courtroom 2<br>Hon. J. Barrett Marum |

I, Arthur D. Levy, say:

1.      I am an attorney and a member in good standing of the State Bar of California and admitted to practice before the United States District Court for the Southern District of California.

#### THE DE LA TORRE CLASS ACTION JUDGMENT AGAINST CASHCALL

2.      I represent creditor Eduardo De La Torre and the certified Class he represents on a Judgment for $245,515,389 rendered in favor of the Class against CashCall, Inc. by the San Mateo County Superior Court on November 7, 2023 in *De La Torre v. CashCall, Inc.*, San Mateo Superior Court Case No.19CIV01235 [the "De La Torre Class Action"].

3.      I have been counsel of record for Eduardo De La Torre and the Certified Class in the De La Torre Class Action from its filing on March 7, 2019 to the present.   The complaint in that case alleged that CashCall had made unconscionable 96% and 135% loans to California subprime borrowers between 2005 and 2011, in violation of Civil Code section 1670.5, Financial Code section 22302, and Business & Professions Code section 17200 (the "UCL").

4.      Data produced by CashCall in that case showed that CashCall had made such loans to over 100,000 borrowers.

5.      The Manatt Phelps firm was counsel of record for CashCall, Inc. throughout the De La Torre Class Action, including the trial, post-trial proceedings, and CashCall's subsequent appeal.

#### THE 2008 PREDECESSOR FEDERAL CLASS ACTION AGAINST CASHCALL

6.      I was also counsel of record for plaintiffs and the Class in the predecessor federal class action to the De La Torre Class Action, *O'Donovan v. CashCall, Inc*., United States District Court for the Northern District of California, Case No. No. C 08-03174 MEJ, filed July 1, 2008. Mr. De La Torre was one of the class representatives in the federal case.  The complaint in the federal case included the same claim for loan unconscionability as in the later De La Torre Class Action.

7.      The Manatt Phelps firm was counsel of record for CashCall, Inc. throughout proceedings in the federal case, in the subsequent appeal to the Ninth Circuit, and in related proceedings in the California Supreme Court.

- 1 -

8.      On November 15, 2011, the District Court certified the Class in the federal case.

9.      October 21, 2014, the District Court granted summary judgment in favor on CashCall.  Plaintiffs appealed the summary judgment to the Ninth Circuit.

10.      On April 4, 2017, the Ninth Circuit certified a question of state law to the California Supreme Court.

11.      On August 3, 2018, the Supreme Court rendered a decision requiring the summary judgment to be reversed, *De La Torre v. CashCall, Inc.* 5 Cal.5th 966 (2018).

12.      On October 3, 2018, the Ninth Circuit remanded the case to the District Court.

13.      On February 5, 2019, the District Court dismissed the case for lack of federal subject matter jurisdiction because the federal question claim on which jurisdiction had been based had been settled, and there was no diversity of citizenship.

TRIAL AND JUDGMENT IN THE DE LA TORRE CLASS ACTION, AND APPEAL

14.      On March 7, 2019, my co-counsel and I refiled the De La Torre Class Action in San Mateo County Superior Court to continue the loan unconscionability class action in state court. The Court certified the Class and denied CashCall's motion for summary judgment.

15.      The court held a bench trial beginning on March 8, 2021. I was co-lead trial counsel throughout the trial.  Trial testimony extended for 14 days during March, April, and May 2021.  The Court ordered post-trial briefs, which the parties submitted on September 20, 2021 and October 4, 2021.  CashCall's counsel requested closing arguments, which the Court set for November 1, 2021 on August 31, 2021.

16.      On November 7, 2023, the court rendered its Amended Judgment for $245,515,389 against CashCall. Exhibit 1 to my declaration is a true and correct copy of the Amended Judgment After Court Trial entered on that date.

17.      Exhibit 2 to my declaration is a true and correct copy of the Amended Final Statement of Decision the Superior Court, also entered in the De La Torre Class Action on November 7, 2023.

18.      On November 29, 2023, CashCall appealed the November 2023 Judgment to the California First District Court of Appeal, Division 3, Case No. A169205.

- 2 -

19.    CashCall did not post an appeal bond pending its appeal in the De La Torre Class Action, rendering it exposed to collection pending the appeal.  Attempts to collect the Judgment from CashCall pending appeal were unsuccessful and yielded no recovery for the Class.

20.    On February 27, 2026, the Court of Appeal affirmed the Judgment in full in an unpublished opinion.

21.    On June 10, 2026, the California Supreme Court denied CashCall's Petition for Review, and the Court of Appeal remanded the case to San Mateo Superior Court on June 15, 2026.

22.    The principal amounts alone of the De La Torre Class Judgment and the CFPB Judgment comprise 99% of CashCall's reported debt.  Dkt. 1 (List of Creditors).

23.    Post-judgment interest has accrued on both the De La Torre and CFPB Judgments, bringing CashCall's judgment debt to over $460 million.  Post-judgment interest has accrued at the rate of 10% on the De La Torre Class Judgment since November 7, 2023, bringing the CashCall's current total debt on the Judgment to over $310 million.  The CFPB has reported that the total outstanding on its Judgment exceeds $150 million, including interest.  Dkt. 20 at p. 1.

24.    Due to CashCall's financial deterioration, the De La Torre Class has not recovered anything on the $245 million Class Judgment.

DE LA TORRE'S FRAUDULENT TRANSFER (UVTA) CASE
AGAINST MR. REDDAM AND CASHCALL

25.    After the De La Torre Class Judgment was rendered in November 2023, Mr. De La Torre's counsel pursued post-Judgment enforcement discovery in the San Mateo case.  Based on that discovery, on August 21, 2024 my co-counsel and I filed a fraudulent transfer case on behalf of Mr. De La Torre in Orange County Superior Court against CashCall and Mr. Reddam under the California Uniform Voidable Transactions Act (UVTA), California Civil Code sections 3439 *et seq.*  The case is *De La Torre v. Reddam et al.*, Orange County Superior Court Case No. 30-2024-01421309.

26.    Exhibit 3 is a true and correct copy of the Complaint in Mr. De La Torre's UVTA case.  The basis for the case is a $45 million shareholder distribution CashCall made to Mr.

- 3 -

Reddam on October 26, 2021, five days before closing arguments were set to be heard in the De La Torre Class Action on November 1, 2021.   The relief sought is recovery of the entire distribution from Mr. Reddam, with interest, in partial satisfaction of the De La Torre Class Judgment.

27.     The Manatt Phelps law firm has jointly represented CashCall and Mr. Reddam throughout the UVTA case, and still does.

28.     The UVTA case is substantially prepared for trial, except for expert discovery, some remaining fact discovery, and compliance with the court's pretrial requirements.

29.      Manatt Phelps represented CashCall and Mr. Reddam in five depositions plaintiff has taken of the key witnesses in the UVTA case, including depositions of Mr. Reddam himself, CashCall's CFO (Delbert Meeks), CashCall's Controller (Shawna Parks), Mr. Reddam's personal financial professional (Elizabeth Emrick), and CashCall's and Mr. Reddam's tax accountant (Michael McGrath).  Manatt Phelps produced over 7,200 pages of documents in response to plaintiff's document requests, including tax documents produced by Mr. Reddam.

30.     On November 3, 2025, Manatt Phelps filed a Motion for Summary Judgment on behalf of both CashCall and Mr. Reddam.  Exhibit 4 to my declaration is a true and correct copy of its Motion for Summary Judgment.

31.     Exhibit 5 to my declaration is a true and correct copy of the Declaration of Delbert O. Meeks, CashCall's CFO, which Manatt prepared and filed in support of the Summary Judgment Motion.

32.     I filed opposition to the motion on behalf of Mr. De La Torre. Exhibit 6 to my declaration is a true and correct copy of the public (redacted) version of the opposition brief. Exhibit 7 to my declaration in the public (redacted) version of De La Torre's Response to the Separate Statement of Material Facts that Manatt Phelps had filed jointly on behalf of CashCall and Reddam in support of its Motion for Summary Judgment.

33.     The Court denied summary judgment on July 10, 2026.  Exhibit 8 to my declaration is a true and correct copy of the Court's Order Denying CashCall's and Mr. Reddam's Summary Judgment Motion.

- 4 -

34.     Manatt also represented Reddam in vigorously opposing De La Torre's discovery motion in the UVTA case to compel production of tax documents from Mr. Reddam to discover the amounts Mr. Reddam actually paid and owed on account of 2021 taxes, and was partially successful in avoiding production of some tax documents. The requested tax documents are directly relevant to whether the October 26, 2021 distribution was a legitimate tax distribution or a cover for hindering, delaying, or defrauding the Class in collecting its Judgment.

35.     The UVTA case remains pending, with Manatt as counsel of record for CashCall and Mr. Reddam.  Trial of the case is set for October 12, 2026.  I believe this case has automatically stayed the entire UVTA case, including as to Mr. Reddam, have confirmed that with CashCall's counsel, and will proceed no further with the UVTA case unless and until the stay is lifted.

36.     Exhibit 9 to my declaration are true and correct excerpts from the Deposition of Mr. Reddam taken in the UVTA Case on November 6, 2025.

37.     On June 25, 2026, CashCall and Mr. Reddam filed a joint motion in the District Court in the CFPB case to vacate the CFPB's Judgment against them.  Exhibit 10 is a true and correct copy of their joint brief in support of that motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 12th day of August 2026 at Oakland, California.

_____

Arthur D. Levy

- 5 -

404415052.1

# EXHIBIT 1

FILED
SAN MATEO COUNTY

NOV 0 7 2023

Clerk of the Superior Court
By
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| EDUARDO DE LA TORRE, on behalf of all others similarly situated and the general public, | Case No. 19CIV01235 CLASS ACTION |
| Plaintiffs, | Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 |
| vs. | ***AMENDED* JUDGMENT AFTER COURT TRIAL** |
| CASHCALL, INC., a California corporation, and DOES 1 through 25 inclusive, | |
| Defendants. | |

Court Trial was held in Department 2 of this Court before the Honorable Marie S. Weiner, as the single-assigned judge. James Sturdevant of The Sturdevant Law Firm, Steven Tindall of Gibbs Law Group LLP, Arthur Levy, Esq., and Jessica Riggin of Rukin Hyland & Riggin LLP appeared on behalf of Plaintiff de la Torre and the Certified Class; and Brad Seiling, Donald Brown, and Justin Jones-Rodriguez of Manatt Phelps & Phillips LLP appeared on behalf of Defendant CashCall Inc.

This complex case and certified class action commenced Court Trial on March 8, 2021, the presentation of evidence concluded on May 14, 2021, written Closing

1

Argument Briefs were filed concluding October 4, 2021, and oral Closing Arguments were conducted and concluded on November 1, 2021. A Tentative Decision was issued. A Proposed Statement of Decision was issued. Objections to the Proposed Statement of Decision were filed by the parties. A Final Statement of Decision after Court Trial was issued. Judgment was entered, and post-trial motions filed – in response to which this Court decided to issue an Amended Final Statement of Decision and this Amended Judgment.

IT IS HEREBY DECIDED, ORDERED AND ADJUDGED that Judgment shall be and is entered in favor of Plaintiff Eduardo de la Torre and the Certified Class and against Defendant CashCall Inc.

The Certified Class was previously certified and defined as follows: "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August 1, 2005 to July 10, 2011." Plaintiff Eduardo De La Torre was previously appointed the Plaintiff Class Representative.

The Amended Final Statement of Decision after Court Trial entered November 7, 2023 is incorporated herein by reference. Plaintiff and the Certified Class have proven, by a preponderance of the evidence, their cause of action for violation of Business & Professions Code Section 17200 *et seq.* based upon violation of Financial Code Section 22302 (and related Civil Code Section 1670.5).

Plaintiff and the Class are entitled to monetary restitution of any and all interest payments made to Defendant CashCall Inc. on those $2600 consumer loans funded during the Class Period. Accordingly, Plaintiff Eduardo de la Torre and the Certified Class are awarded monetary restitution under Business & Professions Code Section

2

17200 *et seq.* for the total amount of **$245,515,389,** against Defendant CashCall Inc. This reflects the return (restitution) of all interest paid by those Class members who have paid to Defendant more than the amount of their principal on their 101,564 loans. No monetary restitution is awarded on the 32,284 loans to those Class members who have paid to Defendant less than the amount of the principal of their loans.

Injunctive relief is granted to Plaintiff and the Class, as follows: Defendant CashCall Inc., and any and all of its parents, subsidiaries, assignees, transferees, loan portfolio purchasers, representatives, agents, officers, directors, employees, and/or trustees, are enjoined from and shall not collect, receive, charge, take, or obtain payments of any *interest* on any consumer loans entered into at any time from August 1, 2005 to July 10, 2011 between any Plaintiff or any member of the Certified Class on the one hand, and Defendant CashCall Inc. on the other hand, with an initial principal amount of $2,500 to $2,600. This is not a prohibition against collection of any principal still due and owing only on the 32,284 loans to those Class members whose net payments to Defendant are less than the amount of the principal of their loans.

No prejudgment interest is awarded.

Plaintiff and the Certified Class are the prevailing parties entitled to statutory costs upon timely filing and service of a Memorandum of Costs.

The Plan of Distribution of the Amended Judgment proceeds to the Plaintiff and members of the Certified Class shall be proposed and considered by the Court after entry of the Amended Judgment.

3

Plaintiff shall immediately file and serve formal Notice of Entry of Amended Judgment.

DATED: November 7, 2023

HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

4

# EXHIBIT 2

**FILED**
SAN MATEO COUNTY

NOV 0 7 2023

Clerk of the Superior Court
By_____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

EDUARDO DE LA TORRE, on behalf
of all others similarly situated and the
general public,

      Plaintiffs,

vs.

CASHCALL, INC., a California
corporation, and DOES 1 through 25
inclusive,

      Defendants.
_____/

Case No. 19CIV01235
CLASS ACTION

Assigned for All Purposes to
Hon. Marie S. Weiner, Dept. 2

***AMENDED* FINAL STATEMENT
OF DECISION AFTER COURT
TRIAL**

Court Trial was held in Department 2 of this Court before the Honorable Marie S.

Weiner, as the single-assigned judge. James Sturdevant of The Sturdevant Law Firm,

Steven Tindall of Gibbs Law Group LLP, Arthur Levy, Esq., and Jessica Riggin of Rukin

Hyland & Riggin LLP appeared on behalf of Plaintiff de la Torre and the Certified Class;

and Brad Seiling, Donald Brown, and Justin Jones-Rodriguez of Manatt Phelps &

Phillips LLP appeared on behalf of Defendant CashCall Inc.

1

This complex case and certified class action commenced Court Trial on March 8, 2021, the presentation of evidence concluded on May 14, 2021, written Closing Argument Briefs were filed concluding October 4, 2021, and oral Closing Arguments were conducted and concluded on November 1, 2021. A Tentative Decision was issued. A Proposed Statement of Decision was issued. Objections to the Proposed Statement of Decision were filed by the parties. A Final Statement of Decision was filed, and Judgment entered. Defendant filed a motion for new trial and motion to vacate the judgment, which were denied; but the Court is exercising its discretion to amend the Final Statement of Decision and Amend the Judgment.

`Upon due consideration of the briefs, evidence presented, the arguments of counsel, and the Objections to the Proposed Statement of Decision, and matters raised in the prior post-judgment motions,

IT IS HEREBY DECIDED, ORDERED AND ADJUDGED, as the Court's *Amended* Final Statement of Decision after Court Trial as follows:

The Court previously certified the following Plaintiff Class: "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August 1, 2005 to July 10, 2011."[1] Plaintiff Eduardo De La Torre was appointed the Plaintiff Class Representative.

Plaintiff and the Class have alleged a single cause of action against Defendant CashCall Inc. for violation of California Business & Professions Code Section 17200 *et seq.* for unlawful business act(s) or practice(s), based upon violation of Financial Code Section 22302 and Civil Code Section 1670.5, in that the consumer loan contracts

---

[1]    By April 2006, CashCall was doing business in five states, but 93% of its consumer loans were in California.

2

between Plaintiff and the Class members and Defendant CashCall Inc. were unconscionable.

Plaintiff and the Class have proven, by a preponderance of the evidence, their cause of action for violation of Business & Professions Code Section 17200 *et seq.* based upon violation of Financial Code Section 22302 (and related Civil Code Section 1670.5), in that the Court finds that the *contracts* for the $2600 consumer loans to Plaintiff and the Class by Defendant CashCall Inc. during the Class Period were *procedurally and substantively unconscionable* at the time the agreements were entered into. The loan agreements are unconscionable under Civil Code Section 1670.5, AND are unconscionable under Finance Code Section 22302, and such statutes are subject to enforcement as their violation constitutes unlawful business acts or practices under Business & Professions Code Section 17200, *et seq*.

Plaintiff and the Class are entitled to monetary restitution of any and all interest payments made to Defendant CashCall Inc. on those $2600 consumer loans funded during the Class Period. Accordingly, Plaintiff Eduardo de la Torre and the Certified Class are awarded monetary restitution under Business & Professions Code Section 17200 *et seq.* for the total amount of **$245,515,389,** against Defendant CashCall Inc. This reflects the return (restitution) of all interest paid by those Class members who have paid to Defendant more than the amount of their principal on their 101,564 loans, and minus the $75 origination fee charged by Defendant (which is not illegal). No monetary restitution is awarded on the 32,284 loans to those Class members who have paid to Defendant less than the amount of the principal of their loans.

Injunctive relief is granted to Plaintiff and the Class, as follows: Defendant CashCall Inc., and any and all of its parents, subsidiaries, assignees, transferees, loan

3

portfolio purchasers, representatives, agents, officers, directors, employees, and/or trustees, are enjoined from and shall not collect, receive, charge, take, or obtain payments of any *interest* on any consumer loans entered into at any time from August 1, 2005 to July 10, 2011 between any Plaintiff or any member of the Certified Class on the one hand, and Defendant CashCall Inc. on the other hand, with an initial principal amount of $2,500 to $2,600.  This is not a prohibition against collection of any principal still due and owing only on the 32,284 loans to those Class members whose net payments to Defendant are less than the amount of the principal of their loans.

No prejudgment interest is awarded.

Plaintiff and the Class are the prevailing parties entitled to statutory costs upon timely filing and service of a Memorandum of Costs.

Plaintiff's evidentiary objections to Trial Exhibits Nos. 362, 363 and 365 are SUSTAINED.

Class Counsel shall prepare and submit a proposed Amended Plan of Distribution of the judgment award to Plaintiff and the Class members.

THE COURT FINDS as follows, as its Final Statement of Decision:

### *Applicable Law and Legal Standards*

At all relevant times, CashCall Inc. was a California licensed finance lender. (Finance Code §22009, §22100.)  With some limitations, California licensed finance lenders are statutorily exempt from the Constitutional provision barring usury – specifically they can charge more than 10% simple interest per year on contractual debt. The Finance Code sets specific maximum amounts for interest charges where the principal owed is *less than $2500*.  (Finance Code §22303 and §22304.)

4

Until the enactment of Section 22304.5 in 2019, no limit was set on the amount of interest that could be charged by a California licensed finance lender on a contractual consumer loan over $2500. That statute now requires that a loan for a principal amount of $2500 but less than $10,000 be subject to interest rates no higher than 36% simple interest per year plus the Federal Funds Rate. Plaintiff and the Class have alleged that their consumer loans through CashCall Inc. during the time period 2005 to 2011 were unconscionable, including the high interest rates – which occurred during the Class Period, before the setting of limits by Section 22304.5.

Finance Code Section 22302 is a catch-all provision barring unconscionable loan transactions by California licensed finance lenders, regardless:

    (a)    Section 1670.5 of the Civil Code applies to the provisions of a loan contract that is subject to this division.

    (b)    A loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed to be in violation of this division and subject to the remedies specified in this division.

Civil Code Section 1670.5 states:

    (a)    If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

    (b)    When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded

5

a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination.

California Business & Professions Code Section 17203 give the court authority to grant injunctive relief and monetary relief, and make orders "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." See also Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 176. "A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices." Cortez, at p. 173. Such equitable remedies can include restitution. Caro v. Procter & Gamble Co. (1993) 18 Cal.App.4th 644, 661; Cortez, 23 Cal.4th at pp. 177-178.

This is a class action for violation of Business & Professions Code Section 17200, challenging Defendant CashCall, Inc.'s 96% and 135% $2600 installment sub-prime loan product as unconscionable and unlawful pursuant to Civil Code Section 1670.5 and Financial Code Section 22302.  Plaintiff and the Class claim that the interest rate and other aspects of the loan contract together were unconscionable pursuant to Civil Code Section 1670.5, Financial Code Section 22302, and Business & Professions Code Section 17200.

In the context of this case, while it was procedurally in the federal district court and on certified question to the California Supreme Court, the California Supreme Court held that determination of whether terms of the loan contracts between Plaintiff and the Certified Class and Defendant CashCall Inc. are unconscionable is an intensively factual question and involves judicial weighing and balancing:

6

As long established under California law, the doctrine of unconscionability reaches contract terms relating to the price of goods or services exchanged. [Citations.] Whether the price of a bargain is "unreasonably and unexpectedly harsh" depends on more than just a single printed number, so we examine not only the price term itself but other provisions and circumstances affecting a transaction's benefits and burdens. [Citations.]

An interest rate is the price charged for lending a particular amount of money to a given individual or entity. [Citations.] As with any other price term in an agreement governed by California law, an interest rate may be deemed unconscionable. [Citations.]

\* \* \*

Unconscionability is a flexible doctrine. It is meant to ensure that in circumstances indicating an absence of meaningful choice, contracts do not specify terms that are "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." [Citations.] Nonetheless, at least one thing about the doctrine is clear: it requires more than just looking at one particular term in a contract, comparing it to a fixed benchmark, and declaring the term unconscionable.

Instead, unconscionability requires oppression **or** surprise – that is, procedural unconscionability – along with the overly harsh or one-sided results that epitomize substantive unconscionability. [Citations.] Some measure of both procedural and substantive unconscionability must be present – although given the sliding scale nature of the doctrine, more of

7

one kind mitigates how much of the other kind is needed. [Citation.] Even where a party complains of a single contract clause, the court usually must still examine the bargaining process for any procedural unfairness. [Citations.] The court must consider whether there was (1) undue oppression arising from "an inequality of bargaining power," including the various factors tending to show relative bargaining power such as the parties' sophistication, their cognitive limitations, and the availability of alternatives; and (2) surprise owing to, for example, the "terms of the bargain [being] hidden in a prolix printed form" or pressure to hurry and sign. [Citations.] In short, a determination of procedural unconscionability may well be "highly dependent on context," very much different than deciding whether a certain rate cap applies. [Citations.]

In assessing the presence of substantive unconscionability, a court may also need to consider context. [Citation.] When a price term is alleged to be substantively unconscionable, we have explained that it is not sufficient for a court to consider only whether "the price exceeds cost or fair value." [Citations.] The court must also "look to the basis and justification for the price." [Citations.] If, for example, the interest rate is high because the borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability. [Citation.] Finally, a court may consider whether there are market imperfections that make it less likely that the price was set by a "freely competitive market and therefore more susceptible to the unconscionability. [Citation.]

8

De La Torre v. CashCall Inc. (2018) 5 Cal.5th 966, 975-976, 982-983. "An

unconscionability determination does not generally depend on a single factor, and tends

to be 'highly dependent on context.' [Citation.]" Id., at p. 984.

> [W]hile unconscionability is ultimately a question of law, numerous
>
> factual inquiries bear upon that question. [Citations.] The business
>
> conditions under which the contract was formed directly affect the parties'
>
> relative bargaining power, reasonable expectations, and the commercial
>
> reasonableness of the risk allocation as provided in the written agreement.

A & M Produce Co. v. FMC Corp. (1982) 135 Cal.App.3d 473, 489 see also, Perdue v.

Crocker National Bank (1985) 38 Cal.3d 913, 925-928.

> An evaluation of unconscionability is highly dependent on context.
>
> [Citation.] The doctrine often requires inquiry into the "commercial
>
> setting, purpose, and effect of the contract or contract provision.
>
> [Citations.] . . . The ultimate issue in every case is whether the terms of
>
> the contract are sufficiently unfair, in view of all relevant circumstances,
>
> that a court should withhold enforcement.

Sanchez v. Valencia Holding Co., LLC (2015) 61 Cal.4th 899, 911-912; see also OTO

LLC v. Kho (2019) 8 Cal.5th 111, 125-126.

The claim in this Class Action lawsuit seeks determination of whether the terms

of the loan agreements between CashCall and its borrowers are unconscionable in

violation of California law. As established under California law, a determination of

unconscionability of a contract, or its terms, requires consideration of whether there is

procedural unconscionability *and* substantive unconscionability. In regard to

9

procedurally unconscionability, Plaintiff has explicitly stated that he is claiming "oppression" and *not* "surprise" – only one of which must be shown.

Given the "sliding scale" analysis of unconscionability, where "a procedure is demonstrably oppressive", "even a low degree of substantive unconscionability may suffice to render the agreement unenforceable". OTO, at p. 130.

That Plaintiff and the members of the Class voluntarily agreed to a high interest loan does not vitiate their right to claim "usury" or voidability of the contract after the fact. Public policy protects against illegal contracts regardless:

> An illegal contract cannot have the vital spark of legality infused into it by the mere hand of the man who subsequently asserts its nullity. The voice of him who induces an unlawful transaction has never attained to such virtue as will validate an unlawful contract; nor will the application of his hand to the preparation of an instrument evidencing an agreement effect the interference of divinity.

Martin v. Ajax Construction Co. (1954) 124 Cal.App.2d 425, 431. For example, a usury claim is not negated and "an estoppel does not arise simply because the borrower knew of the usurious nature of the transaction, took the initiative in seeking the loan, and paid usurious interests without protest." Janisse v. Winston Investment Co. (1957) 154 Cal.App.2d 580, 587.

Defendant asserts that its interest rates of 96% and 135% are not excessive or unconscionable given the First Appellate District's decision holding that a 100 percent markup "may be a generous profit, but it is wholly within the range of commonly accepted notions of fair profitability." California Grocers Assn. v. Bank of America (1994) 22 Cal.App.4th 205, 216. That is cherry-picking language out of the opinion

10

without putting it in the contexts of the facts of that case. In <u>California Grocers</u>, plaintiffs asserted that an NSF fee of $3 by Bank of America, which was double the actual costs to the bank, was unconscionable. The Court of Appeal held that there was an adhesion contract but acknowledged that the $3 NSF fee was openly disclosed in pamphlets regarding the terms of opening accounts. The Court of Appeal did not consider any other facts or elements of procedural unconscionability. The analysis of the Court of Appeal is inconsistent with the standards set by the California Supreme Court in <u>De La Torre v. CashCall</u>, as set forth above, that the availability of alternatives is part of the consideration for *procedural* unconscionability. In <u>California Grocers</u>, the Court of Appeal acknowledged that customers had multiple options to have their checking accounts at other financial institutions instead, when it considered the NSF fees charged by other institutions, as part of its *substantive unconscionability* analysis. <u>Id.</u>, at p. 215. The Court of Appeal then found that a $3 did not "shock the conscience" given its low amount, given that it was only double, and given that other banks charged $4 to $10 NSF fees. It thus held there was no substantive unconscionability.

In making the above-quoted statement in <u>California Grocers</u> at page 216, the First Appellate District expressly compared and contrasted it with the situation in <u>Perdue</u> and in <u>Carboni</u>. In <u>Perdue</u>, 38 Cal.3d 913, Crocker National Bank charged a $6 NSF fee, but its costs were only 30 cents, thus a profit of 2000%, which might be the basis for substantive unconscionability. <u>Id.</u>, at p. 928. In addition, the Court of Appeal found that initial disclosure of the fee was not upfront in a clear contract, but rather was in "a document which serves at least in part as a handwriting exemplar, and whose contractual character is not obvious. The contractual language appears in print so small that many could not read it." <u>Id.</u> This also went to the determination of procedural

11

unconscionability – facts not present in <u>California Grocers</u>. Accordingly, the Supreme Court overruled the demurrer.

In <u>Carboni v. Arrospide</u> (1991) 2 Cal.App.4th 76, the First Appellate District held that a 200% interest rate on a secured loan was substantive unconscionable. <u>Id.</u>, at p. 83 ("We have little trouble concluding that an interest rate of 200 percent on a secured $99,000 loan is substantively unconscionable; i.e, that it imposes a cost on the borrower which is overly harsh and was not justified by the circumstances in which the contract was made.") The rate was 10 times that charged in the marketplace. The Court of Appeal also considered the evidence on defendant's "justification" for the higher rate, but determined that it was substantively unconscionable and not justified under the circumstances. <u>Id.</u>, at pp. 84-85. The Court of Appeal also found procedural unconscionability, although the terms were clearly disclosed in the agreement, as it was an adhesion contract, not subject to bargaining, and the customer had no meaningful choice of other alternatives. <u>Id.</u>, at pp. 85-86. In weighing on the sliding scale, the First Appellate District upheld the trial courts finding of unconscionability, and its judgment that only 24% could be charged.

It is clear that each case revolved around their own facts and circumstances. <u>California Grocers</u> does not hold as a matter of law that a charge yielding a profit of 100% is never unconscionable. The body of law is established that there is a weighing process of many facts and factors in the determination of unconscionability.

"Although unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question. 'to the extent there are conflicts int the evidence or in the factual inferences which may be drawn therefrom, we must assume a set of facts

12

consistent with the court's finding of unconscionability if such an assumption is supported by substantial evidence.' [Citation.]" <u>Carboni</u>, at p. 93.

### *Plaintiff's CashCall Loan Experience*

Plaintiff Eduardo de law Torre testified at trial regarding his CashCall loan transaction. Plaintiff obtained a CashCall $2600 loan back in 2006, when we was a college student, age 21. He grew up in Redwood City, California, and lives in East Palo Alto. His parents were immigrants to the USA, with a sixth grade education, and worked doing manual labor. Plaintiff has four sisters who did not go to college. Plaintiff wanted to go to college to have a better life, and obtained scholarships and loans to attend the University of California at Davis in Fall 2003. The school counselor helped Plaintiff fill out the FAFSA financial application to apply for college financial aid. Plaintiff used the funds for tuition as well as living expenses. Plaintiff testified that he did not even understand the terms of his student loans when he acquired them. He had no financial experience or training.

In January 2006, Plaintiff was in a desperate financial situation. He was on academic probation for two academic quarters, and lost his financial aid for that academic quarter as a result. So he had no money to live on. It was "traumatic", and Plaintiff felt embarrassed, shame, desperate, and lonely. He felt he was on his own, and had no one to help, as his family was not in a position to help him financially. Plaintiff was working part-time at school for near minimum wage.

In February 2006, Plaintiff saw the CashCall television advertisement, soliciting people to call "if you need cash fast", and that they can give "relief". Plaintiff was in a time crunch because he had bills to pay. So Plaintiff called the CashCall 800 telephone

13

number, and spoke to a representative about taking out a loan. Plaintiff only wanted to borrow $1300. Plaintiff was told that the terms of the loan were not negotiable, and told that the minimum loan was $2600. Plaintiff anticipated that he would do a $1300 prepayment of the loan (2600-1300) after he got his student loan which would start in Summer 2006. Plaintiff was told that he could apply, submit a form, and get a quick turn-around. He was told that he must apply online. During the telephone conversation with the CashCall representative, Plaintiff was not told the terms of the loans, other than the loan amount of $2600 and the monthly payment amount. Plaintiff went online and filled out the "boxes" on the application.

Thereafter, Plaintiff received a follow-up message from CashCall requesting further paperwork and documentation. Plaintiff gave them a copy of his ID, and a voided check so that CashCall could do direct deposit (and withdrawals).

Plaintiff was funded a $2600 loan from CashCall within 2-3 days of applying. He was sent a promissory note, that he doesn't recall signing. (Trial Exhibit #1.) He had no information about the term length of the loan, the annual percentage rate, the interest rate charged, or the amount of interest payments prior to entering into the transactions. He never asked. Plaintiff testified that he was in a "dire state of mind", trying "to survive". The terms were not important at the time, because he just needed to financially survive and pay his living expenses.

Plaintiff did know and realize that the monthly payment on the CashCall loan would be about $200, and he knew the $2600 principal amount. He said this would meet "my basic survival needs." He just wanted to pay his bills, and stay in his school.

Plaintiff did not think he had other financial options. He did not have a car, so he could not get an auto title loan. He did not have assets, so he could not get a pawn shop

loan. He was not aware of any upcoming tax refund for a tax refund anticipation loan. He did not think it was viable to apply for a personal loan from his bank, because it is "complicated", he had no credit history, and didn't want to wait two weeks or more to get funding.

Plaintiff made his CashCall monthly loan payments for about 1-1/2 years. In late 2007 or early 2008 he had trouble and missed a payment. He had too many debits on his account that month, and contacted CashCall to alert them that he could not pay that month, but CashCall did an attempted electronic payment anyway, yielding an NSF. In fact, Plaintiff was only two payments away from paying off the loan.

CashCall then started making multiple calls to Plaintiff regarding the debt, and calling Plaintiff's references to tell them about his debt. It is identified as a charge-off in Plaintiff's credit report. Plaintiff testified that he would not have taken out the CashCall loan if he knew then what he knows now.

### *Unconscionability Analysis of the CashCall $2600 Loan Transactions*

The Court certified the following Plaintiff Class: "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August 1, 2005 to July 10, 2011." Evidence was presented that during this time period 133,848 such CashCall loans were made to Plaintiff and the Class. (See McFarlane trial testimony on 3/22/21, and demonstratives Trial Exhibits #35 and #36.) During the Class Period, CashCall charged annual interest rates of 96% for a 42-month term, or 136% for a 36-month term. The loan amount was always $2600, of which $75 was immediately paid to Defendant (upon funding of the

15

loan by the Defendant) as a loan "origination fee".  So the actual loan proceeds to the borrower were $2525.

The California Supreme Court gave guidance to this Court that interest rates should be declared unconscionable only if they are so unreasonable and unexpectedly harsh as to be unduly oppressive or shock the conscience, in light of the totality of the transaction.  De La Torre v. CashCall Inc., 5 Cal.5th at p. 973.

"Unconscionability is a flexible standard in which the court looks not only at the complained-of term but also at the process by which the contractual parties arrived at the agreement and the larger context surrounding the contract, including its 'commercial setting, purpose, and effect.' [Citations.]" De La Torre, at p. 976; see also, page 982.

The Supreme Court has instructed that this Court should consider, for procedural unconscionability:

- Unequal bargaining power

- Sophistication of the parties

- Cognitive limitations of the parties

- Availability of alternatives

- Existence of hidden terms

- Pressure to hurry and sign

- Procedural unfairness in the bargaining process

De la Torre, at pp. 982-983.  For substantive unconscionability, the Court should consider:

- Harsh or one-sided results

- Lender's costs in making or administering the loan

- Basis and justification for the price/interest rate

16

- Whether the price is based upon a freely competitive market, or not

Id., at pp. 983-984.

### Adhesion Contract and Unequal Bargaining Power

The evidence is undisputed that all of these CashCall consumer loans issued to Plaintiff and the Class were adhesion contracts. Thus there is an initial showing of procedural unconscionability. *None* of the terms of the CashCall $2600 consumer loans were negotiable. CashCall dictated the amount of the loan, the interest rate on the loan, the length of the loan, minimum monthly payment on the loan, and all of the terms of the written contract. No negotiation was acceptable. When a potential borrower requested to borrow *less* than $2600, CashCall refused. Defendant's agents simply told the potential borrower that if they didn't want all of the $2600[2] they could just immediately pay some of it back upon funding. Why? Because if Defendant loaned less than $2500 then the loan would be subject to the California Financial Code statutes limiting the amount of interest chargeable.[3] For example, applying the limits set by Finance Code Section 22303, if the loan was only for $1200, the lender could only charge interest of 24.75% per year – not 96%.

Plaintiff and the Class had *zero* bargaining power. Defendant only made these loans on a take-it-or-leave-it basis. The potential borrower could only accept, or walk away.

---

[2]    Plaintiffs' expert Professor Adam Levitin testified that $2600 is not a standard loan amount in the consumer loan market. The only purpose of making the loan be $2600 is to evade the usury loans in California.

[3]    Evidence was presented that CashCall *did* make loans for less than $2600 in other states, but not in California.

17

### *Sophistication of the parties*

In regard to sophistication of the parties, the focus is upon *financial* sophistication. Margot Saunders, Plaintiffs' expert on predatory lending practices, is a Senior Counsel at the National Consumer Law Center. Saunders testified that studies show that 90% of USA consumers cannot answer basic questions about financial matters. She testified that most people do not understand interest rates or how they apply to principal. People also do not understand why they would have to keep paying on a loan if they have already paid more than the amount of the loan principal in the first place. Many people also cannot understand how to calculate interest on a loan. She called this a "lack of quantitative literacy".

She testified that consumers who are Black, Hispanic, immigrant, lacking a high school degree, or whose first language is not English are shown to be particularly vulnerable to predatory lending practices. People who need money quickly are generally desperate and have a "perceived lack of choice". Most subprime borrowers do not compare providers of credit, and most think that the subprime high-interest rate loan is their only option. Their focus is simply upon the amount of the monthly payment. Saunders opined that there is a "grossly unequal knowledge level between consumer creditors versus consumer borrowers." Saunders did acknowledge that her opinions are not based upon the specific circumstances of each individual member of the Class.

### *Cognitive Limitations of the Parties*

As to cognitive limitations, there was no particular evidence on this factor, other than the general lack of comprehension by subprime borrowers regarding financial matters – which is probably how they became subprime in the first place. Although

18

Plaintiff presented the testimony of Dr. Stacey Wood, a neuropsychologist, as an expert on borrower decision-making, it was too general. Dr. Wood's primary focus in her work is on decision-making by the aged and elderly, and how it changes over the lifespan – which is not relevant here. She did not conduct any survey of the Class members, or talk to any member of the Class, although she listened to some of the phone calls recorded by CashCall. She has no experience regarding lending. Her opinioned regarding the decision-making process was not of particular assistance to the Court in considering and weighing the unconscionability factors.

### *Availability of Alternatives*

The $2600 CashCall loan product was not comparable to Alternative Financial Services Products. The "alternatives" asserted by Defendant are not actually comparable to or suitable substitutes for the CashCall $2600 unsecured subprime loans.

Delbert Meeks, the Chief Financial Officer of CashCall, testified that when he joined Defendant in August 2004, there was no one else in their market. Meeks testified that the CashCall loan product was "unique". The product was an unsecured, simple interest (no compound interest) consumer loan, with no prepayment penalty, provided to people with a poor credit history. Meeks testified to the effect that "no one else" was doing this at the time CashCall was founded.

Meeks testified that CashCall's $2600 subprime loans filled a niche between conventional bank loans and pay day loans. Such CashCall borrowers have an average FICO score of 578[4] – CashCall refers to such people as "unbankable". If these borrowers had a higher FICO score they could get a regular bank loan at conventional bank terms.

---

[4]    Evidence was presented that "subprime" is defined by the FDIC as a borrower with a FICO score of less than 660.

19

Meeks testified that the financial options for the subprime borrowers were not comparable to the CashCall $2600 product:

*Pay Day Loans.* Meeks explained that "pay day loans" are a loan based upon an advance on a paycheck. Typically, it is for a two-week term. The fees are high. Meeks stated that commonly the pay day loan is "rolled over" with new fees added. The loan is unsecured, i.e., there is no assignment of the paycheck. In California, they are referenced as "deferred deposit transactions"; and according to the California Department of Corporations, are for an average amount of $253 for an average term of 17 days with an average *annual* interest rate of 426%. [But on a loan of $253, that would be about $45 in interest due.]

*Auto Title Loans.* Meeks also testified that auto title loans were available, but that the borrower must own a vehicle that has zero debt on it, and the loan is secured on the vehicle.

*Tax Refund Anticipation Loans.* Meeks described the availability of loans based upon a tax refund. Where a borrower has already filed a tax return and a refund is due, the borrower takes a loan upfront, the tax refund is paid directly to the lender, and then any net is given to the borrower.

Plaintiffs' expert Saunders also testified regarding these "alternatives". She stated that the government refers to them as "Alternative Financial Services Products". Saunders testified that pay day loans in California are different from the CashCall unsecured loans. In California the pay day loan is limited to $300 for a term limited to one month. Typically the amount owed to pay back is $340. There is no underwriting. In order to get a pay day loan, the borrower must have a job with a paycheck and must have a bank account.

20

Plaintiffs' expert Adam Levitin opined that the CashCall $2600 product had "little or no direct competition" until late in the Class Period. He opined that all of these "alternatives" have very different characteristics than the $2600 CashCall unsecured subprime loans, as they all differed in regard to amount, length of term, secured or unsecured, fees, underwriting requirements, and/or prepayment options.

Levitin testified that Alternative Financial Services are *not* true "alternatives". They are non-bank, non-mainstream financial products, considered "fringe" financial services for people with bad credit. And none are comparable to the $2600 CashCall loan. He testified that simply "comparing" the interest rates charged, on an annual basis, is not an adequate comparison, as there are other aspects to each type of subprime financial product.

Levitin testified regarding California pay day loans, stating that they are for a maximum of $300, that they typically are $260 plus $40 in "fees" or interest. Their terms are 14 to 30 days, with maximum of 30 days and an average of 17 days. He stated that California does not allow rollovers for pay day loans – so one must find a different lender after 30 days.

Levitin discussed auto title loans in California. He stated that the borrower must own a vehicle completely, i.e., without debt or lien, and that the vehicle is used for security on the loan. It is not a loan used to buy the vehicle. Typically the loan amount is 25% to 50% of the BlueBook value. The term is generally 6 to 8 months.

Levitin discussed secured credit cards. The borrower must have a bank account with money in the bank – which deposit is held as collateral. A secured credit card had a small credit limit, typically $250 to $300. The money on deposit at the bank cannot be used until the credit card is paid off.

21

Levitin discussed pawn broker loans in California. He testified that they are loans secured by tangible property. So the borrower must have valuable assets already that the person does not need in order to live. California sets a maximum four-month term on such loans.

Levitin also discussed tax refund anticipation loans. He explained that the lender is your tax preparer. The loan is repaid out of the tax refund via direct deposit. The term is typically 11 days. So a borrower must file a tax return, and be owed money by the government in order to get such a loan.

### *Existence of Hidden Terms*

The terms which Plaintiff and the Class find unconscionable are expressly stated in the subject loan agreement. There is no evidence of "surprise" in regard to the terms of the loan agreement. Plaintiff and Class agree that they are not asserting unconscionability based upon "surprise" but rather that it is based on "oppression" – as only one of the two need be shown. As there is no contention of surprise by Plaintiff and the Class, Defendant focused upon evidence showing no surprise. Surprise is not required, but there appears to be no barrier to the Court considering whether or not there is surprise in weighing the factors of unconscionability.

Plaintiffs emphasized that there is a difference between disclosure of terms versus understanding of those terms.

Evidence was presented by Defendant that some of the Class members actually paid off their CashCall loans, and then applied for and received another $2600 CashCall loan.

22

On the other hand, evidence was presented that CashCall does not affirmatively disclose all of the material terms of the loan prior to accepting the loan application or prior to issuing the promissory note. Evidence was presented that the phone representatives of CashCall will answer specific questions asked by the potential loan applicant if that person specifically asks the question in the first place. Defendant's advertising expert John Fuller, who did all the advertising for CashCall during the Class Period, testified at trial on cross-examination, that the television advertisements for the CashCall loans do *not* mention the length/term of the loan, do *not* state the total amount of interest payments, do *not* state the annual percentage rate of the interest to be charged, and do *not* state the actual interest rate. Fuller testified that CashCall customers focus on the amount of the monthly payment, not the interest rates.

### *Pressure to Hurry and Sign*

Evidence reflects that there was no real pressure to "hurry and sign" per se. One of the ways that CashCall was unique, is that it was a pioneer in providing customers with the ability to prepare and submit loan applications online. Defendant's advertising emphasized speed: "Call today; cash tomorrow." Thus, the "pressure" was to proceed with the loan, even at the high interest rates.

CashCall would determine whether the application initially met its underwriting guidelines. Then the representative would walk the applicant through the process. Evidence was presented that sometimes applicants would stop and hang up, but then later decide to apply. So there was no pressure to sign, but rather emphasis on the speed of the process.

23

### *Procedural Unfairness in the Bargaining Process*

As discussed previously, there was no bargaining process, because Defendant refused to negotiate any terms of the loan.

### *Harsh or One-sided Results*

Evidence was presented that on a $2600 CashCall consumer loan at the 96% interest rate, the term of the loan was 42 months, with monthly payments of $216.44. The total payments due would be $9184.17 – of which $6659.17 is interest charges, and $2600 is principal. On a $2600 CashCall consumer loan at 135% interest rate, the term of the loan was 36 months, with monthly payments of $298.94. The total payments due would be $10,761.78 – of which $8236.78 is interest charges, and $2600 is principal.

Evidence was presented as to the "benefits" to the borrower of a CashCall loan: The lender makes a quick decision, typically within one to four days from the application. The application is easily done online and can be done with the assistance of a telephone representative of CashCall. Upon approval, funding of the loan is done quickly, typically after one day and certainly less than four days. Loans are given to a borrower with compromised credit history who lacks the ability to get conventional loans. No security is required.

Yet, a lender is not doing a favor to a borrower to give a loan that they cannot afford to pay.

The high interest rate and the payment structure over 3-1/2 years yields harsh results for the borrower – especially given that the borrowers are know to be subprime in the first place. Plaintiffs' expert Bruce McFarlane testified that on a typical $2600 CashCall consumer loan, after the borrower makes the contractual monthly payments for

24

*one year*, the borrower would have paid down only $162.00 in principal despite making total payments of $2688.73 – *more than the full amount of the principal.* (See Trial Exhibit #1 and also Trial Exhibit #31 demonstrative.) After making the contractual monthly payments for 20 months, the borrower would have only paid a total of $354 in principal, despite making total payments of $4421,13 – over one and a half times the amount of principal.

Plaintiff's expert on predatory lending practices, Margot Saunders, testified about the long-term harm to subprime borrowers. At the time of entering into the loan transactions, Defendant already knew and expected that there was a 35% to 40% probability that the borrower would default – and thus significant probability that the borrower would incur late fees, higher interest obligations, and further damage to credit history.[5] Saunders opined that Defendant "designed the loans knowing borrowers would have difficulty making the payments". Defendants' business strategy was intended to lend "to very risky borrowers."

The harshness of the situation is also reflected in the fact that borrowers *could not* borrow less than $2600, as discussed above. The purpose was to charge 96% (or 135%) interest rather than the regulated rate (approximately 24%). By requiring borrowers to borrow more than they wanted, and simply telling them to just prepay back what principal they didn't need/want, this yielded interest rate profits to CashCall that were unjustified. The impact is reflected in Defendant's own data, as testified to by Meeks, that of the Class members, 5467 of them repaid the entire loan in one month (approximately 4%) and 17.29% of the Class prepaid their loans within six months.

---

[5]     Defendant presented evidence that 33% of the Class members were not delinquent on their CashCall loans.

25

Plaintiff's expert Margot Saunders testified that the length of the loan term was also unfair and harmful to the borrowers. CashCall had the data that most of its loans were paid off by 20 months, but Defendant has the loan duration be 36 to 42 months long. If it had been 20 months, the default rates would be lower, and the borrowers would be less likely to end up with a "charged off" loan that further harmed their creditworthiness.[6] Even at 20 months, if the borrower prepaid to pay off the $2600 loan, the borrower would have already paid $4330 to CashCall and be expected to still owe $2208 in principal – thus yielding payments to Defendant of $6538 to pay off a $2600 loan. Instead Defendant set the loans for longer duration for its economic benefit, not caring if the loans went into default thereafter because they would have already been profitable to CashCall.

Expert Saunders also opined that the "no prepayment penalty" was *not* for the benefit of the borrowers. On the contrary, if a prepayment penalty was charged by CashCall it would undermine Defendant encouraging people to take out loans for more than they wanted/needed. Defendant pushed prospective borrowers to accept a $2600 loan, by assuring them that they could simply prepay what principal they did not need. As set forth above, the sole purpose was to impose a $2600 loan, and not something smaller, so that CashCall could charge a much higher interest rate.

Plaintiff's expert Adam Levitin also opined that the $2600 CashCall loan transaction was overly harsh and shocking if the loan terms are taken in combination, including the interest rate, the length of term, and that the underwriting was not based upon ability to repay. He testified that these loans were "loans doomed to failure" from

---

[6]   Saunders testified that higher interest rates actually *create* more risk of default. This makes sense because it increased the total that has to be paid on the loan.

26

the start. They were "overly harsh and unfair to borrowers and unduly favorable to CashCall." The business model for Defendant was to achieve a profit before the loan went into default, and that at the time of making the loan, Defendant already factored in that it expected 40% of these loans to go into default. Thus the subprime borrowers were set up to fail – as long as they "failed" after 20 months of making payments. Even if the loan goes into default, CashCall then gets *additional* money by selling those charged-off loans to others.

### *Lender's Costs in Making or Administering the Loan*

The sole cost evidence presented by Defendant specific to its $2600 loan product was based upon its own profitability model. Defendant did not present any evidence as to the actual dollar cost for making and administering these $2600 loans at the time. The evidence is that the high interest rates charged by CashCall were *not* due to high administrative costs in making or servicing these loans. On the contrary, the evidence is that Defendant kept costs down – except for its advertising budget.

The advertising costs were not a true "cost" of making the loans or administering the loans. Indeed, the vast majority of the people who responded to the advertisements by "making the call" to CashCall ultimately did not apply, or did apply and were rejected.

In regard to administering loans, Defendant requires that its $2600 loan borrowers have an existing bank account, and requires that the monthly payments on the loans be set up as an automatic ACH withdrawal.

In regard to defaults and delinquencies, it was CashCall's policies and procedures that if a monthly payment was not made (such as a situation of NSF), Defendant would contact the borrower regarding payment. If the monthly payment was still not made, the

27

loan was deemed "delinquent". If a loan was delinquent for 150 days, then it was "charged off" aka deemed to be in "default".

Defendant's overhead is lower than conventional lenders, as all loan transactions are done online (starting back in 2004 when they were the only ones), and all communications are by telephone or online, so CashCall has centralized operations, i.e., no branch offices.

### *Basis and Justification for the price/interest rate*

Meeks testified regarding the history of the CashCall $2600 product. The first loans by CashCall were in July 2003 for $10,000.[7] The first $2600 loans were in fourth quarter 2004. Originally, CashCall was issuing $2600 unsecured consumer loans at 79% annual interest. This was then increased by Defendant to 87%, as Defendant was experiencing losses due to defaults and business costs at the 79% rate. CashCall was still not profitable at 87%. During mid-2005, CashCall increased the interest rate to 96%, and was profitable. The second half of 2007, Defendant posted losses. Starting July 2009, CashCall increased the interest rate to 135%, because Defendant's own cost of capital doubled from 15% to 30% due to the Great Recession. There were also higher default rates being experienced by CashCall during that time period, due to the liquidity crisis in the American economy.[8]

---

[7]    CFO Meeks testified that these $10,000 loans were originally offered at 24% to 39%, but that CashCall was unable to make many loans because it set its underwriting guidelines to require a FICO score of at least 600, plus residual income.

[8]    Plaintiffs' expert Levitin testified that the proper remedy for high default rates is to tighten your underwriting requirements, not to raise interest rates.

28

Unlike a bank which takes in deposits, Defendant was purely a lender. CashCall's founder and CEO Paul Reddam "invested" an initial tranche of $40 million of his personal capital into CashCall, plus a $20 million loan with note payable (later converted to equity).[9] This funding was used up by CashCall, and further rounds of funding were necessary. In second quarter 2006, a "Loan Syndicate" was formed by Deutsche Bank to include banks, hedge funds, etc. to lend funds to CashCall that Defendant used to fund the loans it made. Thus, Defendant borrowed money in order to lend money to Plaintiff and the Class – at a higher rate than Defendant was paying. The initial credit line by the Loan Syndicate was $486 million, and then increased beyond that over time. The consumer loans made by CashCall were the collateral for its own loan.

CashCall had a default rate[10] of 35% to 40% at the time Defendant decided to increase its loan interest rate to 96%. Yet, CashCall had that *same* default rate at the time Defendant decided to increase its interest rate to 135% in July 2009. Indeed, Meeks testified that **during the entire Class Period, CashCall's default rate stayed the same** ***regardless of the interest rate charged to customers***. Even borrowers with better FICO score were charged the same high interest rates, rather than adjusting the loan terms (including interest) based upon the particular individual's creditworthiness.

Meeks testified that the actual default rate for the Class was 40.5%. Yet, he testified that the "default" rate was calculated by CashCall based upon the total dollar amounts of loans that went into default (i.e., failed to make a payment sometime during

---

[9]   CashCall Inc. was set up as an S Corporation owned by Reddam. Accordingly the company did not pay taxes, rather all profits/losses and tax obligations passed to its owner Reddam.

[10]   CashCall calculated its "default rate" as unpaid loan balances charged off divided by the number of loans x $2600.

the term of the loan), and was *not* based upon the number of loans. The default rate of the Class based upon number of loans was apparently 45.9% -- and the evidence is that the higher rate was due to the Great Recession during the Class Period.

During the Class Period, 45% to 50% of the loans were prepaid, i.e., that payments were made on the loan for more than the minimum amount or sooner than the 3-1/2 year term concluded. Such prepayments reduce the amount of interest income to Defendant. 43.8% of the borrowers pay off the loan prior to the term end. The average life of a $2600 loan is less than 2 years (1.6 to 1.7 years). Only about 10% of the borrowers go all the way to 42 months.

Meeks testified that CashCall will meet its profit target on the $2600 loan product if the borrower continues to pay 20 months. More specifically, on a loan pool basis, the average loan in the pool had to pay to month 20 in order for CashCall to reach its 15% to 20% profit target. He testified that the "break even" point for CashCall to recover its costs and overhead is about 15 months, unless the loan is prepaid earlier. CashCall will "break even" on its costs and overhead if the entire loan is prepaid in 8 to 9 months. (See also Trial Exhibit #331.) He stated that if a $2600 loan is paid off before month 10, then CashCall will sustain a loss.

### *Whether the price is based upon a freely competitive market, or not*

As set forth above, CFO Meeks testified that the CashCall $2600 unsecured subprime consumer loan was "unique". Indeed, CashCall represented to its own prospective lenders (back in 2006) that CashCall had a "3-year first movement advantage" over other potential competitors, that it was a "pioneer in the industry", that it had "no competitors", and has "strong brand recognition". (Trial Exhibit #8 "Pitch

Book" and Trial Exhibit #10, testimony by Meeks.)  Indeed, CashCall stated to others that pay day lenders and auto title lenders are not direct competitors of Defendants.

Meeks testified that CashCall had its own internal "profitability model" that it used, and the Executive team (of five people) at CashCall set the interest rates during the Class Period.  The model considered historical data including loan pool size, prepayments, defaults, company costs, costs of financing, and overhead; and calculated profitability per product type *daily* as to actual versus projected profitability.  The profitability model is focused on achieving a profit of 15% to 20%.[11]

CashCall's profitability model attributes 25% of the loan amount as loan origination costs – of which approximately 3% is immediately recouped by charging the $75 loan origination fee to the borrower.  Of these "costs", *over 50% is for advertising*, and the remainder is for employee labor costs/payroll and for credit reports.  Thus, these business costs have nothing to do with the "risk" of making these loans to subprime borrowers, and cannot be the basis for justifying high interest rates or other related terms.

CashCall attributes 8% to 9% to "servicing" costs, including customer service, payment processing, and *predominantly* collection efforts.  CashCall also has its own financing costs, for borrowing money for use in lending, that was originally in the neighborhood of 9% but escalated to 30% during the Great Recession.

Meeks testified that the 96% interest rate *was not* set by CashCall based upon competitive pricing or comparison with competitors, but rather it was set by the "model" to achieve the profitability that CashCall wanted.  It was "risk based" pricing, *not* competitive pricing.

---

[11]    Plaintiffs' expert Adam levitin testified that a profitability target of 15% to 20% was high for the consumer finance industry.

31

At the time of making these $2600 subprime consumer loans, CashCall *expects* that 35% to 40% of the loans will default, i.e., that monthly payments will stop before the loan is fully repaid.

If the borrower goes all the way and makes all monthly payments timely, but does not prepay, and pays for the full 42-month term, then CashCall would make a 15% to 20% profit on that individual $2600 loan. But CashCall gave no market comparison. Meeks testified that CashCall *does not compete* with others, and Defendant *does not* adjust its interest rates to compete with others. It simply sets its own profitability targets. Indeed the evidence is that CashCall *never* modified it profitability targets over the years, despite changes in the market and the economy.

Evidence was presented that even Defendant's change in its interest rate from 96% to 135% was not based upon market conditions or as a response to any competitors. There was no fair market pricing used by CashCall.

Meeks testified that during the Class Period, CashCall made a profit of 7% to 8% on its $2600 loans. CashCall presented not documentation to support this oral statement. The financials presented by Defendant during the Meeks testimony was for the entire company as to all of its loan products during the years of the Class Period, and none had profits or losses broken out loan product.

The same is true for the testimony of Defendant's expert witness Christopher James. Although James asserted that CashCall's profitability was "below median" of the subprime lending market (including "alternatives"), he conceded that the financial statements were for the company over all[12], included the mortgage loan business of

---

[12]    James testified that the total net profit margin for CashCall, according to its financial statements, was 23.3% of 2005, 9.4% for 2006, negative 7.3% for 2007, 0.3% for 2008 and for 2009, 13.3% for 2010, and 24.2% for 2011.

32

CashCall (i.e., secured loans), and had no data as to the $2600 unsecured loan products alone. It was also conceded that profitability went down because of the Great Recession. Even true monopolies lose profitability during a recession.

James asserted that there was "a lot of shopping in this market going on" for subprime loans, and that there was comparative shopping and competition. The Court did not find the testimony of James to be persuasive. As examples: James testified that other subprime loan products are non-negotiable just like CashCall. This ignores the factual evidence that the alternative lenders *do* allow the customer to choose or negotiation the amount of the loan, whereas CashCall does not. James testified that the TILA disclosures in the CashCall promissory note allow a customer to compare with other subprime lenders. This doesn't make sense, because the customer doesn't see the TILA disclosures under *after* CashCall loan is approved. James testified that the annual percentage rate is the best basis for customer comparison. This makes no sense here, because alternates like auto title loans and pay day loans does not have TILA disclosures; and the evidence is that CashCall never advertises its annual percentage rate to the public. James opined that the CashCall loans and Alternative financial Services Products had common features, such as that they were "short-term loans". Yet, the CashCall loans are obviously not "short term", because they are more than one year, and indeed are for three to three and one half year terms. James stated that he considers secured mortgages to be long term, not unsecured subprime loans. James testified that these other subprime products are "alternatives" to customers if it influences the price of the product at issue. Yet, evidence was presented through Meek that the price of other alternative subprime products *do not* effect the "price" terms of CashCall $2600 loan products.

33

Expert Adam Levitin testified that CashCall had no competition through 2007, and even as of 2010/2011 Defendant admittedly (via deposition testimony of Meeks) had "only minor competition" or "only minimal competition." In those later years, CashCall had four possible competitive lenders, but they were all minor players in this subprime market and had no price pressure on CashCall even though they offered lower rates.

Adam Levitin opined that any competition had no effect on Defendant's pricing. Indeed, Defendant increased the loan pricing, even during the time that Defendant had complete market power in the subprime lending market.

Levitin opined that any alleged "competition" had no effect on the CashCall $2600 loan product. Despite Defendant's assertions that competitors and "alternatives" existed in the market, during the Class Period, Defendant's default rate did not change, Defendant's interest rates *increased* not decreased, Defendant did not change its profitability target, and Defendant did not change its product to "match the market". What other lenders did was ignored by CashCall. Its focus was advertising targeted to desperate borrowers who did not shop around for financing.

### Weighing the Factors

On weighing these factors, the Court finds that the $2600 CashCall consumer loan agreements with Plaintiff and the Class were procedurally and substantively unconscionable.

As to procedurally unconscionability, the evidence is clear that these are adhesion contract, as to which *zero* terms are negotiable, and that CashCall has all (unequal) bargaining power. Thus there was also procedural unfairness in the bargaining process. The financial sophistication of the parties is also unequal, as CashCall intentionally

34

targets subprime borrowers desperate for funds. During the Class Period, there were no comparable alternatives. Other "loan" types available to the public were not the same as the CashCall $2600 loan products. Those subprime loan companies that came into the market later in the Class Period were insignificant or not well-known, given CashCall's primary entry into the subprime loan product market and established market recognition. These factors weigh significantly in demonstrating heavy procedural unconscionability, as compared to the other procedural factors.

As to substantive unconscionability, evidence was presented that the terms of the CashCall $2600 subprime loan agreements yielded harsh results to the borrower, that the amount of the loan principal and the term of the loan were specifically designed to require the borrower to pay exorbitant amounts of interest with tiny amortizement of principal with the monthly payments over the first two-plus years. The terms also yielded a high probability that the subprime borrower would default on the CashCall loan, such that they would be even more uncreditworthy. CashCall's costs of business did not justify or require the huge interest rates charged by it. On the contrary, the evidence is that CashCall *did not* price its $2600 loan product based upon the costs of business, but rather set an artificial profit goal – which profit goal had no demonstrated correlation to the profit margin of other subprime lenders or allege "alternative" lenders. CashCall presented no such profitability evidence as to competitors in the market. The "price" of the CashCall loan was not based upon a freely competitive market. CashCall presented no reasonable basis or justification for its contractual terms and "price". That it had a high default rate is not a sufficient basis, as it never adjusted its terms *based upon the default rate* – on the contrary, the evidence is that it adjusted its *underwriting criteria* based upon the default rate, but did not decrease or increase its *contractual terms* to the

35

borrowers.  These substantive facts weigh significantly in demonstrating heavy substantive unconscionability, as compared to any other substantive factors

### *CashCall's Justification*

CashCall strenuously asserts that it was simply providing a service for which there is demand, namely a high-risk financial transaction, and accordingly it must charge high prices in order to make it financially worthwhile.  As a matter of public policy, our society does not require or condone that every human "demand" be satisfied with "supply".  In California there are needs and desires that people must suffer without fulfillment, for the protection of themselves and/or other members of society.  Other needs and desires are also denied fulfillment for the sake of our environment or against cruelty.

Defendant's argument is also watered down by the fact that CashCall does not make loans to everyone who applies.  Indeed, the vast majority of people who apply for a $2600 CashCall subprime consumer loan are *rejected* by Defendant.  Evidence was presented as to the "underwriting" requirements of CashCall before it will make a loan.  These underwriting requirements by Defendant changed throughout the Class Period.  (Trial Exhibits #251, #32.)  Of the hundreds of thousands of people who call CashCall inquiring about a loan, only 5% ultimately apply and receive a loan.  Of the people who do apply for the CashCall $2600 loan, 70% of them are rejected by Defendant.

Evidence was presented that the business model of CashCall in making these $2600 subprime consumer loans is *not* consistent with general reasonable business

36

practices.[13] Rather it was to attempt to reap money through onerous loan contracts preying upon financially desperate people who were not creditworthy.

### *Remedies*

Finance Code Section 22750(b) provides that if there is a violation of the statutes pertaining to finance lenders making consumer loans, which violation is done willfully, "the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." Section 22750(a) provides that "if any amount other than, or in excess of, the charges permitted by this division is willfully charged, contracted for, or received, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."

Finance Code Sections 22751 and 22752 provide that if excess interest or other amounts are charged, or other violations of the finance lending statutes are committed, "for any reason other than a willful act of the licensee", then the interest and excess charges on the loan are "forfeit" but the lender can still keep or receive the principal amount of the loan.

The $75 "prepaid finance charge/origination fee" fee charged by CashCall upfront, by taking it out of the loan principal at the time of funding the loan, was legal under Finance Code Section 22305.

---

[13]   Meeks testified that CashCall stopped making any unsecured consumer loans as of approximately 2018. LoanMe is now the company in that business, founded by several ex-executives of CashCall. Instead, CashCall switched to making mortgage-backed loans.

Ours is not a direct cause of action under the Finance Code, but rather a claim for unlawful business act or practices under Business & Professions Code Section 17200. Remedies thereunder include monetary restitution and injunctive relief. Section 17203 provides that the Court has authority in equity to make orders or judgments "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." See Cortez v. Purolator Air Filtrations Products Co. (2000) 23 Cal.4th 163, 176. This includes the return of money obtained. Cortez, at p. 177.

In Fletcher v. Security Pacific National Bank (1979) 23 Cal.3d 442, the bank charged interest on commercial loans calculated as a 360-day year, rather than a 365-day year. The California Supreme Court held that even though the case could not proceed as a class action for breach of the loan contract (because of the individual question of knowledge), that a class action might proceed on unfair business advertising practices to seek recovery of the excess interest. Fletcher, at p. 451.

Such monetary recovery is limited to restitution of funds taken, not disgorgement of all profits. Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1148.

"The court's discretion is very broad. Section 17203 does not mandate restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court "*may* make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property." [Citation.] That is, as our cases confirm, a grant of broad equitable power." Cortez, at p. 180.

Upon due consideration of all the circumstances, the Court orders that (i) as the subject contracts were unconscionable at the time of the parties' agreement, including but

38

not limited to that the interest rate charged was unconscionable at the time of entering into the loan contract, and thus in violation of the finance lending statutes, and constituting an unlawful business practice, Defendant CashCall Inc. must forfeit and return to Plaintiff and the Class any and all interest paid by Plaintiff and the Class on their CashCall $2600 loans; and (ii) Plaintiff and the Class are responsible for payment of any principal due and owing on their CashCall loans, and this principal is not forfeit by Defendant. As the interest obligation is enjoined, then all payments actually made would be credited to total principal due by Plaintiff and the Class – and any net would be the restitution of the interest paid by Plaintiff and the Class as to the 101,564 "$2600" consumer loans where the Class member paid more than the amount of principal on those loans.[14] Plaintiff and the Class presented expert witness evidence of Bruce McFarlane as to these totals for them, and the net results of restitution due to Plaintiff and the Class as a group. No further money is collectable against Plaintiff and the Class as to those 101,564 consumer loans, and any collection of interest thereon is enjoined.

Although the $75 loan origination fees charged is legal, and not subject to restitution, that amount is accounted for as part of the $2600 principal that Defendant is entitled to keep/be paid.

According to the expert testimony of McFarlane, the net calculation for restitution, as determined by this Court, would be $245,515,389.

McFarlane testified that as to 32,384 of the $2600 CashCall consumer loans to the Class, the borrower paid less than the total amount of principal, and thus those members

_____

[14]    Evidence was presented that 54% of the Class paid their CashCall loans in full (principal and interest).

39

of the Class do not receive monetary restitution, but are entitled to injunctive relief against any collection of interest on those loans.

Both sides assert that this Court can consider a remedy based upon a finding of what would *not* be an unconscionable interest rate on these $2600 consumer loan products made to people with risky creditworthiness. Suggestion is made and evidence presented as to 36% -- which is a basis for the new statute setting an interest rate cap on such loans.

The Court does not agree. This Court must adjudicate whether or not the 96% (or 135%) interest rate charged is unconscionable under the circumstances. It is not up to this Court to adjudicate what would *not* be an unconscionable interest rate above the Constitutional interest rate of 10% simple interest per year. (California Constitution, Article XV, Section 1(2).) That the Legislature has now set a maximum of 36% (plus) is a matter of policy or of legislative negotiation, not an adjudication of conscionability.

Defendant asserts that Plaintiff and the Class must prove and the Court must determine as "offset" of "value" using a "price premium" approach. The cases upon which Defendant relies require no such thing in our action. The present case is on a single claim for *unlawful* business conduct in violation of *statute*(s), involving consumer loan products where principal is a sum certain and easily distinguishable from the unconscionable interest requirement. There is no claim asserted under the "unfair" or the "deceptive" prongs of Section 17200.

Instead, Defendant seeks to impose case law from lawsuits involving *intangible* aspects of *physical* products and/or involving claims of *deceptive advertising* under Business & Professions Code Section 17500 (along with Section 17200). Those "price premium" cases that Defendant seeks to apply specifically pertain to measure of

40

restitution *for false representations and material omissions* under a claim for *deceptive practices* under Section 17200 and/or *false advertising* under Section 17500. Stern, Business & Professions Code Section 17200 Practice (TRG 2023) §8:87. This distinction is identified and highlighted by the Ninth Circuit Court of Appeals in Pulaski & Middleman LLC v. Google Inc. (9th Cir. 2015) 802 F.3d 979, 988-989 (discussing *Nelson, Colgan, Kwikset* and the measure for restitution if the plaintiff is "deceived by misrepresentations into making a purchase" or "other forms of fraudulent omission"). "In calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase **without the fraudulent or omitted information**." Pulaski, at p. 989, bold added. That is simply not the claim here.

Defendant cites to Colgan v. Leatherman Tool Group Inc. (2006) 135 Cal.App.4th 663. That case involved a claim for false advertising under Section 17500 as well as deceptive business practices under Section 17200 and CLRA (Civil Code Section 1750) for labeling and advertising its tool products as "Made in U.S.A.", when parts of them were actually manufactured outside the United States. This was a false advertising and *deceptive* practices case regarding an *intangible* aspect of a *physical* product. The Court of Appeal upheld the trial court's ability to order restitution, but reversed on the basis that the trial court had no evidence supporting his methodology. In Colgan, the trial court decided that 25% of the price paid the tool would be attributed to the false intangible representation that it was Made in USA. The Court of Appeal found that there was no evidence support this arbitrary 25%, and remanded the case. The *holding* in Colgan was based upon a lack of any evidence for the restitution amount awarded – which is not our situation. In addressing the measure of restitution *in that case*, the Court of Appeal relied

41

upon a treatise regarding the situation of "fraud, duress or other consciously tortious conduct". Id., at pp. 698-700. It is *that* portion of the Colgan decision that Defendant seeks to impose here; but it is not applicable because there is no claim of deceptive practices or of tortious conduct, but rather is for violation of statute.

Defendant cites to In re Tobacco Cases II (2015) 240 Cal.App.4th 779, which again is a *deceptive advertising* case. Plaintiffs asserted that the tobacco industry falsely advertising "light" cigarettes as being healthier than standard cigarettes. Plaintiffs sought restitution as the difference between what they paid for the cigarettes and their value if they had been healthier than regular cigarettes – which made no sense since the trial court held that all cigarettes were unhealthy. The Court of Appeal held that the consumers were not entitled to return of their entire purchase price, and that they had no evidence the *intangible* "value" of a healthier cigarette as comparison. Id., at pp. 792-794. The Court of Appeal's discussion was that a full refund is only appropriate *for deceptive advertising* if the product purchased has no value. Id., at pp. 794-795; see also Nelson v. Pearson Ford Co. (2016) 186 Cal.App.4th 983, 1018. Otherwise what is subject to restitution must be a measurable amount. Id. Again, the decision does not apply to our CashCall situation.

Defendant cites to In re Vioxx Class Cases (2009) 180 Cal.App.4th 116. That case involved a claim for *deceptive advertising* and material omission of failure to disclose that it was more dangerous than other pain relievers. Plaintiff and the Class were not seeking tort damages for personal injuries, but rather sought "restitution" of the difference between the price of Vioxx and the price of "a safer, equally effective, pain reliever." The Court of Appeal in Vioxx was only addressing the issue of class certification, not the merits and not any award after trial. In the section of the Vioxx

42

decision cited by Defendant CashCall at page 131, the Court of Appeal was discussing the restitutionary measure for *deceptive* practices, not unlawful practices in violation of statute. Vioxx, at p. 131 ("This language, providing restitution of funds which 'may have been acquired,' has been interpreted to allow recovery without proof that the funds were lost as a result of actual reliance on the defendant's deceptive conduct."); see also at page 136 ("However, in order to obtain classwide restitution under the UCL, plaintiffs need establish not only a misrepresentation that was likely to deceived but also the existence of a 'measurable amount' of restitution, supported by the evidence.")

Defendant also cites to Dumas v. Stocker (1989) 213 Cal.App.3d 1262, which is completely irrelevant. That was a personal injury case, holding that the plaintiff has the burden of proof of punitive damages evidence. Thus it has nothing to do with restitution or Section 17200.

The difficulty in those deceptive advertising practices cases involving a fraudulent omission is that the Business & Professions Code requires a showing that the consumer actually parted with money acquired by the defendant *by means of* the deceptive practice. There is no such difficulty in our CashCall case, because Plaintiff and the Class *did* pay interest to Defendant, and it can be readily determined what was paid as the unlawful interest and what was paid as the lawful principal.

Although Defendant references the Supreme Court's decision in Cortez, 23 Cal.4th 163, Defendant ignores the restitutionary measure for **unlawful** business practices, i.e., violation of a statute then enforced through Section 17200. In Cortez, the plaintiff and class alleged a violation of the Labor Code for failure to pay overtime wages when due for work performed.

43

> [W]e also conclude that unlawfully withheld wages are property of the
> employee within the contemplation of the UCL.  Our conclusion that these
> wages may be the subject of a restitutionary order under section 17203 is
> consistent with our recognition in Walnut Creek [citation], **that**
> **restitutionary awards encompass quantifiable sums one person owes**
> **to another. . . "**

Cortez, at p. 170, bold added.  The money that belongs to the plaintiff pursuant to statute and does not belong to the defendant pursuant to statute is subject to restitution.  There is no weighing of values.

In People ex rel Kennedy v. Beaumont Investment, Ltd. (2003) 111 Cal.App.4th 102, cited by Defendant, is a case alleging *unlawful* business practices under Section 17200 based upon a rent control ordinance violation.  The Court of Appeal upheld the trial court's restitution remedy of requiring defendant to repay to all mobilehome tenants the amount of rent charged above-ordinance rent – i.e., restitution of *all* of the money charged in violation of the ordinance law -- and upheld the trial court's injunctive relief forbidding the defendant from charging excessive rent in the future.  Kennedy, at pp. 135-136.  This supports this Court's remedies awarded.

As set forth above, the Finance Code provides that the *entirety* of the interest is unlawful and forfeit if it is unconscionable.  The Finance Code goes even further to say that the principal may also be forfeit – but that is not a remedy provided under Section 17200.  The unlawful conduct was charging the unconscionable interest, and thus all of the interest is unlawful and subject to return to the consumer.

This Court's remedy of restitution is indeed the restoration of money to a person acquired by Defendant by means of its unlawful business practice of charging

44

unconscionable interest on a consumer loan. B&P Code §17203. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." <u>Korea Supply</u>, at p. 1149.

DATED:    November 7, 2023

_____
HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

45

# EXHIBIT 3

Michael A. Gould (SBN 151851)
Michael@wageandhourlaw.com
Aarin A. Zeif (SBN 247088)
Aarin@wageandhourlaw.com
THE GOULD LAW FIRM
161 Fashion Lane, Suite 207
Tustin, California 92780-3364
Telephone: (714) 592-4936

Arthur D. Levy (SBN 95659)
arthur@yesquire.com
LAW OFFICE OF ARTHUR D. LEVY
610 – 16th Street, Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551

Attorneys for Plaintiff
EDUARDO DE LA TORRE

*Additional Counsel listed on signature page*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| EDUARDO DE LA TORRE,<br><br>Plaintiff,<br><br>v.<br><br>JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive,<br><br>Defendants. | Case No. 30-2024-01421309-CU-NP-NJC<br><br>**Assigned for All Purposes**<br>Judge Nathan Vu<br><br>**COMPLAINT FOR AVOIDANCE AND RECOVERY OF VOIDABLE TRANSFER [Civil Code §§ 3934 *et seq.*]** |

COMPLAINT FOR AVOIDANCE AND RECOVERY OF VOIDABLE TRANSFER

Plaintiff Eduardo De La Torre, for himself and for the benefit of the Class certified in *De La Torre v. CashCall, Inc*., San Mateo Superior Court Case No. 19CIV01235, complains against defendants, and each of them, pursuant to Civil Code section 3439.07, and alleges as follows:

1.      Eduardo De La Torre is the plaintiff and class representative in a class action lawsuit against defendant CashCall, Inc. ("CashCall") in San Mateo County Superior Court, *De La Torre v. CashCall, Inc*., San Mateo Superior Court Case No. 19CIV01235.

2.      The Court in *De La Torre v. CashCall* certified a plaintiff Class and has rendered a money judgment against CashCall in favor of the Class.

3.      Plaintiff brings this action for himself and for the benefit of the Class in *De La Torre v. CashCall* pursuant to the Uniform Voidable Transactions Act (UVTA), Civil Code §§ 3934 *et seq*., to avoid and recover a large money distribution CashCall made in October 2021 to its sole shareholder, defendant John Paul Reddam, in violation of the UVTA, and any other transfers CashCall has made to Mr. Reddam in violation of the UVTA.

4.      Defendant John Paul Reddam is, and all material times was, the sole shareholder and Chief Executive Officer of CashCall.  Plaintiff is informed and believes, and on that basis alleges, that Reddam is a resident of California and resides in Orange County, California.

5.      Defendant CashCall is a California corporation whose principal place of business is located in Orange County, California.  Plaintiff joins CashCall as a defendant in this case because CashCall may have an interest relating to the subject of this action and be so situated that the disposition of the action in its absence may as a practical matter impair or impede its ability to protect that interest.

6.      Defendants DOE 1 through DOE 20 are persons or entities whose true names and identities are now unknown to plaintiff, and who therefore are sued by these fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of these fictitiously named defendants when they are ascertained. Each of the fictitiously named defendants is a recipient of and/or has possession of distributions made by CashCall in violation of the UVTA and is liable to pay these distributions to plaintiff for his benefit and for the benefit of the Class certified in *De La Torre v. CashCall, Inc*.

1

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

7.        On March 7, 2019, plaintiff filed *De La Torre v. CashCall* as a class action, seeking restitution and injunctive relief under the Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*.  The complaint challenged CashCall's $2,600 consumer installment loans as unconscionable, in violation of Civil Code section 1670.5 and Financial Code section 22302, and requested restitution of interest paid on those loans by members of the Class.  Plaintiff requested that the court certify a plaintiff Class defined as "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall, Inc., for personal, family or household use at any time from August 1, 2005 to July 10, 2011."

8.        The case was assigned to the Honorable Marie S. Weiner, Judge of the San Mateo Superior Court.

9.        On January 16, 2020, Judge Weiner granted plaintiff's Motion for Class Certification.  The Court certified a Class consisting of "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August 1, 2005 to July 10, 2011."

10.        By later Stipulation and Order, the Class definition was amended as follows:  "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August, 1, 2005 to July 10, 2011, whose loans had an interest rate of 90% or more."

11.        In 2021, Judge Weiner presided over the trial of *De La Torre v. CashCall*.  The trial began on March 8, 2021, and testimony concluded on May 18, 2021.

12.        During the trial, Class Counsel presented expert testimony calculating the restitution sought on behalf of the Class as $292,393,266 and $243,355,073, based on two different calculation methodologies.   These calculations were based on borrower transactional data, including borrower payments, that CashCall had produced for the period through May 13, 2020.

13.        On or about August 6, 2021, CashCall reached a settlement in principle of a legal malpractice action (the "Katten Litigation") CashCall had filed against the law firm of Katten Muchin Rosenman LLP ("Katten").

2

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

14. On or about August 21, 2021, CashCall and Katten signed a settlement agreement and the Katten Litigation was dismissed.

15. On August 31, 2021, at CashCall's request, final argument was scheduled in *De La Torre v. CashCall* for November 1, 2021.

16. On or about September 16, 2021, Katten and/or entities on Katten's behalf wired the initial settlement payment of the Katten Litigation to CashCall.

17. On September 20, 2021 and October 4, 2021, Class Counsel and counsel for CashCall submitted simultaneous opening and closing post-trial briefs in *De La Torre v. CashCall*. In plaintiff's September 20, 2021 brief, plaintiff requested that the court award restitution of $292,393,266 in interest to the Class, in accordance with the evidence plaintiff submitted at trial.

18. On or about October 19, 2021, CashCall made a large money distribution to Mr. Reddam (the "Transfer"). The Transfer was over half of the net settlement payment wired to CashCall on or about September 16, 2021.

19. On November 1, 2021, Judge Weiner heard closing arguments in *De La Torre v. CashCall*.

20. On January 20, 2022, Judge Weiner issued a Tentative Decision After Court Trial, proposing to award the Class "any and all interest payments made to Defendant CashCall Inc. on those consumer loans funded during the Class Period; offset by any and all principal amounts (including the $75 fees) on the consumer loans made by Defendant to Plaintiff and the Class on those same consumer loans."

21. On November 7, 2023, Judge Weiner entered an Amended Judgment After Court Trial (the "Amended Judgment"), awarding the Class a money judgment of $245,515,389 on account of interest paid to CashCall by class members. A true and correct copy of the Amended Judgment After Court Trial is attached as Exhibit "A".

22. CashCall has appealed the Amended Judgment, but has not posted any bond, and collection of the Amended Judgment has not been stayed.

3

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

23. The amount of interest paid by plaintiff and the members of the Class was calculable on or before May 13, 2020, the date CashCall produced the transactional records on which the restitution calculations were based.

24. Plaintiff is informed and believes, and on that basis alleges, that CashCall made the Transfer to Mr. Reddam with actual intent to hinder, delay, or defraud the Class in the collection of the Amended Judgment in *De La Torre v. CashCall*, and/or without receiving a reasonably equivalent value in exchange for the Transfer.

25. Plaintiff is informed and believes, and on that basis alleges, that at the time of the Transfer to Mr. Reddam, CashCall believed or reasonably should have believed that it was about to incur liability to the Class in *De La Torre v. CashCall* beyond CashCall's ability to pay.

26. Plaintiff is informed and believes, and on that basis alleges, that CashCall made the Transfer to Mr. Reddam without receiving a reasonably equivalent value in exchange, and that CashCall was insolvent at that time of the Transfer.

27. The Amended Judgment in *De La Torre v. CashCall* exceeds the amount of the Transfer. Plaintiff seeks to avoid and recover the entire Transfer and have the entire Transfer avoided and for a money judgment to be entered against Mr. Reddam in the amount of the Transfer, plus prejudgment interest and costs, and any additional transfers established by the plaintiff, in favor of Plaintiff and the Class.

### FIRST CAUSE OF ACTION
**Avoidance and Recovery of Actual Fraudulent Transfer**
**Cal. Civ. Code §§ 3934 *et seq.***

28. Plaintiff realleges the allegations set forth in paragraphs 1 through 27 above and incorporates them by reference.

29. The Transfer was a transfer of an interest of CashCall in property.

30. Plaintiff is informed and believes, and on that basis alleges, that CashCall made the Transfer and incurred obligations relating to the Transfer with actual intent to hinder, delay, or defraud Plaintiff and the Class a creditor of CashCall.

31. Based on the foregoing, Plaintiff requests judgment as set forth below.

4

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

## SECOND CAUSE OF ACTION
### Avoidance and Recovery of Constructive Fraudulent Transfer
### Cal. Civ. Code §§ 3934 *et seq.*

32.    Plaintiff realleges the allegations set forth in paragraphs 1 through 27 above and incorporates them by reference.

33.    The Transfer was a transfer of an interest of CashCall in property.

34.    Plaintiff is informed and believes, and on that basis alleges, that that CashCall received less than a reasonably equivalent value in exchange for the Transfer.

35.    Plaintiff is informed and believes, and on that basis alleges, that CashCall was insolvent on the date that the Transfer was made or became insolvent as a result of the Transfer, or was engaged in a business or transaction or was about to engage in a business or transaction for which any property remaining with CashCall was unreasonably small capital.

Based on the foregoing, plaintiff requests judgment as set forth below.

## RELIEF SOUGHT

Plaintiff requests the following relief for himself and on behalf of Class *in De La Torre v. CashCall*:

1.    On the First and Second Causes of Action:

a.    Entry of a judgment in favor of plaintiff, for his benefit and for the benefit of the Class in *De La Torre v. CashCall*, and against defendants, and each of them, avoiding the Transfer and any other fraudulent transfer established by the Plaintiff, and awarding a money judgment in the full amount of the Transfer (and any additional established fraudulent transfers).

b.    Prejudgment attachment and/or other provisional relief against defendants, pursuant to Code of Civil Procedure section 3439.07, subd. (a)(2) and (b);

c.    Preliminary and permanent injunctive relief against further disposition of the Transfer by the defendants, and each of them, pursuant to Code of Civil Procedure section 3439.07(a)(3);

d.    Issuance of writ(s) of execution, pursuant to Code of Civil Procedure section 3439.07(c);

5

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

e.    Prejudgment interest;

f.    Costs of suit; and

2.    Such other and further orders and relief as may be necessary and proper to effectuate the avoidance and recovery of all transfers to Mr. Reddam in violation of the UVTA, and payment to or for the benefit of plaintiff and the Class in *De La Torre v. CashCall.*

DATED:  August 21, 2024

By: _____
Michael A. Gould

Michael A. Gould (SBN 151851)
Aarin A. Zeif (SBN 247088)
THE GOULD LAW FIRM
161 Fashion Lane, Suite 207
Tustin, California 92780-3364
Telephone: (714) 592-4936
Michael@wageandhourlaw.com
aarin@wageandhourlaw.com

Arthur D. Levy (SBN 95659)
LAW OFFICE OF ARTHUR D. LEVY
610 – 16th Street
Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551
arthur@yesquire.com

James C. Sturdevant (SBN 94551)
THE STURDEVANT LAW FIRM
A Professional Corporation
P. O. Box 151560
San Rafael, CA 94915
Telephone: (415) 518-8636
jsturdevant@sturdevantlaw.com

Steven M. Tindall (SBN 187862)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
smt@classlawgroup.com

Jessica Riggin (SBN 281712)
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 925
Oakland, CA 94612
Telephone: (415) 421-1800
jriggin@rukinhyland.com

6

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

Damon Connolly (SBN 139779)
Damon Connolly Law Offices
1888 Las Gallinas Ave.
San Rafael, CA 94903
Telephone: (415) 250-6127
damon@damonconnollylaw.com

*Attorneys for Plaintiff*
EDUARDO DE LA TORRE

7

COMPLAINT FOR RECOVERY OF VOIDABLE TRANSFER

# Exhibit A

FILED
SAN MATEO COUNTY

NOV 0 7 2023

Clerk of the Superior Court
By
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| EDUARDO DE LA TORRE, on behalf of all others similarly situated and the general public, | Case No. 19CIV01235 CLASS ACTION |
| Plaintiffs, | Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 |
| vs. | ***AMENDED* JUDGMENT AFTER COURT TRIAL** |
| CASHCALL, INC., a California corporation, and DOES 1 through 25 inclusive, | |
| Defendants. | |

Court Trial was held in Department 2 of this Court before the Honorable Marie S. Weiner, as the single-assigned judge. James Sturdevant of The Sturdevant Law Firm, Steven Tindall of Gibbs Law Group LLP, Arthur Levy, Esq., and Jessica Riggin of Rukin Hyland & Riggin LLP appeared on behalf of Plaintiff de la Torre and the Certified Class; and Brad Seiling, Donald Brown, and Justin Jones-Rodriguez of Manatt Phelps & Phillips LLP appeared on behalf of Defendant CashCall Inc.

This complex case and certified class action commenced Court Trial on March 8, 2021, the presentation of evidence concluded on May 14, 2021, written Closing

1

Argument Briefs were filed concluding October 4, 2021, and oral Closing Arguments were conducted and concluded on November 1, 2021. A Tentative Decision was issued. A Proposed Statement of Decision was issued. Objections to the Proposed Statement of Decision were filed by the parties. A Final Statement of Decision after Court Trial was issued. Judgment was entered, and post-trial motions filed – in response to which this Court decided to issue an Amended Final Statement of Decision and this Amended Judgment.

IT IS HEREBY DECIDED, ORDERED AND ADJUDGED that Judgment shall be and is entered in favor of Plaintiff Eduardo de la Torre and the Certified Class and against Defendant CashCall Inc.

The Certified Class was previously certified and defined as follows: "All individuals who, while residing in California, borrowed from $2,500 to $2,600 from CashCall for personal, family or household use at any time from August 1, 2005 to July 10, 2011." Plaintiff Eduardo De La Torre was previously appointed the Plaintiff Class Representative.

The Amended Final Statement of Decision after Court Trial entered November 7, 2023 is incorporated herein by reference. Plaintiff and the Certified Class have proven, by a preponderance of the evidence, their cause of action for violation of Business & Professions Code Section 17200 *et seq.* based upon violation of Financial Code Section 22302 (and related Civil Code Section 1670.5).

Plaintiff and the Class are entitled to monetary restitution of any and all interest payments made to Defendant CashCall Inc. on those $2600 consumer loans funded during the Class Period. Accordingly, Plaintiff Eduardo de la Torre and the Certified Class are awarded monetary restitution under Business & Professions Code Section

2

17200 *et seq.* for the total amount of **$245,515,389,** against Defendant CashCall Inc. This reflects the return (restitution) of all interest paid by those Class members who have paid to Defendant more than the amount of their principal on their 101,564 loans. No monetary restitution is awarded on the 32,284 loans to those Class members who have paid to Defendant less than the amount of the principal of their loans.

Injunctive relief is granted to Plaintiff and the Class, as follows: Defendant CashCall Inc., and any and all of its parents, subsidiaries, assignees, transferees, loan portfolio purchasers, representatives, agents, officers, directors, employees, and/or trustees, are enjoined from and shall not collect, receive, charge, take, or obtain payments of any *interest* on any consumer loans entered into at any time from August 1, 2005 to July 10, 2011 between any Plaintiff or any member of the Certified Class on the one hand, and Defendant CashCall Inc. on the other hand, with an initial principal amount of $2,500 to $2,600. This is not a prohibition against collection of any principal still due and owing only on the 32,284 loans to those Class members whose net payments to Defendant are less than the amount of the principal of their loans.

No prejudgment interest is awarded.

Plaintiff and the Certified Class are the prevailing parties entitled to statutory costs upon timely filing and service of a Memorandum of Costs.

The Plan of Distribution of the Amended Judgment proceeds to the Plaintiff and members of the Certified Class shall be proposed and considered by the Court after entry of the Amended Judgment.

3

Plaintiff shall immediately file and serve formal Notice of Entry of Amended Judgment.

DATED:     November 7, 2023

_____

HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

4

# EXHIBIT 4

**MANATT, PHELPS & PHILLIPS, LLP**
BRAD W. SEILING (Bar No. CA 143515)
E-mail: BSeiling@manatt.com
DONALD R. BROWN (Bar No. CA 156548)
E-mail: DBrown@manatt.com
BRANDON WONG (Bar No. CA 327372)
E-mail: BWong@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA  90067
Telephone:     (310) 312-4000
Facsimile:      (310) 312-4224

Attorneys for Defendants
JOHN PAUL REDDAM and CASHCALL,
INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| EDUARDO DE LA TORRE,<br><br>         Plaintiff,<br><br>    v.<br><br>JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive,<br><br>         Defendants.<br><br>` | Case No. 30-2024-01421309-CU-NP-NJC<br><br>Hon. Nathan N. Vu<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with:<br><br>1.  Separate Statement of Undisputed Material Facts<br>2.  Compendium of Evidence<br>3.  [Proposed] Order]<br><br>Hearing Date:  May 11, 2026<br>Time:         9:00 a.m.<br>Dept.:        N15<br><br>Complaint Filed:  August 21, 2024<br>Trial Scheduled:  February 23, 2026 |

**TO THE COURT, PLAINTIFF, AND HIS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 11, 2026, at 9:00 a.m. or as soon as thereafter as can be heard in Department N15 of the above-captioned Court, located at 1275 N. Berkley Ave., Fullerton, California 92838, defendants CashCall, Inc. ("CashCall") and John Paul Reddam ("Reddam") (together, "Defendants") will and hereby do move for summary judgment on plaintiff Eduardo de la Torre's ("Plaintiff") Complaint, which asserts two causes of action under the Uniform Voidable Transfer Act ("UVTA"), or alternatively, for summary adjudication on each of the two causes of action.

This Motion is made pursuant to California Code of Civil Procedure section 437c on the grounds that there is no triable issue as to any material fact and that Defendants are entitled to judgment as a matter of law. The sole transfer at issue in the Complaint cannot be voided under the UVTA because CashCall, the transferor, did not intend to hinder, delay, or defraud Plaintiff by making the transfer and there is no factual basis to impute fraud to CashCall.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Compendium of Evidence filed concurrently herewith, the papers and pleadings on file in this matter, and such other evidence as the Court may deem proper.

Dated:    November 3, 2025          Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: *Brad W. Seiling*
_____
Brad W. Seiling
Donald R. Brown
Brandon Wong
*Attorneys for Defendants*
JOHN PAUL REDDAM and CASHCALL, INC.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

404304569.13

2

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     RELEVANT FACTUAL BACKGROUND ................................................................ 2

     A.     CashCall and Reddam ................................................................................ 2

     B.     The Federal Litigation Against CashCall .................................................. 2

     C.     The San Mateo Litigation Against CashCall ............................................. 3

     D.     The Malpractice Case and Settlement ....................................................... 4

     E.     2021 Tax Liabilities and the Tax Distribution to Reddam ......................... 4

III.    LEGAL STANDARD ................................................................................................ 5

IV.    ARGUMENT ............................................................................................................ 7

     A.     As a Matter of Law, CashCall Had No Actual Intent to Hinder, Delay, or Defraud Plaintiff or Any Other Creditor. ......................................................... 7

     B.     The Tax Distribution Is Not Voidable Under a Constructive Fraud Theory. .............. 9

V.      CONCLUSION ...................................................................................................... 11

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-i-

404304569.13

## TABLE OF AUTHORITIES

**Page**

### CASES

*Aguilar v. Atl. Richfield Co.*,
    25 Cal.4th 826 (2001) ............................................................................................. 5, 6

*Ark v. HAF Corp.*,
    2023 WL 4681591 (C.D. Cal. June 27, 2023) ............................................................ 9

*De la Torre v. CashCall, Inc.*,
    Case No. 3:08-cv-03174-TSH (N.D. Cal.)................................................................. 2

*De la Torre v. CashCall, Inc.*,
    San Mateo County Superior Court Case No. 19-CIV-01235............ 1, 2, 3, 4, 5, 7, 8, 9, 10, 11

*Eduardo de la Torre v. CashCall, Inc.*,
    A169205 (Cal. Ct. App. 1st Dist. appeal lodged Dec. 4, 2023)................................. 3

*Eisenberg v. Alameda Newspapers, Inc.*,
    74 Cal. App. 4th 1359 (1999) ................................................................................... 6

*In re Paradigm Int'l, Inc.*,
    635 F. App'x 355 (9th Cir. 2015) ............................................................................. 9

*Jordan v. Malone*,
    5 Cal. App. 4th 18 (1992) ......................................................................................... 8

*Leslie G. v. Perry & Assocs.*,
    43 Cal. App. 4th 472 (1996) ..................................................................................... 6

*Nelson v. United Techs.*,
    74 Cal. App. 4th 597 (1999) ..................................................................................... 6

*Preach v. Monter Rainbow*,
    12 Cal. App. 4th 1441 (1993) ................................................................................... 6

*Sangster v. Paetkau*,
    68 Cal. App. 4th 151 (1998) ..................................................................................... 6

*Silverado Modjeska Recreation & Park Dist. v. Cty. of Orange*,
    197 Cal. App. 4th 282 (2011) ................................................................................... 8

*Sinai Mem'l Chapel v. Dudler*,
    231 Cal. App. 3d 190 (1991)..................................................................................... 6

*Spinner v. Am. Broad. Cos.*,
    215 Cal. App. 4th 172 (2013) ................................................................................... 6

*Yaesu Elecs. Corp. v. Tamura*,
    28 Cal. App. 4th 8 (1994) ......................................................................................... 7

### STATUTES

Cal. Civ. Code § 3439.01(d) .......................................................................................... 11

Cal. Civ. Code § 3439.02(a) .......................................................................................... 10

-ii-

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

404304569.13

Cal. Civ. Code § 3439.04 ................................................................................................ 8, 11

Cal. Civ. Code § 3439.04(a)(1) .............................................................................................. 7

Cal. Civ. Code § 3439.04(a)(2)(A) ........................................................................................ 9

Cal. Civ. Code § 3439.04(a)(2)(B) ................................................................................... 9, 10

Cal. Civ. Code § 3439.04(c) ................................................................................................... 7

Cal. Civ. Code § 3439.05(a) ............................................................................................. 9, 10

Cal. Code Civ. Proc. § 437c(c) ............................................................................................... 5

Cal. Code Civ. Proc., § 437c(o)(2) ........................................................................................ 5

Cal. Evid. Code § 602 ............................................................................................................. 6

## OTHER AUTHORITIES

*Transaction*, BLACK'S LAW DICTIONARY ................................................................................ 9

## RULES

Cal. R. Ct. 3.1590(b) .............................................................................................................. 8

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-iii-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

404304569.13

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff Eduardo De la Torre alleges that defendant CashCall, a Chapter S corporation under the Internal Revenue Code, made a fraudulent conveyance to its sole shareholder, defendant John Paul Reddam, when it made a tax distribution to Reddam in October 2021. Chapter S corporations do not pay income taxes; their shareholders (Reddam in this instance) are responsible for paying any state and federal income taxes that flow from the S corporation's taxable income. The potential tax obligation that occasioned the tax distribution to Reddam arose out of a payment to CashCall in settlement of litigation filed by CashCall and Reddam. Plaintiff's fraudulent conveyance claims fail, because the tax distribution wasn't made with the intent to shield the funds from Plaintiff, and because the transfer was made in good faith to satisfy potential tax obligations that Reddam would owe as CashCall's sole shareholder.

Plaintiff's case rests on the *conjectural theory* that the transfer was made because Defendants knew that CashCall was about to sustain an adverse judgment in a class action lawsuit involving CashCall's California lending operations, *De la Torre v. CashCall, Inc.*, San Mateo County Superior Court Case No. 19-CIV-01235 (the "San Mateo Litigation"). That theory is contrary to the undisputed facts, which show:

- CashCall and Reddam sued their prior counsel for legal malpractice arising out of advice relating to CashCall's non-California lending operations (the "Malpractice Case").

- In August 2021, CashCall and Reddam decided to settle the Malpractice Case on the eve of trial (after four years of litigation) for reasons related solely to that case.

- Before the Malpractice Case settlement funds were disbursed in September 2021, CashCall and Reddam commissioned a tax analysis, which recommended payment to CashCall rather than Reddam because it would result in the lowest tax obligation.

- In October 2021, CashCall made a distribution to Reddam (the "Tax Distribution") to cover the potential tax obligations arising from CashCall's taxable income (which increased significantly as a result of the settlement payment).

-1-

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

404304569.13

6

- The amount of the Tax Distribution was calculated by applying the tax rates that would be applicable to Reddam to CashCall's net income as of September 30, 2021.

- Everyone involved in the Tax Distribution has testified that the San Mateo Litigation played no role in the decision to settle the Malpractice Case or in the Tax Distribution.

- At the time of the Malpractice Case Settlement and Tax Distribution, the San Mateo Litigation trial was still in progress.

- CashCall was solvent at the time of the Tax Distribution and is still in business today.

Not only do those undisputed facts compel summary judgment in Defendants' favor, but Plaintiff's theory defies common sense. If Defendants had wanted to shield the Malpractice Case Settlement funds from a potential judgment in the San Mateo Litigation (despite undisputed facts showing otherwise), they could have simply chosen for all funds to be sent to Reddam, bypassing CashCall entirely. They did not do that because the San Mateo Litigation played no role in the decision to settle the Malpractice Case or the decision to make a Tax Distribution to Reddam.

Theories and allegations do not defeat summary judgment. Yet that's all Plaintiff has after extensive and intrusive financial discovery. Summary judgment should be granted.[1]

## II.    RELEVANT FACTUAL BACKGROUND

### A.    CashCall and Reddam

CashCall is a finance lender licensed by the California Department of Financial Protection and Innovation. (Separate Statement of Undisputed Material Facts ("UF") 1.) Reddam founded CashCall in 2003 and is its sole shareholder. (UF 1, 2.)

### B.    The Federal Litigation Against CashCall

In 2008, a California consumer filed a putative class action complaint against CashCall in federal court, alleging that its loans violated state and federal law (the "Federal Litigation"). (UF 6.) Plaintiff here (De la Torre) was added as a named plaintiff in the Federal Litigation. (UF 6; Declaration of Brad W. Seiling ("Seiling Decl.") ¶ 3.)[2] After many twists and turns, the Federal

---

[1] If, for any reason, the Court declines to award judgment to CashCall on one of Plaintiff's claims, it should award summary adjudication in CashCall's favor on the other claim.

[2] *See generally De la Torre v. CashCall, Inc.*, Case No. 3:08-cv-03174-TSH (N.D. Cal.).

Litigation was dismissed without prejudice for lack of subject matter jurisdiction in February 2019. (UF 8.)

### C. The San Mateo Litigation Against CashCall

On March 7, 2019, De La Torre filed a class action complaint against CashCall in San Mateo County Superior Court (previously defined as the "San Mateo Litigation"), again alleging that its loans violated state and federal law. (UF 9.) A bench trial commenced on March 8, 2021, and testimony concluded on May 14, 2021, after 13 days of trial testimony. (UF 10, 11.) The parties submitted post-trial briefs on September 20, 2021, and replies thereto on October 4, 2021. (UF 22.) The Court held closing arguments on November 1, 2021. (UF 31.)

On January 20, 2022, the court issued a Tentative Ruling After Court Trial. (UF 32.) Ten months later, on November 17, 2022, the court issued a Proposed Statement of Decision After Court Trial. (UF 33.) Both sides filed objections to the Proposed Statement of Decision, with CashCall's objections being filed on December 19, 2022. (UF 34.) Eight months later, on August 22, 2023, the Court issued a Final Statement of Decision that revised the Proposed Statement of Decision and awarded restitution to De La Torre and the class in the amount of $245,515,389. (UF 35.) On August 31, 2023, the Court issued its Judgment After Court Trial. (UF 36.)

On September 7, 2023, CashCall moved for a new trial and to vacate the judgment. (UF 37.) On November 7, 2023, the Court denied CashCall's motion but exercised its discretion to issue an Amended Final Statement of Decision and Amended Judgment. (UF 38.) On November 17, 2023, Plaintiff filed a Motion for an Amended Judgment, which was denied on January 9, 2024. (UF 39, 41.)

On November 29, 2023, CashCall filed a notice of appeal with regard to the November 2023 Amended Judgment. (UF 40.)[3] The appeal has been fully briefed and, as of the date of this Motion, the parties are awaiting the scheduling of oral argument. (Seiling Decl. ¶ 17.)

---

[3] *See generally Eduardo de la Torre v. CashCall, Inc.*, A169205 (Cal. Ct. App. 1st Dist. appeal lodged Dec. 4, 2023).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-3-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

404304569.13

8

On January 19, 2024, the court granted *preliminary* approval of Plaintiff's motion for attorney's fees and a plan of allocation indicating, among other things, that the court would schedule a hearing on the plan of allocation after any appeal is completed and final. (UF 42.)

### D. The Malpractice Case and Settlement

In 2017, CashCall and Reddam filed a lawsuit in Orange County Superior Court against their former outside counsel for legal malpractice related to advice given in connection with CashCall's non-California lending operations (previously defined as the "Malpractice Case"). (UF 7.) On August 6, 2021, ten days before trial was scheduled to commence, the parties agreed to settle the Malpractice Case and signed a confidential Settlement Term Sheet. (UF 12.) The parties then signed a confidential settlement agreement ("Malpractice Case Settlement") on August 13, 2021, prior to the completion of post-trial briefing and closing arguments in the San Mateo Litigation. (UF 15, 22, 31.) The San Mateo Litigation played no role in CashCall and Reddam's decision to settle the Malpractice Case or the timing of the settlement. (UF 13.)

Because there would be a large initial payment under the Malpractice Case Settlement, Reddam and CashCall, through their in-house tax advisor, asked their outside tax accountant on August 9, 2021, to conduct a tax analysis to determine whether the proceeds of the settlement should be paid to CashCall, Reddam, or some combination of the two. (UF 14, 19.) Based on the advice of their tax advisors, all sums from the settlement (after deducting payment for attorneys' fees paid to CashCall and Reddam's counsel) were paid to CashCall. (UF 17.)[4]

### E. 2021 Tax Liabilities and the Tax Distribution to Reddam

CashCall is an S corporation and does not pay federal or state income taxes, other than a 3.5% California state income tax on financial institutions. (UF 3, 4.) Under state and federal law, Reddam, as CashCall's sole shareholder, is responsible for paying taxes on taxable income earned by CashCall. (UF 5.) CashCall and Reddam understood that the Malpractice Case settlement

---

[4] Due to the confidential nature of the Malpractice Case Settlement, and to obviate the need for redactions and motions to seal for this brief and all but one of the supporting declarations, the separate statement and declarations specify where the amount of the settlement payment and subsequent tax distribution (and the identity of the Malpractice Case defendant, should that for any reason be relevant to this motion) can be found.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-4-

payment would result in a substantial increase in CashCall's net income that potentially could result in a significant tax obligation for Reddam. (UF 19.) Reddam and CashCall's chief financial officer Delbert Meeks discussed making a distribution to Reddam for tax purposes (previously defined as the "Tax Distribution"). (UF 20.) This was not the first time CashCall had made a distribution to Reddam to account for anticipated tax liabilities from CashCall's operations—to the contrary, CashCall had made distributions to Reddam on numerous prior occasions to account for anticipated tax obligations arising out of CashCall's taxable income. (UF 21.)

CashCall calculated the amount of the Tax Distribution by applying the maximum California and federal tax rates to CashCall's net income as of September 30, 2021. (UF 24.) Then, on October 26, 2021, CashCall sent a wire transfer to Reddam. (UF 23.)

The San Mateo Litigation played no role in CashCall's decision to make the Tax Distribution to Reddam or the amount of the Tax Distribution. (UF 25.) In fact, at the time of the Tax Distribution, the trial in the San Mateo Litigation was still under way (testimony had concluded, but the parties were engaged in post-trial briefing, and closing arguments had not yet been made). (UF 11, 22, 31.)

Moreover, at the time of the Tax Distribution and through the end of 2021, CashCall was paying its debts as they came due, and the total sum of CashCall's debts was less than the total sum of its assets. (UF 26, 27.) At that time, CashCall had no plans to cease doing business, and Reddam had no plans to initiate bankruptcy or insolvency proceedings for CashCall. (UF 16, 28, 29.) CashCall continues to do business and is originating new loans. (UF 30.)

III.    **LEGAL STANDARD**

To prevail on a motion for summary judgment or summary adjudication, the moving party must demonstrate that there are no triable issues of material fact and that it is "entitled to a judgment as a matter of law." Code Civ. Proc. § 437c(c). The moving party may meet its burden by demonstrating that one or more elements of the cause of action in question cannot be established or that there is a complete defense. *Aguilar v. Atl. Richfield Co.*, 25 Cal.4th 826, 850 (2001) (citing Code Civ. Proc., § 437c(o)(2)). A triable issue of material fact exists only if the evidence would

allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." *Id.*

As the Supreme Court further explained, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." *Id.* "A prima facie showing is one that is sufficient to support the position of the party in question." *Id.* at 851 (citing Evid. Code § 602).

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination, or guess work.' Further an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions or mere possibilities.'" *Spinner v. Am. Broad. Cos.*, 215 Cal. App. 4th 172, 183 (2013) (citing *Sinai Mem'l Chapel v. Dudler*, 231 Cal. App. 3d 190, 196-97 (1991) (internal citations omitted)); *see also Sangster v. Paetkau*, 68 Cal. App. 4th 151, 163 (1998) (evidence giving rise to mere speculation "cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"). An inference in favor of a party must be "*more reasonable or probable*" than one that can be inferred against the party. *Leslie G. v. Perry & Assocs.*, 43 Cal. App. 4th 472, 483 (1996) (emphasis in original). If a plaintiff rests "'upon conclusory allegations, improbable inferences, and unsupported speculation,' summary judgment may be appropriate even where intent is an issue." *Nelson v. United Techs.*, 74 Cal. App. 4th 597, 614 (1999).

"[I]f the facts are undisputed and admit of only one conclusion, then summary judgment may be entered on issues that otherwise would be submitted to the jury." *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1386-87 (1999); *see also Preach v. Monter Rainbow*, 12 Cal. App. 4th 1441, 1451 (1993) ("'[An] issue of fact becomes one of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion.'" (quoting *Advanced Micro Devices, Inc. v. Great Am. Surplus Lines Ins. Co.* 199 Cal. App. 3d 791, 795-96 (1988))).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-6-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION
404304569.13

11

## IV.    ARGUMENT

The premise of Plaintiff's claim that the Tax Distribution to Reddam violated the UVTA is that CashCall made the distribution to shield assets that might otherwise satisfy a potential judgment in Plaintiff's favor in the San Mateo Litigation—even though judgment was not entered in the San Mateo Litigation until August 31, 2023, almost two years after the date of the Tax Distribution. (UF 18, 36.) The undisputed facts confirm that CashCall made the Tax Distribution for a legitimate purpose at a time when it was solvent and remained solvent after the Tax Distribution. There is no evidence of any intent to defraud Plaintiff, nor can any such intent be inferred from the undisputed facts.

### A.    As a Matter of Law, CashCall Had No Actual Intent to Hinder, Delay, or Defraud Plaintiff or Any Other Creditor.

"A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." *Yaesu Elecs. Corp. v. Tamura*, 28 Cal. App. 4th 8, 13 (1994). A transfer is voidable if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1). The creditor must establish all elements of an actual intent claim by a preponderance of the evidence. *Id.* § 3439.04(c).

As a matter of law, CashCall had no such intent. The undisputed facts confirm that CashCall made the Tax Distribution to Reddam because Reddam is responsible, as the owner of the S corporation, for paying taxes on CashCall's taxable income, including on the settlement payment from the Malpractice Case Settlement. The testimony and exhibits in support of this motion uniformly demonstrate that the Tax Distribution was made for that purpose. CashCall and Reddam consulted tax advisors to determine how to apply the settlement proceeds. (UF 14, 17.) Recognizing that the settlement proceeds would substantially increase CashCall's net income, which potentially could result in a significant tax obligation for Reddam, CashCall's CFO and Reddam discussed making a tax distribution to Reddam. (UF 19, 20.) This was not out of the ordinary; CashCall had made distributions to Reddam on numerous prior occasions to account for anticipated tax obligations arising out of CashCall's taxable income. (UF 21.) CashCall calculated the amount of

-7-

the distribution by applying the maximum California and federal tax rates to CashCall's net income as of September 30, 2021. (UF 24.)

The evidence also uniformly demonstrates that the San Mateo Litigation was not a consideration when settling the Malpractice Case or when CashCall made the Tax Distribution. The Malpractice Case Settlement was reached in August 2021, at a time when testimony in the San Mateo Litigation had concluded, but before post-trial briefing and closing arguments. (UF 11, 22, 25, 31.) When the Tax Distribution occurred two months later, closing arguments in the San Mateo Litigation still hadn't taken place. (UF 23, 31.) The court didn't issue its Tentative Ruling After Court Trial until January 20, 2021—three months after the Tax Distribution—and when it came, the Tentative Ruling did not even specify the amount of restitution to be awarded.[5] (UF 32.) There was no judgment at the time of the Tax Distribution, let alone an enforceable final judgment.

In addition, if CashCall and Reddam had "colluded" to shield the settlement funds from potential collection by Plaintiff (even though trial in the San Mateo Litigation was still in progress), they could simply have chosen for the settlement payment to be made directly to Reddam. Instead, CashCall and Reddam elected to have the net proceeds of the settlement paid to CashCall based on tax advice that payment to CashCall would result in the lowest tax obligation. This underscores the undisputed fact that the San Mateo Litigation played no role in the decision to settle the Malpractice Case and to make the Tax Distribution.

Accordingly, Plaintiff's first cause of action for violation of Civil Code section 3439.04, which claims that CashCall made the Tax Distribution "with actual intent to hinder, delay, or defraud Plaintiff and the Class[6] as a creditor of CashCall," fails as a matter of law, warranting judgment in CashCall's favor.

---

[5] And even if the Tentative Ruling did specify an amount of restitution, it would not have been binding on CashCall.  A tentative opinion does not have the force of law until it has been adopted by the court.  *See* Cal. R. Ct. 3.1590(b) ("The tentative decision does not constitute a judgment and is not binding on the court."); *Silverado Modjeska Recreation & Park Dist. v. Cty. of Orange*, 197 Cal. App. 4th 282, 300 (2011) ("[A] trial court's tentative ruling is not binding on the court; the court's final order supersedes the tentative ruling."). *See generally Jordan v. Malone*, 5 Cal. App. 4th 18 (1992).

[6] There is no "Class" in this case, so Plaintiff has no right to assert claims in this case on behalf of a "Class." But that issue does not affect Defendants' right to summary judgment or summary adjudication.

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

-8-

**B.    The Tax Distribution Is Not Voidable Under a Constructive Fraud Theory.**

Plaintiff's alternative claim that the Tax Distribution is voidable under a theory of constructive fraud also fails. Fraud may be implied under the UVTA when a debtor does not receive "reasonably equivalent value" for a particular asset or obligation **and** the debtor (1) was engaged or about to be engaged in a business or transaction for which the debtor's remaining assets were unreasonably small relative to the size of the business or transaction (Cal. Civ. Code § 3439.04(a)(2)(A)); (2) intended to incur, or objectively should have known it would incur, debts beyond its ability to pay (*id.* § 3439.04(a)(2)(B)); or (3) was insolvent at the time of the transfer or became insolvent because of the transfer (*id.* § 3439.05(a)). Leaving aside whether CashCall received reasonably equivalent value for the Tax Distribution (it did),[7] the undisputed material facts show that Plaintiff cannot establish the second part of this equation, as Plaintiff cannot demonstrate any of the three alternatives listed above.

First, Plaintiff cannot establish that CashCall was engaged or about to be engaged in a transaction for which its assets were unreasonably small relative to the size of the transaction. (Cal. Civ. Code §§ 3439.04(a)(2)(A)). The supposed "transaction" is the mere possibility (at the time) that Plaintiff would prevail in the San Mateo Litigation and obtain a large judgment in his favor. A potential adverse judgment is not a "transaction" under the plain meaning of that word, which connotes a voluntary exchange. *See Transaction*, BLACK'S LAW DICTIONARY ("1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. Something performed or carried out; a business agreement or exchange."). Accordingly, Defendants are aware of no case under the UVTA interpreting "transaction" as including a judgment; rather, cases have interpreted "transaction" in accord with its plain meaning. *See, e.g., Ark v. HAF Corp.*, 2023 WL 4681591 (C.D. Cal. June 27, 2023) (paying attorneys); *In re Paradigm Int'l, Inc.*, 635 F. App'x 355, 358 (9th Cir. 2015) (payment under asset-backed guaranty).

In addition, the UVTA focuses on events occurring at the time of the transfer the plaintiff seeks to void. At the time of the Tax Distribution and through the end of 2021, CashCall was paying

---

[7] Defendants need not establish reasonably equivalent value in order to defeat this claim and therefore decline to address that element, to avoid any argument that it supposedly implicates a material issue of fact.

-9-

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

404304569.13

14

its debts as they came due, and the total sum of CashCall's debts was not greater than the total sum of its assets. (UF 26, 27.) CashCall had no plans to cease operations or initiate bankruptcy or insolvency proceedings. (UF 16.) And because no judgment of any kind had been returned at the time, there is no objective grounds for Plaintiff to argue that CashCall's assets were unreasonably small relative to a judgment.

Second, Plaintiff cannot establish that CashCall intended to, or objectively should have known that it would, incur debts beyond its ability to pay. (Cal. Civ. Code § 3439.04(a)(2)(B).) Plaintiff wants to apply hindsight—arguing that because the court in the San Mateo Litigation ultimately entered judgment against CashCall (two years after the Tax Distribution), CashCall should have known at the time of the Tax Distribution that liability was imminent. That theory is contrary to the law and the undisputed facts. It is undisputed that the San Mateo Litigation played no role in the decisions concerning the Tax Distribution. (UF 13, 25.) None.

At the time of the Tax Distribution, trial in the San Mateo Litigation was still in progress, and CashCall certainly did not intend to incur an adverse judgment, nor, objectively "should" CashCall have known that it would incur an adverse judgment. Plaintiff can point to no ruling from the trial judge in the San Mateo Litigation that would have shown that liability was imminent at the time of the Tax Distribution. Theories and conjecture do not defeat summary judgment or support a viable claim under the UVTA. In addition, two prior trial judges—Judge Victoria Chaney of the Los Angeles County Superior Court and Magistrate Judge Maria-Elena James—had dismissed claims based on the legal theory advanced in the San Mateo Litigation. (Seiling Decl. ¶¶ 2, 5.) Plaintiff can cite to no evidence that CashCall or Reddam were expecting a different result in the San Mateo Litigation.

Third, Plaintiff cannot establish that CashCall was insolvent at the time of the Tax Distribution or became insolvent because of the Tax Distribution. Cal. Civ. Code § 3439.05(a). "Insolvent" means that the fair value of all debts exceeds the fair value of all nonexempt assets. *Id.* § 3439.02(a). CashCall was solvent at the time of the Tax Distribution and after the Tax Distribution (UF 16, 26, 27), and Plaintiff cannot demonstrate otherwise. As explained at length above, the San

Mateo Litigation trial was still in progress, so there was no decision on the merits, let alone a final judgment. Hence there was no "debt"[8] by reason of that litigation.

Accordingly, Plaintiff's second cause of action for violation of Civil Code section 3439.04, which is based on a theory of constructive fraud, fails as a matter of law, warranting judgment in CashCall's favor.

## V.    CONCLUSION

There is no factual basis for Plaintiff's claims. Theory and conjecture do not defeat summary judgment. The undisputed facts confirm that the San Mateo Litigation played no role in the decision to make the Tax Distribution or the timing of that decision. For the forgoing reasons, the Court should grant summary judgment in Defendants' favor. Alternatively, if the Court finds that one of the claims is not subject to judgment as a matter of law, Defendants respectfully request that the Court grant summary adjudication to whichever claim does fail as a matter of law.

Dated:    November 3, 2025

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP


By: *Brad W. Seiling*
Brad W. Seiling
Donald R. Brown
Brandon Wong
*Attorneys for Defendants*
JOHN PAUL REDDAM and
CASHCALL, INC.

---

[8] "'Debt' means liability on a claim." Cal. Civ. Code § 3439.01(d).

-11-

# EXHIBIT 5

**MANATT, PHELPS & PHILLIPS, LLP**
BRAD W. SEILING (Bar No. CA 143515)
E-mail: BSeiling@manatt.com
DONALD R. BROWN (Bar No. CA 156548)
E-mail: DBrown@manatt.com
BRANDON WONG (Bar No. CA 327372)
E-mail: BWong@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, CA  90067
Telephone:    (310) 312-4000
Facsimile:    (310) 312-4224

Attorneys for Defendants
JOHN PAUL REDDAM and CASHCALL, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| EDUARDO DE LA TORRE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive,<br><br>　　　　　Defendants. | Case No. 30-2024-01421309-CU-NP-NJC<br><br>**DECLARATION OF DELBERT O. MEEKS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed concurrently with:<br><br>　1. Memorandum of Points and Authorities<br><br>　2. Separate Statement of Undisputed Material Facts<br><br>　3. Declaration of John Paul Reddam<br><br>　4. Declaration of Elizabeth Emrick<br><br>　5. Declaration of Brad W. Seiling<br><br>　6. [PROPOSED] Order] |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF DELBERT O. MEEKS IN SUPPORT OF SUMMARY JUDGMENT

404310948.2

16

I, Delbert O. Meeks, declare as follows:

1.      I am a certified public accountant and am the chief financial officer ("CFO") of CashCall, Inc. ("CashCall"). The following facts are within my personal knowledge, and if called as a witness, I could testify competently thereto.

2.      I have been CashCall's CFO since August 2004. For most of its existence, CashCall offered consumer loans to California residents, including unsecured loans and, at various times, mortgage loans. CashCall is currently making unsecured consumer loans. I am responsible for preparing CashCall's financial statements, including annual and monthly statements. I also work with CashCall's outside accountants on the preparation of CashCall's annual audited financial statements. CashCall is a licensed finance lender under California law. As a licensed finance lender, CashCall also must prepare annual financial statements for its regulators, and I am responsible for gathering the financial data reported to the regulators.

3.      CashCall has elected to be taxed as a Subchapter S corporation under the Internal Revenue Code. As such, CashCall does not pay federal or state income taxes, other than a 3.5% California income tax on net income. John Paul Reddam is CashCall's sole shareholder. As the sole shareholder of CashCall, Mr. Reddam is responsible for paying any federal and California state income taxes due based on CashCall's taxable income.

4.      I am aware that CashCall and Reddam filed a lawsuit in 2017 against CashCall's former legal counsel Katten Muchin Rosenman, LLP and one of its partners in Orange County Superior Court (the "Katten Litigation"). I was not involved in the Katten Litigation or any of the negotiations regarding its potential settlement, although I was aware that such discussions had occurred.

5.      In August 2021, I was made aware that there was an agreement to settle the Katten Litigation that would result in a substantial lump-sum payment and payments over time (the "Katten Settlement'). I was not involved in those settlement discussions or in any discussions regarding the allocation of the settlement payment between CashCall and Mr. Reddam. At the time of the settlement of the Katten Settlement, Elizabeth Emrick was responsible for Mr. Reddam's and

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

DECLARATION OF DELBERT O. MEEKS IN SUPPORT OF SUMMARY JUDGMENT

404310948.2

17

CashCall's tax issues. Ms. Emrick worked with CashCall's and Reddam's outside tax advisors, and I had only minimal involvement in those tax issues.

6.    In September 2021, the net proceeds from the Katten Settlement were deposited into CashCall's operating account. As CashCall's CFO, I needed to decide how to manage this substantial infusion of cash. The decision was made to repay outstanding loans to save the interest payments that CashCall was obligated to pay. We also decided to use some of the funds to pay other outstanding obligations.

7.    We also understood that the Katten Settlement payment would result in a substantial increase in CashCall's net income that potentially could result in a significant tax obligation for Mr. Reddam. Mr. Reddam and I discussed making a distribution to him for tax purposes (the "2021 Tax Distribution"). This was not the first time CashCall had made a distribution to Mr. Reddam to account for anticipated tax liabilities from CashCall's operations. To the contrary, on numerous prior occasions, CashCall had made distributions to Mr. Reddam to account for anticipated tax obligations arising out of CashCall's operations. In fact, I do not recall CashCall ever making a distribution to Mr. Reddam other than for tax purposes.

8.    To calculate the amount of the 2021 Tax Distribution, we used the tax rates that would apply to Mr. Reddam; Elizabeth Emrick provided those rates to me—37.60% federal, 13.3% California state. I applied these rates to CashCall's net income through September 30, 2021. I prepared CashCall's financial statements for the month ended September 30, 2021. A true and correct copy of the financial statements though September 30, 2021 is attached as **Exhibit 5 to the Compendium of Evidence ("Compendium Exhibit")**. The September 2021 financial statements reflect the amount of the Tax Distribution to Mr. Reddam. Month-end financial statements typically are not complete until the middle off the next month. The financial statements for September 30, 2021, were not complete until mid-October 2021.

9.    I instructed CashCall's controller Shawna Parks to wire the 2021 Tax Distribution to Mr. Reddam's account. A true and correct copy of the memorandum authorizing the wire transfer of the 2021 Tax Distribution is attached as **Compendium Exhibit 6**. As reflected in **Compendium**

**Exhibit 6**, the amount of the 2021 Tax Distribution was calculated by applying the applicable tax rates provided by Ms. Emrick to CashCall's net income through September 30, 2021.

10.     At the time CashCall made the 2021 Tax Distribution to Mr. Reddam, the sum of CashCall's debts did not exceed its assets, as reflected in the financial statements through September 30, 2021. At the time CashCall made the 2021 Tax Distribution to Mr. Reddam, CashCall was paying its debts as they came due.

11.     At the time CashCall made the 2021 Tax Distribution to Mr. Reddam, there were no plans for CashCall to stop doing business. CashCall continues to operate today and is making new loans.

12.     I am aware that CashCall was sued in a class action lawsuit in Northern California challenging the interest rates charged on its unsecured consumer loans, which I understand is referred to in filings in this case as the "San Mateo Litigation.". I was deposed in the San Mateo Litigation, provided declarations to counsel, assisted in gathering financial documents, testified by Zoom at the trial, and observed other days of testimony of the trial when I was not a witness.

13.     There were no discussions of the San Mateo Litigation in connection with the decisions regarding the application of the proceeds from the Katten Settlement, including the decision to make the 2021 Tax Distribution. The San Mateo Litigation played no role in the decision to make the 2021 Tax Distribution or the timing of the distribution. I did not discuss the San Mateo Litigation with Mr. Reddam when we discussed the 2021 Tax Distribution, and I did not discuss the San Mateo Litigation with Ms. Parks when I instructed her to wire the 2021 Tax Distribution to Mr. Reddam's account.

14.     At all times in 2021, based on my observations of the trial and my understanding of the claims at issue, I regarded the chance of an unfavorable outcome in the San Mateo Litigation as slight. Under Generally Accepted Accounting Principles, there is no obligation to account for a remote potential liability from pending litigation.

15.     As mentioned above, CashCall has used outside accountants to prepare audited annual financial statements as long as I have been CFO. Baker Tilly USA, LLP was the audit firm that prepared CashCall's audited financial statements for the year ended December 31, 2021. Baker

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

DECLARATION OF DELBERT O. MEEKS IN SUPPORT OF SUMMARY JUDGMENT

404310948.2

19

Tilly was the successor company of the auditing firms that had been preparing CashCall's audited financial statement as long as I have been CashCall's CFO.

16. I was deposed in this case. At my deposition, plaintiff's counsel, Arthur Levy, showed me various pages from Baker Tilly's work papers, which I had never seen before, that used the term "winding down" to refer to CashCall's business. I disagree with the characterization that CashCall was in "wind down mode" in 2021 and I do not know why Baker Tilly used this term in its work papers. That CashCall continues to do business is a good indication that it was not winding down operations in 2021. And if Baker Tilly believed that CashCall was in a "wind down mode," it would have been required to disclose that fact in the audited financial statements, yet there was no such disclosure in CashCall's 2021 audited financial statements. A true and correct copy of CashCall's audited financial statements for the year ended December 31, 2021 is attached as **Compendium Exhibit 7**.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct. Executed this 10/31/2025 day of October 2025, at Orange, California.

Signed by:

A544751DE7B94D8

Delbert O. Meeks

4

DECLARATION OF DELBERT O. MEEKS IN SUPPORT OF SUMMARY JUDGMENT

404310948.2

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

20

# EXHIBIT 6

Michael A. Gould (SBN 151851)
THE GOULD LAW FIRM
161 Fashion Lane, Suite 207
Tustin, California 92780-3364
Telephone: (714) 592-4936

Arthur D. Levy (SBN 95659)
LAW OFFICE OF ARTHUR D. LEVY
610 – 16th Street, Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551

Attorneys for Plaintiff
EDUARDO DE LA TORRE

*Additional Counsel Appear on Signature Page*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| EDUARDO DE LA TORRE,<br><br>Plaintiff,<br><br>v.<br><br>JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive,<br><br>Defendants. | **REDACTED (PUBLIC) VERSION FILED WITH THE COURT PER CRC 2.551(b)(3)(A)(ii); LODGED VERSION CONTAINS MATERIAL DESIGNATED CONFIDENTIAL UNDER STIPULATED PROTECTIVE ORDER**<br><br>Case No. 30-2024-01421309<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 11, 2026<br>Time: 9:00 a.m.<br>Dept.: N15<br><br>Case Filed: August 21, 2024<br>Trial Date: October 12, 2026 |

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ......................................................................................................................... 1

SUMMARY JUDGMENT STANDARDS ................................................................................... 2

THE UNIFORM VOIDABLE TRANSACTIONS ACT .............................................................. 3

ARGUMENT ................................................................................................................................ 4

    1.    Summary Adjudication of the First Cause of Should be Denied; a Triable Issue of Fact Exists on Intention to Hinder, Delay, or Defraud the Class. ......................................................... 4

        a.    Well-Established "Badges of Fraud" Prove Intent to Hinder, Delay, or Defraud ............. 5

        b.    Application of the Badges of Fraud to the Distribution ................................................ 6

            i.    Badge (1): "Whether the transfer or obligation was to an insider" ............................. 8

            ii.    Badge (4):  "Whether before the transfer was made …, the debtor had been sued or threatened with suit" ........................................................................................................ 8

            iii.    Badge (10) "Whether the transfer occurred *shortly before* or shortly after a substantial debt was incurred" ...................................................................................... 8

            iv.    Badge (9):  "Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred" .............................................. 12

            v.    Badge (8):  "Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred" ....................................................................................................... 12

    2.    Summary Adjudication Should Be Denied on the Second Cause of Action:  There is a Triable Issue of Fact on CashCall's Insolvency ....................................................................... 13

        a.    CashCall Has Failed to Carry Its Burden of Proving Insolvency ............................... 14

        b.    A Triable Issue of Fact Exists as to CashCall's Insolvency ....................................... 17

            i.    The Baker Tilly Audited Financial Statements Do Prove Any Fair Valuation of CashCall's Liability to the Class ........................................................................................ 19

            ii.    Valuation of the Class Liability as Non-Contingent Debt ........................................ 19

- ii -

TABLE OF AUTHORITIES

**California Cases**

*Aghaian v. Minassian*
  (2020) 59 Cal.App.5th 447 .................................................................................. 3, 4, 6, 8

*Aguilar v. Atl. Richfield Co.*
  (2001) 25 Cal.4th 826 ................................................................................................... 2

*Aguilar v. Mandarich Law Group, LLP*
  (2023) 87 Cal.App.5th 607 .......................................................................................... 15

*Chen v. Berenjian*
  (2019) 33 Cal.App.5th 811 ............................................................................................ 3

*De La Torre v. CashCall, Inc.*
  (2018) 5 Cal.5th 966 ................................................................................................... 17

*Filip v. Bucurenciu*
  (2005) 129 Cal.App.4th 825 ...................................................................................... 5, 6

*Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*
  (2010) 181 Cal. App. 4th 60 .......................................................................................... 2

*North Coast Bus. Park v. Nielsen Constr. Co.*
  (1993) 17 Cal.App.4th 22 .............................................................................................. 2

*Olson v. Six Rivers Nat'l Bank*
  (2003) 111 Cal.App.4th 1 ............................................................................................ 15

*Thompson v. Ioane*
  (2017) 11 Cal.App.5th 1180 .......................................................................................... 2

*United Cmty. Church v. Garcin*
  (1991) 231 Cal.App.3d 327 ........................................................................................... 2

**Federal Cases**

*Acequia, Inc. v. Clinton*
  (9th Cir. 1994) 34 F.3d 800 ........................................................................................ 5, 6

*Arrow Elecs., Inc. v. Justus*
  (9th Cir. 2000) 218 F.3d 1070 ..................................................................................... 19

- iii -

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*

(9th Cir. 2025) 124 F.4th 1209 ...................................................................................... 6

*Covey v. Commercial Nat'l Bank*

(7th Cir 1992) 960 F.2d 657 ....................................................................................... 16

*Deitsch Plastic Co. v. Generations Re Ventures LLC*

(C.D. Cal. Apr. 17, 2025) 2025 U.S. Dist. LEXIS 106519 at *10; 2025 LX 111832; 2025 WL

1543611 ......................................................................................................................... 6

*Dundon v. McKinsey & Co.*

(S.D.N.Y. 2025) 674 B.R. 349 ........................................................................... 15, 17, 18

*Freeland v. Enodis Corp.*

(7th Cir. 2008) 540 F.3d 721 ............................................................................. 6, 8, 16

*In re Adelphia Commc'ns Corp.*

(Bank. S.D.N.Y. 2014) 512 B.R. 447 ...................................................................... 18

*In re Fostvedt*

(9th Cir. 1987) 823 F.2d 305 ....................................................................................... 20

*In re Loya*

(Bank. 9th Cir. 1991) 123 B.R. 338 ........................................................................ 20

*In re Mama De'Angelo, Inc.*

(10th Cir. 1995) 55 F.3d 552 ...................................................................................... 18

*In Re Sierra Steel*

(9th Cir. B.A.P. 1989) 96 B.R. 275 ..................................................................... 17, 19

*In re W.R. Grace & Co.*

(Bankr. D. Del. 2002) 281 B.R. 852 .......................................................... 15, 17, 18, 20

*In re Wireless Sys. Sols. LLC*

(Bankr. E.D.N.C. 2025)  675 B.R. 451 ....................................................................... 5

*In Re Xonics Photochemical*

(7th Cir. 1988) 841 F.2d 198 ............................................................................... 15, 16

*Ind. Bell Tel. Co. v. Lovelady*

(W.D. Tex. Mar. 4, 2008) 2008 U.S. Dist. ............................................................... 20

*Kirschner v. Fitzsimons*

(S.D.N.Y. Jan. 6, 2017) 2017 U.S. Dist. LEXIS 3039 ............................................. 4

- iv -

*Lids Corp. v. Marathon Partners, L.P.*

(Bankr. D. Del. 2002)  281 B.R. 535 ....................................................................... 17

*Merkel v. Commissioner*

(9th Cir. 1999) 192 F.3d 844 ................................................................................ 16

*Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Group, LLC*

(Bankr.N.D.Ill. 2014) 521 B.R. 842 ..................................................................... 13

*Tronox, Inc. v. Kerr-McGee Corp.*

(Bank. S.D.N.Y. 2013) 503 B.R. 239 ............................................................... 19, 20

**California Statutes**

Civ. Code, §§ 3439 *et seq* .............................................. 3, 4, 5, 8, 12, 14, 15

Code Civ. Proc. § 437c.......................................................................................... 2

Evid. Code § 1200.............................................................................................. 19

Stats. 2015, ch. 44 §§ 1–16 [SD. 161] ................................................................. 3

**Federal Statutes**

11 U.S.C. § 101(32) ............................................................................................ 15

26 U.S.C. § 108(d)(3)......................................................................................... 16

**Other Authorities**

Sen. Rules Comm., Analysis of Sen. Bill. No. 161 (2015–2016 Reg. Sess.) ................................. 3

Uniform Voidable Transactions Act ...................................................... 3, 5, 6

CASE NO. 30-2024-01421309—PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

404415052.1

INTRODUCTION

Plaintiff is the class representative in a class action filed in 2019 against CashCall to recover interest payments made on 135,000 96% and 135% loans CashCall made to subprime borrowers between 2005 and 2011. The case was tried to a San Mateo County Superior Court Judge during the Spring of 2021. The trial judge held closing arguments on November 1, 2021. In November 2023, the trial judge issued a final Statement of Decision and a final Judgment, finding the loans unconscionable and holding CashCall liable to pay restitution of $245 million to the Class.

CashCall appealed. On February 27, 2026, the First District Court of Appeal affirmed the Judgment in full.

Five days before closing arguments in the trial court—on October 26, 2021—CashCall made a ███████ distribution to its founder, sole shareholder, CEO, and director, defendant John Paul Reddam. CashCall justified the distribution in an interrogatory answer verified by CashCall's CFO, Delbert Meeks, stating:



Levy Dec. Ex. 6, emphasis added.

In fact, ████████████████████████████, and didn't have to pay any additional income tax until January 15, 2022, 2-1/2 months later. The distribution was ████ ████████ than Reddam actually paid for 2021 income taxes.

As to the First Cause of Action in the Complaint to recover the distribution based on an actual fraudulent transfer, the circumstances of the distribution bear multiple "badges of fraud" the courts have traditionally considered in assessing intent in fraudulent transfer cases. These badges of fraud prove that the "tax distribution" was a subterfuge and preclude summary judgment. Triable issues of fact exist as to whether CashCall intended to hinder, delay, or defraud the Class.

- 1 -

As to the Second Cause of Action to recover the distribution based on a constructive fraudulent transfer, CashCall fails to carry its initial burden of proving that CashCall was solvent at the time of the transfer.  To the extent the Court may find CashCall's proof sufficient, genuine issues of fact still preclude summary judgment.

<u>SUMMARY JUDGMENT STANDARDS</u>

The pleadings frame the scope of what may be addressed via a motion for summary judgment.   (*Nieto v. Blue Shield of Cal. Life & Health Ins. Co.* (2010) 181 Cal. App. 4th 60, 74.) The evidence submitted in support of or in opposition to the motion must be addressed to the causes of action stated.

If the moving party fails to state a material allegation of the complaint in its separate statement, the court cannot grant summary judgment on the ground that such unstated fact is not in genuine dispute.  "We construe the statutory mandate for a separate statement as requiring a party to *specify within that document* any facts he deems to be disputed facts material to the issue presented." (*North Coast Bus. Park v. Nielsen Constr. Co.* (1993) 17 Cal.App.4th 22, 30 [emphasis in original].)  "[I]f the facts presented in the moving party's separate statement, even if true, do not require or permit the desired ruling, the motion will be denied without further analysis.  (*United Cmty. Church v. Garcin* (1991) 231 Cal.App.3d 327, 338.)

A court must draw all inferences from the evidence in the light most favorable to the non-moving party—here, plaintiff.  (*Aguilar v. Atl. Richfield Co.* (2001) 25 Cal.4th 826, 843.)  The court may not grant a motion for summary judgment "based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).)

The Court must initially determine whether the moving party has met its initial burden of showing "that one or more elements of the cause of action, even if not separately pleaded, cannot be established .…"  (*Id*. subd. (p)(2).)  Only when the court concludes that burden has been met does the burden shift to the opposing party "to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1196.)

- 2 -

THE UNIFORM VOIDABLE TRANSACTIONS ACT

In 2015 the Legislature amended what had previously been known as the Uniform Fraudulent Transfer Act ("UFTA").  (Stats. 2015, ch. 44, §§ 1–16 [SB 161].)  The revised statute substantially adopted the Uniform Voidable Transactions Act recommended by the National Conference of Commissioners on Uniform State Laws (hereinafter, "Uniform Law" [Appendix (App.) Ex. "A"]). (Sen. Judiciary Comm. (April 21, 2015), Analysis of Sen. Bill. No. 161 (2015–2016 Reg. Sess.) p. 7; Legislative Counsel's Digest to SB 161.)

The 2015 legislation is codified as the Uniform Voidable Transactions Act (UVTA). (Civ. Code, §§ 3439 *et seq*.)   California's enactment of the UVTA did not alter the essential elements of a cause of action for a fraudulent or voidable transfer.  (*Aghaian v. Minassian* (2020) 59 Cal.App.5th 447, 455 fn. 8.)   The UVTA is generally interpreted as consistent with the prior UFTA. (*Id*.; Civ. Code, § 3439.14, subd. (d).)

"The purpose of the UVTA is to prevent debtors from placing, beyond the reach of creditors, property that should be made available to satisfy a debt." (*Chen v. Berenjian* (2019) 33 Cal.App.5th 811, 817.)  A creditor may set aside a transfer as fraudulent under the UVTA by showing either "actual fraud" or "constructive fraud."  (*Ibid*.)

A transaction is voidable if made with "actual intent to hinder, delay, or defraud any creditor of the debtor."  (Civ. Code, § 3439.04, subd. (a)(1).)

Alternatively, a transaction may be "constructively fraudulent," without regard to intent, if the debtor did not receive "reasonably equivalent value" for the transfer, and the transaction was made when the debtor was insolvent.  (*Id*., § 3439.05.)  Constructive fraud liability also exists under section 3439.04(a)(2) if the debtor either "(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "(B) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[1]

---

[1] CashCall's Separate Statement does not address liability under Civil Code section 3439.02(a)(2)(B), that at the time of the distribution, CashCall "intended to incur, or believed *or*

- 3 -

ARGUMENT[2]

    1.      Summary Adjudication of the First Cause of Should be Denied; a Triable Issue of Fact Exists on Intention to Hinder, Delay, or Defraud the Class.

The debtor's intent is an issue of fact.  (*Aghaian*, *supra*, 59 Cal.App.5th at 456.)  Intent need only be shown by a preponderance of the evidence.  (Civ. Code, § 3439.04, subd. (d).)

Here, the controlling intent is that of CFO Delbert Meeks.  The intent of the debtor—CashCall—is controlling, not the intent of the recipient, Reddam.  (Civ. Code, § 3439.04(a)(1); *Kirschner v. Fitzsimons* (S.D.N.Y. Jan. 6, 2017) 2017 U.S. Dist. LEXIS 3039, at *13.)

Within CashCall, Meeks *alone* made the decision to pay ▮▮▮▮▮ to Reddam on October 26, 2021, without consulting Reddam's personal tax advisor, Elizabeth Emrick (other than to obtain income tax rates), or Reddam.  Meeks Depo. (Levy Dec. Ex. 1) 129:4-130:25; 132:1-8; Emrick Depo. (Ex. 2) 10:24-11:18; 79:12-80:17; Reddam Depo. (Ex. 4) 105:16-107:5.

As for CashCall's point that CashCall and Reddam decided that all of the Katten settlement proceeds would be allocated to CashCall, not Reddam, Meeks had no involvement in or knowledge of that decision process.  Meeks Dec. ¶ 5, Separate Statement (SS) 14.  Further, the tax allocation analysis (CE Ex. 3) recommended the most advantageous approach for CashCall and Reddam to minimize their overall taxes.  Defendants' Compendium of Evidence (CE) Ex. 5 at pp. 52-53; SS 17.

The only direct evidence of Meeks' intent CashCall provides is Meeks' bald statement that "The San Mateo Litigation played no role in the decision to make the 2021 Tax Distribution or the timing of the distribution."  (UF 25, CE Ex. "C" ¶ 13.)[3]

---

*reasonably should have believed that [it] would incur, debts beyond the debtor's ability to pay as they became due.*"  (Emphasis added.)  This is alleged in paragraph 25 of the Complaint.  This alone is a basis for denying summary judgment and summary adjudication.

[2] CashCall's exhibits are identified by "CE" (Compendium of Evidence).  Plaintiff's exhibits are identified by "Ex."

[3] Although Mr. Meeks uses the term "we" throughout his declaration, he does not make clear to whom he is referring.  At best, he can only speak for his own intentions.  Plaintiff objects on grounds of relevancy and lack of personal knowledge to his testimony to the extent he purports to testify to the intentions of others.  Reddam testified he had no knowledge or participation in calculating the distribution or its timing.  Ex. 4 105:16-107:5.

- 4 -

Because the UVTA adopted sections 4 and 5 of the Uniform Law without material change, the Uniform Law provides direct guidance in interpreting the UVTA.  (Civ. Code, § 3439.13 [UVTA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it"]; Sen. Analysis.)

The comments to the Uniform Law explain that an actual intent to defraud need not be shown, only conduct that "unacceptably contravenes norms of creditors' rights," including hindering or delaying collection of a debt:

> Section 4(a)(1) is sometimes said to require "actual fraud," by contrast to § 4(a)(2) and § 5(a), which are said to require "constructive fraud."  That shorthand is highly misleading.  Fraud is not a necessary element of a claim for relief under any of those provisions….  "Hinder, delay, or defraud" is best considered to be a single term of art describing a transaction that unacceptably contravenes norms of creditors' rights.  Such a transaction need not bear any resemblance to common-law fraud.  Thus, the Supreme Court held a given transfer voidable because made with intent to "hinder, delay, or defraud" creditors, but emphasized: "We have no thought in so holding to impute to [the debtor] a willingness to participate in conduct known to be fraudulent…. [He] acted in the genuine belief that what [he] planned was fair and lawful.  Genuine the belief was, but mistaken it was also.  Conduct and purpose have a quality imprinted on them by the law." *Shapiro v. Wilgus.* 287 U.S. 348, 357.

(Uniform Law [App. Ex. "A"] at p. 25, emphasis added.)

> a.    Well-Established "Badges of Fraud" Prove Intent to Hinder, Delay, or Defraud

"Rarely will a fraudster admit outright to the commission of a devious act. A transferor's intent must therefore be gleaned and deduced through the consideration of circumstances surrounding a transfer."[4]  (*In re Wireless Sys. Sols. LLC* (Bankr. E.D.N.C. 2025)  675 B.R. 451, 462.)  Because intent to intent to hinder, delay or defraud creditors is rarely admitted, courts can infer intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or "badges of fraud."  (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 834; *Acequia, Inc. v. Clinton* (9th Cir. 1994) 34 F.3d 800, 805-06; *Deitsch Plastic Co. v. Generations*

---

[4]  The leading cases on voidable transfers are federal bankruptcy cases because bankruptcy trustees have broad avoidance powers, including under substantially the same substantive standards as the UVTA. App. Ex. "B"-"E".

- 5 -

*Re Ventures LLC* (C.D. Cal. Apr. 17, 2025) 2025 U.S. Dist. LEXIS 106519 at *10; 2025 LX 111832; 2025 WL 1543611.)

Section 3439.04(b) provides a non-exclusive list of well-established circumstantial "badges of fraud" to guide the courts in determining intent. (*Filip*, *supra*, 129 Cal.App.4th at 834.) Although these factors do not necessarily compel a finding one or the other (*id*.), they "include[] most of the so-called 'badges of fraud' that have been recognized by the courts in construing and applying the Statute of 13 Elizabeth and § 7 of the Uniform Fraudulent Conveyance Act." (App Ex. "A" at 22.)

"Although 'no one badge of fraud constitutes a per se showing of fraudulent intent,' the presence of a number of badges of fraud 'is said to 'create . . . an overwhelming presumption of fraud' or to 'raise . . . a strong inference of fraudulent intent'." (*Freeland v. Enodis Corp.* (7th Cir. 2008) 540 F.3d 721, 733, internal citations omitted; *Acequia*, *supra*, 34 F.3d at 805-06.)

The courts have found the presence of multiple badges of fraud to be sufficient to prove fraudulent intent in the face of express disavowals by defendants. (*E.g.*, *Aghaian*, *supra*, 59 Cal.App.5th at 456 [transfers to insider, retention of control, plaintiff's lawsuit filed before the transfers were made, and absence of reasonably equivalent value for transfers held sufficient to state cause of action for actual fraud); *Filip, supra,* 129 Cal.App.4th at 834 [transfers made after defendant knew that the creditor had filed suit and "knew that a judgment against Peter might be forthcoming"]; *Freeland*, *supra*, 540 F.3d at 733-34.

Here, multiple badges of fraud are present that preclude summary judgment.

b.      Application of the Badges of Fraud to the Distribution

Meeks paid Reddam on the backdrop of several years of the company's profound financial decline. CashCall had embarked on a disastrous program to expand its subprime lending nationally by operating through a supposed Indian tribal entity. *Consumer Fin. Prot. Bureau v. CashCall, Inc.* (9th Cir. 2025) 124 F.4th 1209, 1212, *cert. denied*, March 2, 2026. In 2013, the federal Consumer Financial Protection Bureau sued CashCall, challenging its tribal lending program and seeking penalties and restitution. Ex. 4 27:23-28: 4; Ex. 17. The CFPB case prevented CashCall not only from re-expanding nationally, but also from getting funding for

lending in California.  *Id*. 26:20-28:4; 45:24-48:12.  This led to a dramatic contraction of CashCall's business.  *Id*.; Ex. 1 96:2-11.

By 2015, CashCall was beginning to wind down.  Ex. 7.  CashCall did not make any new loans in 2019 and that continued through 2021.  Ex. 1 19:19-20:11; 96:2-11.  Even now, CashCall lending is minimal, only about 5-10 loans a month. Parks Depo. (Ex. 5) 74:8-19.

The Katten Settlement was a rare victory for a declining company, bringing a "huge cash settlement" ████████████████████████████████. Ex. 1 129:4-20; CE Ex. 5 at p. 59 ("Miscellaneous Income").  The settlement enabled CashCall ████████████████████████ ████████████████████████████████████████████████████████. CE Ex. 7 at p. 87; Ex. 1 93:10-96:1; Ex. 5 45:15-46:20, 65:22-66:8; Ex. 8, 9, 11.

For Meeks, the Katten settlement money was an opportunity to push a large amount of money out the door to Reddam before a large judgment could be rendered in the class action.  He had a strong motive for getting money into Reddam's hands.  The pretext of a "tax distribution" fit the bill:

> Q.  Did you know when Mr. Reddam's estimated tax payment was due at this time in October of 2021?
>
> A.  I do not know the date -- the exact date.
>
> Q.·  Did you have any concern that Mr. Reddam was going to be penalized for making a late estimated tax payment?
>
> A.  My concern is getting him the money.·  His -- and then his work starts with his tax person to determine the time, dates, and the payments.
>
> Q.  Did you check to see when his estimated tax payment was due?
>
> A.  It is not under my privy.
>
> Q.  And I take it from your testimony, you didn't contact Mr. McGrath in connection with this distribution to ask him how much Mr. Reddam would owe in estimated taxes?
>
> A.  No.

Ex. 1: 131:9-25.

- 7 -

     i.     Badge (1): "Whether the transfer or obligation was to an insider"

Reddam is an insider. He is the founder, sole shareholder, CEO, director, and active, indeed predominant, decisionmaker at CashCall. SS 2; Ex. 4 10:12-12:13. Meeks did not know the tax law and had a strong motive for getting money out of the Katten "huge cash settlement" to his boss, Reddam. Ex. 1 10:1-3; 23:14-18; 129:4-20; 131:9-25.

     ii.     Badge (4): "Whether before the transfer was made …, the debtor had been sued or threatened with suit"

Defendants rely heavily on the facts that the San Mateo Court had not yet rendered its Tentative Decision or entered Judgment against CashCall. The UVTA does not require that a creditor even to have filed suit to avoid a transfer. Section 3439.01(d) defines a "debt" as liability on a claim. "Claim" is broadly defined as "a right to payment, *whether or not the right is reduced to judgment*, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured." (*Id*., § 3439.01, subd. (b), emphasis added; § 3439.04(a) [transfer voidable "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred'].)

A threatened or pending lawsuit suffices to trigger badge (4). (*E.g.*, *Aghaian*, *supra*, 59 Cal.App.5th at 456 [lawsuit filed before the transfers were made]; *Freeland*, *supra*, 540 F.3d at 733 [transfers occurred when debtor "knew it faced significant furnace-related claims" from pending and likely future lawsuits].)

Here, the class action had been pending since 2019, and had already been tried in the Spring of 2021. SS 9-11. CashCall's summary judgment motion had been denied. Ex. 10. Meeks made the distribution to Reddam just five days before closing arguments in the trial. SS 22, 23, 31.

     iii.     Badge (10) "Whether the transfer occurred *shortly before* or shortly after a substantial debt was incurred"

Meeks paid Reddam "shortly before" the San Mateo Court was about to hear closing arguments and render its Tentative Decision. SS 23, 31, 32. The evidence raises a triable issue of

- 8 -

CASE NO. 30-2024-01421309—PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT
404415052.1

fact whether Meeks really intended to make a tax distribution—or whether tax was a pretext for getting money out to Reddam before the San Mateo Court ruled.

CashCall received the Katten payment on September 14.  SS 18.  Although Reddam's deadline for making a third quarter estimated tax payment was September 15,[5] Meeks did not make his "tax distribution" to Reddam until six weeks later, on October 26.  SS 23.

███████████████████████████████████████████████████████████

██████████████████████████████.  Ex. 8, 11; Ex. 5 65:22-66:6.

███████████████████████████████████████████████████████

███████████████████.  Ex. 12, 13.  Meeks had been active during the class trial, serving as CashCall's' client representative during the trial.  Ex. 14.  The brief ████████ summarized the trial evidence supporting a judgment against CashCall, and made clear that the Class was asking for at least $243 million, roughly the same amount the court eventually awarded:

> Plaintiff introduced two separate methodologies for restitution based on loan data provided by CashCall.  In both, Mr. McFarlane calculated borrowers' total payments and then deducted the unpaid principal on the loans to determine restitution.  In Methodology 1, he calculated that the total amount of interest paid on the loans made during the Class period was $292,393,266.  In Methodology 2, he calculated that the total amount of interest paid by Class members *above 36%* interest was $243,355,073.

Ex. 13 at 23:27-24:8, record citations omitted, emphasis added.  The brief went on to state that "Plaintiff … respectfully submits that Methodology 1 is the more appropriate approach …."  *Id*. at 25:1.

███████████████████ and then preparing the September financials in mid-October (Meeks Dec. ¶ 8), on October 26—five calendar days before the San Mateo Court would be hearing closing arguments for the trial on November 1—Meeks processed the distribution to Reddam on October 26.  Meeks Dec. ¶ 9 & CE Ex. 6; SS 31.

This evidence proves that Meeks was aware of the size of the Class claim, and as soon as he had completed the September financials in mid-October, took action to get money out the door

---

[5] Ex. 3 at 23:19-24:18; Ex. 2 77:24-78:14.

- 9 -

to Reddam as soon as he could.  His deposition testimony quoted above, alone, supports the inference that that, not tax considerations, was his true motive for the timing and size of his distribution to Reddam.   Ex. 1 131:9-25.

Defendants present an alternative scenario, ████████████████████████████ ████████████████████████████████████.  Ex. 6.  Construing the evidence as a whole in favor of plaintiff, a triable issue of fact nevertheless remains as to Meeks' true motive.

Meeks' tax justification rings false:  Estimated income taxes are due April 15, June 15, September 15, and January 15 of the following year.  McGrath Depo. (Ex. 3) 23:19-24:18; Ex. 2 77:24-78:14.

Meeks did not know Reddam's next estimated tax deadline and made no attempt to find out.  Ex. 1 131:1-133:15.  Elizabeth Emrick is Reddam's "personal CFO" and handles his tax matters.  Ex. 2 11:24-19; Ex. 4 20:20-25; Ex. 3 17:24-18:31.  CPA Michael McGrath advises Emick about Reddam's estimated tax amounts and prepares his tax returns.  Ex. 2 56:10-23; 58:12-18.

Meeks contacted Emrick around October 26, but only get the income tax rates he used in calculating the distribution.  Ex. 1 129:14-25; CE Ex. 6.  He did not ask her when Reddam's next estimated tax payment was due, or how much Reddam would owe.  Ex. 2 76:13-17; 79:12-17.  Nor did he ask Reddam's tax preparer, CPA McGrath.  Ex. 1 131:21-25.  ████████████████████████████ ████████████████████.  Ex. 3 59:6-62:1; 69:23-72:15; Ex. 15, 19, 20.  He did not have to pay any additional income tax until January 15, 2022.  Ex. 2 78:24-78:1; Ex. 3 24:14-18.

Meeks' October 26 distribution bore no relationship to the amount of tax Reddam actually owed or would end up owing for 2021.  Reddam had already paid ████████████████ ██████████████.  Levy Dec. ¶ 19 & Ex. 15.  He paid ████████████████ ████████████.  *Ibid.*  His total tax payments on account of 2021 were only ████████ of the October 2021 payment to him, which ████████████████████████████.  *Ibid.*   Even taking account of the credits Reddam claimed against 2021 taxes (including prior year refunds, etc.), his total payments and credits on account of 2021 taxes amounted ████████████████

███████████████████████████████████████████████████████████████.

*Ibid.*

Meeks based the distribution on CashCall income on the CashCall's "book income" from CashCall's internal profit and loss statement through September 30, 2021. SS 24; Meeks Dec. ¶ 8 & CE Ex. 5 at p. 57, 6; Ex. 1 125:25-126:15; Ex. 6. But CashCall's "book" or raw financial statement income is not the "taxable income" that Reddam had to report for income tax purposes. Ex. 3 20:22-22:23. Meeks did not know what CashCall's taxable income was, and made no attempt to find out. Ex. 1 126:16-127:19.

Although Meeks based the distribution to Reddam on book income of ██████████, CashCall's 2021 annual income was falling after September 30. Ex. 1 124:17-125:24;136:21-24. CashCall's book income fell by ████████████████████ as of the end of 2021. *Id*. 136:21-24  CashCall's taxable income was even less, $49.3 million. Ex. 3 84:6-85:7; Ex. 16.

On January 17, 2022—five days before the San Mateo Court's Tentative Decision—Meeks learned that CashCall's 2021 taxable income was about ███████████ than the figure he had used in calculating the distribution to Reddam, only about half of the figure Meeks had used. *Ibid*. Even after Meeks came to realize that he had used a figure nearly twice CashCall's actual 2021 taxable income, he did not think the distribution had been "excessive," and did not ask Reddam for a refund. Ex. 1 136:25-138:9, SS 32.

If Meeks had paid Reddam while having a contingency plan in place to cover the potential for liability to the Class and a potential adverse judgment, that might show an absence of intent to hinder, delay, or defraud the Class. But here the opposite is true: Meeks and CashCall had no such plan. Ex. 1 42:11-47:2; Ex. 1 49:10-23. That Meeks paid out half of the Katten settlement to Reddam while having no plan for addressing the substantial objective potential that existed at the time for a large Class judgment against CashCall shows an intent to hinder, delay, or defraud the Class. SS 31, 32, 36, 38; CE Ex. 7; Ex. 6, 8, 10, 11.

- 11 -

iv.    Badge (9): "Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"

Plaintiff addresses insolvency below in the context of constructive liability.   CashCall was insolvent at the time of the distribution.  See pp. 14-20, below.

v.    Badge (8): "Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"

If the debtor receives reasonably equivalent value from the transferee in exchange for a transfer, that militates against liability under subdivision (a)(1).  (Civ. Code, § 3439.04, subd. (b)(8).)  That is because fair consideration received by the debtor would not unreasonably deplete the debtor's assets.

But here, CashCall received no consideration from Reddam.  The distribution simply depleted funds from CashCall that could otherwise have been applied in satisfaction of the Class Judgment.

CashCall's financial statements are clear that Reddam returned no property or other consideration in exchange for the distribution.  ███████████████████████████.  CE Ex. 5, at p. 58 ("██████████████").  CashCall booked the payment as a ███████."  Ex. 6; Ex. 8 at p. 79 ("██████████").

CashCall does not challenge that the complaint accurately alleges that the payment to Reddam was a "distribution."  (Complaint ¶ 18.)  A "distribution" is a payment to a shareholder solely by reason of ownership—e.g., a dividend paid to shareholder—and does not represent remuneration for services or other compensation.  Corporations Code section 166 defines "distribution" as "the transfer of cash or property by a corporation to its shareholders *without consideration*, whether by way of dividend or otherwise …."  (Emphasis added.)

That CashCall is an S corporation simply confirms that Reddam returned no consideration to CashCall in return for the distribution, far from proving the contrary.  CashCall has been an S corporation from its inception.  Reddam Dec. ¶ 3; Ex. 4 18:1-19:2.  "As an S corporation, CashCall *does not pay* federal or state income taxes, other than a 3.5% California state financial institutions tax." SS 4, emphasis added.  "As the sole shareholder of an S Corporation, Reddam *is*

- 12 -

*responsible* for all state and federal income taxes for taxable income generated by CashCall." SS 5, emphasis added.

Reddam's decision, as CashCall's founder, to elect S corporation tax treatment, means that CashCall incurs no income tax liability (except for 3.5% California tax).  Instead, Reddam is personally liable to pay income tax on all of CashCall's taxable income.  Significantly, CashCall's *losses* are also passed through to Reddam that shelter and reduce his personal income liability.  Ex. 3 25:19-26:5. Therefore, when CashCall makes a "tax distribution" to Reddam, it is making a payment on account of a debt only Mr. Reddam owes, not CashCall.  There is no "reasonably equivalent value" in exchange for such a payment:

> Like an S-corporation, SGK had no income tax liability of its own; its members were required to treat their share of SGK's income as a personal tax liability. Assuming that SGK had committed to pay its members enough cash to satisfy their tax liability for a given year, this arrangement—even if called a contract— was equivalent to a corporate dividend; fulfilling the commitment would not produce any benefit to SGK.

(*Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Group, LLC* (Bankr. N.D. Ill. 2014) 521 B.R. 842, 859.)

2.      Summary Adjudication Should Be Denied on the Second Cause of Action: There is a Triable Issue of Fact on CashCall's Insolvency

Section 3439.05(a) renders a transfer voidable "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor *was insolvent at that time* or the debtor became insolvent as a result of the transfer or obligation."  (Emphasis added.)

In its brief and Separate Statement, CashCall does not raise the issue whether the transfer was made for reasonably equivalent value.[6]  Therefore, the only issue under section 3934.05 is whether CashCall was objectively insolvent at the time of the distribution to Reddam.

---

[6]  However, as shown above there was no reasonably equivalent value.  See pp. 12-13, above.

- 13 -

a.    CashCall Has Failed to Carry Its Burden of Proving Insolvency

The UVTA provides that "A debtor is insolvent if, *at a fair valuation*, the sum of the debtor's debts is greater than the sum of the debtor's assets."  (Civ. Code. § 3439.02, subd. (a), emphasis added.)

Insolvency is an issue of fact and CashCall tenders it as such.  SS 27.  The Separate Statement bases CashCall's proof of solvency on paragraph 10 of the Meeks Declaration.  *Ibid*. There he uses the words of the statute, "the sum of CashCall's debts did not exceed its assets, as reflected in the financial statements through September 30, 2021," without mentioning the "fair valuation" requirement.  CE Ex. "C", ¶ 10.  His testimony at best states a conclusory, subjective, and unsupported opinion that fails to establish that he has applied the UVTA's "fair valuation" standard and has conducted any valuation analysis in conformity with that standard. Viewing his testimony in the light most favorable to plaintiff, he has not, and CashCall's insolvency proof fails.

CashCall's September 30, 2021 unaudited internal balance sheet does not cure this deficiency. ████████████████████████████████████████████████████.  CE Ex. 5 at p. 58.  There is no testimony establishing any of the liabilities are valued in compliance with the UVTA's "fair valuation" standard.  CashCall's September 30 internal financial statements ████████████████████████████████████████████ *Id*. at p. 58. ████████████████████████████████████████████████████████████████████████████████████████████████████████. *Ibid*.; Ex. 1 124:3-11; Pfeiffer Dec. ¶¶ 17, 18.

CashCall appears to take the position that the insolvency determination does not have to account for CashCall's liability to the Class because Judgment was not entered until November 2023.  That is incorrect.

Under the UVTA, a "debt' is "liability on a claim."  The Class had a "claim"  because it had "a right to payment … *whether or not the right [had been] reduced to judgment*, liquidated, *unliquidated*, fixed, *contingent*, matured, unmatured, *disputed*, [or] undisputed …"  (Civ. Code, §

- 14 -

3439.01, subd. (a), emphasis added.)   Because the class claim arose before the transfer, plaintiff has the right to avoid it based on section 3439.05.

In determining insolvency, "fair valuation" of a company's liabilities must take account of liabilities that are disputed, contingent, and/or unliquidated debts and before they have been reduced to judgment.  (*E.g.*,  *In Re Xonics Photochemical* (7th Cir. 1988) 841 F.2d 198, 200 [unasserted potential claim on loan guarantee had to be discounted for solvency purposes, Posner, J.]; *Freedland, supra,* 540 F.3d at 731-32 [furnace-related claims, both filed and threatened, had to be valued and "appropriately discounted" in determining solvency]; *Dundon v. McKinsey & Co.* (S.D.N.Y. 2025) 674 B.R. 349, 419-420 [failure to account for unadjudicated opioid liabilities "led to an exaggerated perception of the company's solvency"]; *In re W.R. Grace & Co.* (Bankr. D. Del. 2002) 281 B.R. 852, 859-62 [unasserted asbestos claims had to be included in fair valuation analysis for determining the company's solvency].)[7]

According to the Uniform Act, the UVTA's insolvency definition "is derived from the definition of 'insolvent' in Bankruptcy Code § 101(29)(A) (1984). The definition in subsection (a) contemplates a fair valuation of the debts as well as the assets of the debtor."  (App. Ex. "A" at p. 14.)

The Bankruptcy Code section defining "insolvent" has been renumbered without substantial change.  (11 U.S.C. § 101(32) [App. Ex. "B"].)   Section 3439.02(a) uses substantially the same language as the Bankruptcy Code in defining insolvency. Judicial interpretation of federal laws "is persuasive authority and entitled to substantial weight" when interpreting parallel California statutes. (*Olson v. Six Rivers Nat'l Bank* (2003) 111 Cal.App.4th 1, 12, citing *Kahn v. Kahn* (1977) 68 Cal.App.3d 372, 387; *Aguilar v. Mandarich Law Group, LLP* (2023) 87 Cal.App.5th 607, 627.)

The Uniform Act departs from the rule of valuing liabilities at their face value and requires "discounting the face amount of a contingent debt to reflect the probability that the contingency will not occur ...."  (App. Ex. "A" at  pp. 14-15.)  The foundational decision on

---

[7]   See also discussion at pp. 19-20, below.

- 15 -

unliquidated contingent debt is *Xonics*. *Xonics* dealt with a "contingent liability," a guarantee the bankruptcy debtor (Xonics) had signed, but had not yet been called upon to pay. The bankruptcy trustee sued to recover payments made to Mitsui as voidable preferences. "The dispositive issue was whether Xonics Photochemical had been insolvent when the payments to Mitsui were made; that is, did the fair value of its liabilities exceed the fair value of its assets" under the Bankruptcy Code. (*Xonics*, *supra*, 841 F.2d at 199.)

The court rejected the position that the guarantee had to be counted at the face value of the debt as "absurd" because it ignored entirely the probability that the debtor would never be called upon to pay the guarantee. Instead, the court adopted the "probability discount" test:

> By definition, a contingent liability is not certain -- and often is highly unlikely -- ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.

(*Xonics*, 841 F.2d at 200.)

> The principle just outlined has long been recognized in cases dealing with the question whether a firm is insolvent within the meaning of the Bankruptcy Code (and this is such a case). It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or <u>liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities</u>.

(*Ibid.*, emphasis added.)

The courts have followed *Xonics* by applying the probability discount rule in valuing contingent liabilities to determine insolvency. *Covey v. Commercial Nat'l Bank* (7th Cir 1992) 960 F.2d 657, 660 ["a firm whose assets are worth less than book value may be insolvent despite a financial statement showing positive net worth"]; *Freeland, supra*, 540 F.3d at 732 ["a bankruptcy court must calculate an appropriately discounted value for contingent liabilities"]; see also, *e.g.*, *Merkel v. Commissioner* (9th Cir. 1999) 192 F.3d 844, 840 [agreeing that "as a general proposition 'discounting a contingent liability by the probability of its occurrence is good economics and therefore good law'", but distinguishing *Covey* because, unlike the Bankruptcy Code, the applicable Tax Code definition (26 U.S.C. § 108(d)(3)) provided that liabilities are not

- 16 -

discounted but valued at face value]; *In Re Sierra Steel* (9th Cir. B.A.P. 1989) 96 B.R. 275, 278-79; *Dundon*, *supra*, 674 B.R. at 418-21.)

CashCall does not submit any probability discount analysis to determine the "present or expected value" of the class liability. Pfeiffer Dec. ¶¶ 12-15, 19. CashCall's simply treats its liability to the Class as non-existent. Because CashCall's motion fails to provide any "fair valuation" of the class liability, it has failed to carry its summary judgment burden on the Second Cause of Action and its motion should be denied.

b.    A Triable Issue of Fact Exists as to CashCall's Insolvency

There is, at minimum, a triable issue of fact as to CashCall's insolvency, and CashCall's motion entirely fails to address it. Pfeiffer Dec. ¶¶ 16-21. At the time of the distribution to Reddam, there was a substantial objective probability of CashCall being held liable for $245 million. *Id.* ¶¶ 20, 21. That probability rendered CashCall insolvent under the "fair valuation" standard. *Ibid.*; see also evidence cited disputing SS 27.

Eight months before the distribution, the San Mateo Court had already denied CashCall's summary judgment motion in an Order dated February 25, 2021. Ex. 10. The California Supreme Court had already rejected CashCall's argument that the Class claim constituted impermissible judicial economic policymaking. (*De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 991.) The parties had already gone through a 13-day trial, during which CashCall presented testimony from three defense experts with distinguished credentials, including Christopher James (the William H. Dial/SunTrust Eminent Scholar in Finance and Economics at the University of Florida), Bruce Carlin (professor of finance at Rice University and the University of Chicago), and Gordon Klein (on the faculty at UCLA's Anderson School of Management). Levy Dec. ¶ 23.

CashCall would not have invested so heavily in its defense unless it took the Class claims seriously.

The UVTA requires that insolvency be determined as of the "time of the transfer." This requires an "objective valuation" of solvency. (*W.R. Grace*, *supra*, 281 B.R. at 857; *Lids Corp. v. Marathon Partners, L.P.* (Bankr. D. Del. 2002) 281 B.R. 535, 547 ["We conclude that

- 17 -

Marathon's arguments are based on a subjective evaluation of Lids' solvency rather than the objective test required by section 547(b)".)

Objective fair valuation but does not put blinders on the court as to post-valuation date events.  Valuation may include consideration of information "originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date, which assures that the valuation is based in reality." (*In re Mama De'Angelo, Inc.* (10th Cir. 1995) 55 F.3d 552, 556; *W.R. Grace*, *supra*, 281 B.R. at 869; *In re Adelphia Commc'ns Corp.* (Bank. S.D.N.Y. 2014) 512 B.R. 447, 495; *Dundon*, *supra*, 674 B.R. at 416-17.)

That CashCall would prevent the court from *any* consideration that the Class has an affirmed Judgment against it for $245 million is to advance a valuation process that has no basis in reality.

Shortly after the distribution, on January 22, 2022, the San Mateo Court issued its decision tentatively holding CashCall liable to pay "restitution of any and all interest payments made to Defendant CashCall Inc. on those consumer loans funded during the Class Period; offset by any and all loan principal amounts (including the $75 fees) on the consumer loans made by Defendant to Plaintiff and the Class on those same consumer loans."  CE Ex. 8.  CashCall's General Counsel ███████████████████████████████████ ███████████████████████████████████ Ex. 17.  Shortly after the Tentative Decision issued, ███████████████████████████████████. Ex. 13.  Greines briefed and argued the appeal for CashCall in the First District.  Levy Dec. ¶¶ 9, 22 & Ex. 18-A, -B.

This evidence shows that upon receiving the Tentative Decision, CashCall had already evaluated that its chances of avoiding an adverse judgment in the trial court were slim.  CashCall would not have decided *so quickly* to appeal and retain appellate specialty counsel if it had not already evaluated its prospects otherwise.  Even at the time of the distribution, CashCall already believed that the court was likely going to rule against it.

Finally, there is the Judgment itself and the Court of Appeal decision affirming the San Mateo Judgment.  CE Ex. 13; Levy Dec. ¶ 2.  Because the Court of Appeal has affirmed, after

- 18 -

fully considering two appeal briefs from CashCall containing its best arguments for reversing the Judgment, the objective probability of the $245 million was substantial as of October 26, 2021. This rendered CashCall insolvent under the fair valuation standard at the time of the transfer. Pfeiffer Dec. ¶¶ 16-21.

> i.    The Baker Tilly Audited Financial Statements Do Prove Any Fair Valuation of CashCall's Liability to the Class

Although CashCall does not cite its audited 2021 financial statements in its Separate Statement, plaintiff will address them.  CE Ex. 7.  Unlike the interim September 2021 financials, the year-end statements were audited by Baker Tilly.   But the audited financials █████████████████████████████████████████████████████████████████████████████████████  Ex. 1 76:11-22; Pfeiffer Dec. ¶¶ 17, 18.

To the extent CashCall might still argue that Baker Tilly's review and certification of the audited statements supports a solvency finding, the audited financials are inadmissible hearsay for the purpose of proving the value of the Class liability.  (Evid. Code, § 1200.)  CashCall presents no sworn testimony from Baker Tilly to vouch for any opinion of value.

Further, the audited financials do not apply the UVTA's "fair value" standard, which is different from auditing standards.  Pfeiffer Dec. ¶¶ 11, 12.  "There is no generally accepted accounting principle for analyzing the insolvency of a company." (*Arrow Elecs., Inc. v. Justus* (9th Cir. 2000) 218 F.3d 1070, 1076; *Sierra Steel*, *supra*, 96 B.R. at 278 ["Requiring application of GAAP would make accountants and the board which promulgate GAAP the arbiters of insolvency questions"]*; Tronox, Inc. v. Kerr-McGee Corp.* (Bank. S.D.N.Y. 2013) 503 B.R. 239, 301 ["A principal reason why financial statements are of little use in a solvency analysis is that generally accepted accounting principles (GAAP) require reserves only for claims that are 'probable and reasonably estimable'"]; *Lids Corp., supra,* 281 B.R. at 542-43.)

> ii.    Valuation of the Class Liability as Non-Contingent Debt

The alternative to applying the *Xonics* probability discount rule is to value CashCall's liability as non-contingent debt.  A "contingent debt" is "one which the debtor will be called upon

- 19 -

to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor." (*In re Fostvedt* (9th Cir. 1987) 823 F.2d 305, 306.)   The mere fact that a claim has not been adjudicated or reduced to judgment does not render it "contingent." (*In re Loya* (Bank. 9th Cir. 1991) 123 B.R. 338, 340 [creditor claim where no suit had been filed or otherwise pursued constituted non-contingent debt].)

Disputed liabilities based on past events triggering liability may be treated as not subject to a probability discount.  In *Tronox*, the court declined to apply a probability discount to matured but unliquidated environmental claims on the ground that, having matured, they are non-contingent. In rejecting an expert's valuation of the environmental claims, the court held

> His probabilistic analysis tends to assume that the environmental claims at issue here are mere contingent claims that should be subject to a discount for the probability they will never be pursued, whereas in fact environmental claims are claims that can be brought (or filed in a bankruptcy case) without satisfaction of a contingency…. [¶] Nevertheless, as Judge Wolin points out, tort liability, like the environmental liability in this case, is not a contingent liability.

(*Tronox*, *supra*, 503 B.R. at 313-14.)

The court instead required that the liability not be reduced by the probability of occurrence, but instead by applying a discount rate of 2.5% annually to arrive at a present value. (*Id.* at 314-15; see also *W.R. Grace & Co.*, *supra*, 281 B.R. at 863-64; *Ind. Bell Tel. Co. v. Lovelady* (W.D. Tex. Mar. 4, 2008) 2008 U.S. Dist. LEXIS 131600 at *14-17.)

Here, all events triggering CashCall's liability to the Class had already occurred before October 26, 2021. The Class definition was loans made between 2005 and 2011.  CE Ex. 12 at p. 178.  That requires valuing CashCall's liability at $245 million reduced by a modest discount rate (such as 2.5%) for two years.

Dated:  April 20, 2026                     LAW OFFICE OF ARTHUR D. LEVY

By: Arthur D. Levy

Michael A. Gould (SBN 151851)
THE GOULD LAW FIRM

*Attorneys For Plaintiff*
EDUARDO DE LA TORRE

- 20 -

CASE NO. 30-2024-01421309—PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT
404415052.1

Additional Counsel:

THE STURDEVANT LAW FIRM
James C. Sturdevant (SBN 94551)
jsturdevant@sturdevantlaw.com
A Professional Corporation
P. O. Box 151560
San Rafael, CA 94915
(415) 518-8636

GIBBS LAW GROUP LLP
Steven M. Tindall (SBN 187862)
smt@classlawgroup.com
1111 Broadway, Suite 2100
Oakland, CA 94607
(510) 350-9700
Fax: 510-350-9701

RUKIN HYLAND & RIGGIN LLP
Jessica Riggin (SBN 281712)
jriggin@rukinhyland.com
1939 Harrison Street, Suite 925
Oakland, CA 94612
(415) 421-1800
Fax: 415-421-1700

DAMON CONNOLLY LAW OFFICES
Damon Connolly (SBN 139779)
damon@damonconnollylaw.com
1888 Las Gallinas Ave.
San Rafael, CA 94903
(415) 250-6127

- 21 -

# EXHIBIT 7

Michael A. Gould (SBN 151851)
THE GOULD LAW FIRM
161 Fashion Lane, Suite 207
Tustin, California 92780-3364
Telephone: (714) 592-4936

Arthur D. Levy (SBN 95659)
LAW OFFICE OF ARTHUR D. LEVY
610 – 16th Street, Suite 420
Oakland, CA 94612
Telephone: (415) 702-4551

Attorneys for Plaintiff
EDUARDO DE LA TORRE

*Additional Counsel Appear on Signature Page*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| EDUARDO DE LA TORRE,<br><br>Plaintiff,<br><br>v.<br><br>JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive,<br><br>Defendants. | **REDACTED (PUBLIC) VERSION FILED WITH THE COURT PER CRC 2.551(b)(3)(A)(ii); LODGED VERSION CONTAINS MATERIAL DESIGNATED CONFIDENTIAL UNDER STIPULATED PROTECTIVE ORDER**<br><br>Case No. 30-2024-01421309<br><br>**PLAINTIFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 11, 2026<br>Time: 9:00 a.m.<br>Dept.: N15<br><br>Case Filed: August 21, 2024<br>Trial Date: October 12, 2026 |

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

Pursuant to Code of Civil Procedure section 437c(b)(3), plaintiff hereby responds to Defendants' Separate Statement of Material Facts and states additional facts as follows:[1]

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1. CashCall, Inc. ("CashCall") was formed in 2003 and is a finance lender licensed by the California Department of Financial Protection and Innovation. (Reddam Decl. ¶ 2) | Undisputed. |
| 2. John Paul Reddam is CashCall's founder and sole shareholder. (Reddam Decl. ¶ 2) | Undisputed; see also Ex. 4 10:12-12:13. |
| 3. CashCall is an S Corporation. (Reddam Decl. ¶ 3) | Undisputed. |
| 4. As an S corporation, CashCall does not pay federal or state income taxes, other than a 3.5% California state financial institutions tax. (Reddam Decl. ¶ 3) | Undisputed. |
| 5. As the sole shareholder of an S Corporation, Reddam is responsible for all state and federal income taxes for taxable income generated by CashCall. (Reddam Decl. ¶ 3) | Undisputed. |
| 6. In 2008, a California consumer filed a putative class action complaint against CashCall in federal court, Case No. 3:08- cv-03174-TSH (N.D. Cal.), that was eventually | Undisputed. |

---

[1] Defendants' exhibits are identified by "CE" (Compendium of Evidence). Plaintiff's exhibits are identified by "Ex."

- 1 -

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| captioned *De la Torre v. CashCall, Inc.* (the "Federal Litigation"). Among other claims in the Federal Litigation, the plaintiffs alleged that the interest rates CashCall charged on loans to California borrowers were unconscionable and therefore unlawful under the California Unfair Competition Law. (Seiling Decl. ¶ 2) | |
| 7.   In 2017, CashCall and Reddam filed a lawsuit in Orange County Superior Court against their former outside counsel for legal malpractice and other claims related to advice given in connection with CashCall's non-California lending operations (the "Malpractice Case"). (Reddam Decl. ¶ 5) | Undisputed. |
| 8.   The Federal Litigation was dismissed by the federal court without prejudice for lack of subject matter jurisdiction in February 2019.  (*De La Torre v. CashCall, Inc.* (N.D. Cal. Feb. 5, 2019) No. 08-CV-03174-TSH, 2019 WL 452028, at *4.) | Undisputed. |
| 9.   On March 7, 2019, De La Torre filed a class action complaint against CashCall in San Mateo County Superior Court, captioned *Eduardo de la Torre v. CashCall, Inc.*, No. | Undisputed, except the allegation was that the *loans* were unconscionable, not just the interest rates. |

- 2 -

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 19CIV01235 (the "San Mateo Litigation"), again alleging that the interest rates CashCall charged on loans to California borrowers were unconscionable and therefore unlawful under the California Unfair Competition Law. (Seiling Decl. ¶ 9) | |
| 10. A bench trial in the San Mateo Litigation commenced on March 8, 2021. (Seiling Decl. ¶ 10) | Undisputed. |
| 11. The last day of trial testimony in the San Mateo Litigation was May 14, 2021; there were a total of 13 days of trial testimony. (Seiling Decl. ¶ 10) | Undisputed. |
| 12. On August 6, 2021, ten days before the trial of the Malpractice Case was scheduled to commence, CashCall and Reddam agreed to settle the case and signed a confidential Settlement Term Sheet. (Reddam Decl. ¶ 6, Compendium Ex. 1) | Undisputed. |
| 13. The San Mateo Litigation played no role in CashCall and Reddam's decision to settle the Malpractice Case or the timing of the settlement. (Reddam Decl. 14) | Undisputed. |
| 14. On August 9, 2021, Reddam and CashCall, through Elizabeth Emrick, their in- | Undisputed. |

- 3 -

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| house tax advisor, asked their tax accountant (Michael McGrath of Financial Advocates) to conduct a tax analysis to determine whether the proceeds from the settlement of the Malpractice Case should be paid to CashCall, Reddam, or some combination of the two. (Emerick Decl. ¶¶ 7–9, Compendium Ex. 3) | |
| 15. The confidential Malpractice Case Settlement Agreement was signed on August 13, 2021. (Reddam Decl. ¶ 9 & Compendium Ex. 2) | Undisputed. |
| 16. ███████████ (Reddam Decl. ¶¶ 7, 10, Compendium Exs. 1 & 2) | Undisputed. |
| 17. On September 9, 2021, Michael McGrath provided his tax analysis, which concluded that payment of the entire proceeds from the Malpractice Case Settlement Agreement to CashCall was the best approach from a tax | Undisputed. |

- 4 -

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| perspective because it would result in the lowest tax obligation. (Emrick Decl. ¶ 11 & Compendium Ex. 3) | |
| 18. On September 14, 2021, the net proceeds from the Malpractice Case Settlement Agreement were wired into CashCall's bank account. (Meeks Decl. ¶ 6) | Undisputed. |
| 19. CashCall and Reddam understood that the Malpractice Case settlement payment would result in a substantial increase in CashCall's net income that potentially could result in a significant tax obligation for Mr. Reddam. (Meeks Decl. ¶ 7) | Undisputed as to Meeks' understanding. Cited testimony does not support that Meeks had personal knowledge of Reddam's state of mind on the subject. |
| 20. Reddam and CashCall's chief financial officer Delbert Meeks discussed making a distribution to Reddam for tax purposes. (Meeks Decl. ¶ 7) | Undisputed. |
| 21. CashCall had made distributions to Reddam on numerous prior occasions to account for anticipated tax obligations arising out of CashCall's taxable income. (Meeks Decl. ¶ 7) | Undisputed. |
| 22. The parties submitted opening post-trial briefs in the San Mateo Litigation on | Undisputed. |

- 5 -

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| September 20, 2021, and reply briefs on October 4, 2021. (Seiling Decl. ¶ 10) | |
| 23. On October 26, 2021, CashCall sent a wire transfer to Reddam (the "Tax Distribution"). (Meeks Decl. ¶ 9) | Undisputed. |
| 24. The amount of the Tax Distribution was calculated by applying the maximum California and federal tax rates to CashCall's net income as of September 30, 2021. (Meeks Decl. ¶ 8; Emrick Decl. ¶ 12) | Undisputed that Meeks based the distribution on CashCall's "book income" as reflected in September 30, 2021 internal financial statements that he had prepared. Meeks Dec. ¶ 8 & CE Ex. 5 at p. 57, 6; Ex. 1 125:25-126:15; Ex. 6. |
| 25. The San Mateo Litigation played no role in CashCall's decision to make the Tax Distribution to Reddam or the amount of the Tax Distribution. (Meeks Decl. ¶ 13; Reddam Decl. ¶ 14) | Disputed based on multiple badges of fraud under Civil Code § 3439.04(b) and other evidence.  The facts and evidence supporting the badges and fraud and other evidence are stated in Additional Fact Nos. 43-66, below, and also in response to Separate Statement (SS) 27.  These facts  are incorporated by reference in this response by reference to promote readability and avoid repetition. |
| 26. At the time of the Tax Distribution and through the end of 2021, CashCall was paying its debts as they came due. (Meeks Decl. ¶ 10) | Disputed. Levy Dec. ¶ 27 & Ex. 21; Ex. 5 45:15-46:20, 65:22-66:8; Ex. 9. |

- 6 -

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 27. At the time of the Tax Distribution and through the end of 2021, the total sum of CashCall's debts was not greater than the total sum of its assets. (Meeks Decl. ¶ 10)<br><br>Objection to Evidence no. 1. | Disputed. At a fair valuation of CashCall's liability to the Class, CashCall was insolvent under the standard of Civil Code § 3439.02(a) at the time of the distribution.  Pfeiffer Dec. ¶¶ 12-21; SS Nos. 9, 10, 11, 13, 22, 32-38; CE Ex. 8, 9, 10, 11, 12, 13; Ex. 10, 12, 13, 16, 17, 18; Levy Dec. ¶¶ 2, 9, 22, 23, 24. |
| 28. At the time of the Tax Distribution, CashCall had no plans to cease doing business. (Meeks Decl. ¶ 11; Reddam Decl. ¶ 7, 10, Compendium Exs. 1 & 2) | Undisputed, but CashCall had not made any loans for three years.  Ex. 1 19:19-20:11; 96:2-11; Ex. 5 74:8-19. |
| 29. At the time of the Tax Distribution, Reddam had no plans to initiate bankruptcy of insolvency proceedings for CashCall. (Reddam Decl. ¶ 10, Compendium Exs. 1 & 2) | Undisputed. |
| 30. CashCall continues to do business and is originating new loans. (Meeks Decl. ¶ 11) | Undisputed that CashCall continues to make a few loans per month.  Ex. 5 74:8-19. |
| 31. The court in the San Mateo Litigation held closing arguments on November 1, 2021. (Seiling Decl. ¶ 10) | Undisputed. |
| 32. On January 20, 2022, the court in the San Mateo Litigation issued a Tentative Ruling After Court Trial. (Seiling Decl. ¶ 11 & Compendium Ex. 8) | Undisputed. |

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 33. Ten months later, on November 17, 2022, the court in the San Mateo Litigation issued a Proposed Statement of Decision After Court Trial. (Seiling Decl. ¶ 12 & Compendium Ex. 9) | Undisputed. |
| 34. Both sides filed objections to the Proposed Statement of Decision; CashCall filed its objections on December 19, 2022. (Seiling Decl. ¶ 12) | Undisputed. |
| 35. On August 22, 2023, the court in the San Mateo Litigation issued a Final Statement of Decision that made revisions to the Proposed Statement of Decision and awarded monetary restitution to De La Torre and the class in the amount of $245,515,389. (Seiling Decl. ¶ 13 & Compendium Ex. 10) | Undisputed. |
| 36. On August 31, 2023, the court in the San Mateo Litigation issued its Judgment After Court Trial. (Seiling Decl. ¶ 14 & Compendium Ex. 11) | Undisputed. |
| 37. On September 7, 2023, CashCall moved for a new trial and to vacate the judgment. (Seiling Decl. ¶ 15) motion for new trial and to vacate the judgment, but exercised its discretion to issue an Amended Final | Undisputed. |

- 8 -

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Statement of Decision and Amended Judgment. (Seiling Decl. ¶ 15, Compendium Ex. 12 & 13) | |
| 38. On November 7, 2023, the court in the San Mateo Litigation denied CashCall's motion for new trial and to vacate the judgment, but exercised its discretion to issue an Amended Final Statement of Decision and Amended Judgment. (Seiling Decl. ¶ 15, Compendium Ex. 12 & 13) | Undisputed. |
| 39. On November 17, 2023, Plaintiff filed a Motion for an Amended Judgment. (Seiling Decl. ¶ 16) | Undisputed. |
| 40. On November 29, 2023, CashCall filed a notice of appeal with regard to the November 2023 Amended Judgment. (Seiling Decl. ¶ 17) | Undisputed.  On February 27, 2026 the First District Court of Appeal affirmed the Judgment in full in an unpublished opinion. See Case No. A169205.  Levy Dec. ¶ 2. |
| 41. On January 9, 2024, the court in the San Mateo Litigation denied Plaintiff's motion for an amended judgment. (Seiling Decl. ¶16) | Undisputed. |
| 42. On January 19, 2024, the court in the San Mateo Litigation granted *preliminary* approval of Plaintiff's motion for attorneys' | Undisputed. |

- 9 -

404415052.1

| DEFENDANTS' MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| fees and a plan of allocation, which order stated in part:<br><br>As the Judgment is on Appeal and no payment has been made or received, the Court's approval of the Amended Plan of Distribution and the Court's approval of the Plaintiffs' counsel's requests for attorneys' fees and reimbursement of costs is PRELIMINARY APPROVAL [sic]. Members of the Certified Class are entitled to received [sic] written Notice of the Judgment, the Amended Plan of Distribution, and the preliminary approval of the Fee and Cost award, including the incentive award to the named Plaintiff, and the opportunity to file Objections thereto. A Notice to the Class, the setting of an Objection deadline and the setting of a Hearing on Final Approval must be done AFTER the Appeal is completed and final, and any Judgment is paid or otherwise recovered.<br><br>(Seiling Decl. ¶ 18 & Compendium Ex. 14) | |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION ||
|---|---|
| **PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE** | **DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE** |
| 43.     Within CashCall, Meeks alone made the decision to pay ▮▮▮▮ to Reddam on October 26, 2021, without consulting Reddam's personal tax advisor, Elizabeth Emrick, other than to obtain income tax rates, or Reddam.  Ex. 1 129:4-130:25; 132:1-8; Ex. | |

- 10 -

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION

| PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE | DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 2 10:24-11:18; 79:12-80:17; Ex. 4 105:16-107:5. | |
| 44.   The amount of the distribution Meeks made to Reddam on October 26, 2021 was ███████. Meeks ¶¶ 8, 9; CE Ex. 6. | |
| 45.   The distribution was ████████ ███ than Reddam actually owed in income taxes for 2021.  Ex. 15 & Levy Dec. ¶ 19. | |
| 46.   By 2015, CashCall was beginning to wind down and by the time of the distribution had not made any loans for three years.  Ex. 7; Ex. 1 19:19-20:11; 96:2-11; Ex. 5 74:8-19. | |
| 47.   The Katten Settlement brought a "huge cash settlement" into CashCall's ████ ████████████. Ex. 1 129:4-20; CE Ex. 5 at p. 59 ███████████████). | |
| 48.  ████████████████████████ ████████████████████████ ████████████████████████ ████████. CE Ex. 7 at p. 87; Ex. 1 93:10-96:1; Ex. 5 45:15-46:20, 65:22-66:8; Levy Ex. 8, 9. | |

- 11 -

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION | |
| --- | --- |
| **PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE** | **DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE** |
| 49. Meeks did not know the tax law and had a strong motive for getting money out of the Katten settlement to his boss, Reddam. Ex. 1 10:1-3; 23:14-18; 129:4-20; 131:9-25. | |
| 50. CashCall's "book" or raw financial statement income as of September 30, 2021, which Meeks used to calculate the distribution amount, is not the "taxable income" that Reddam had to report for income tax purposes. SS 24; Meeks Dec. ¶ 8; Ex. 3 20:22-22:23. | |
| 51. In calculating the distribution, Meeks did not know what CashCall's taxable income was, and made no attempt to find out. Ex. 1 126:16-127:19. | |
| 52. Estimated income taxes are due April 15, June 15, September 15, and January 15 of the following year. McGrath Depo. (Levy Ex. 3) 23:19-24:18; Ex. 2 77:24-78:14. | |
| 53. Meeks did not know when Reddam's next estimated tax payment was due and made no attempt to find out. Ex. 1 131:1-133:15. | |

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION | |
|---|---|
| **PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE** | **DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE** |
| 54.     Long before the distribution, ██████████ ████████████████████ ████████████████████ ██████. Ex. 3 59:6-62:1; 69:23-72:15; Levy Ex. 15, 19, 20. | |
| 55.     At the time of the distribution, Reddam did not have to pay any additional income taxes on account of 2021 until January 15, 2022.  Ex. 2 78:24-78:1; Ex. 3 24:14-18. | |
| 56.     Although Reddam's deadline for making a third quarter estimated tax payment was September 15, Meeks did not make any "tax distribution" to Reddam until six weeks later, on October 26.  SS 23; Ex. 3 at 23:19-24:18; Ex. 2 77:24-78:14. | |
| 57.     On September 20, 2021 ████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ██████████. Ex. 12, 13. | |

- 13 -

404415052.1

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION

| PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE | DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| 58. After ███████████ ███ preparing the September financials in mid-October, Meeks processed the distribution to Reddam on October 26. Meeks Dec. ¶¶ 8, 9 & CE Ex. 6; SS 31. | |
| 59. CashCall ████████ ██████████ ████████ before October 26, but Meeks did not make the distribution to Reddam until after Meeks had received plaintiff's brief and right before the San Mateo Court was going to hear final arguments. SS 22, 23, 31; Meeks Dec. ¶¶ 8, 9 & CE Ex. 6; Levy Ex. 8, 11; Ex. 5 65:22-66:6. | |
| 60. Meeks based the distribution on ████ ██████ "book income" from CashCall's internal profit and loss statement as of September 30, 2021. SS 24; Meeks Dec. ¶ 8 & CE Ex. 5 at p. 57, 6; Ex. 1 125:25-126:15; Ex. 6. | |
| 61. After September 30, 2021, CashCall's 2021 year-to-date book income ████████ | |

- 14 -

CASE NO. 30-2024-01421309— PLANITFF'S RESPONSE TO SEPARATE STATEMENT AND ADDITIONAL FACTS

404415052.1

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION | |
| --- | --- |
| **PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE** | **DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE** |
| ██████████████████████. Meeks 124:17-125:24;136:21-24; 136:21-24. | |
| 62.    CashCall's end of the year taxable income was $49.3 million.  Ex. 3 84:6-85:7; Levy Ex. 16. | |
| 63.    After Meeks knew that he had calculated the distribution using an income figure ████████████ ███████████████, he did not think the distribution had been "excessive," and did not ask Reddam for a refund.  Ex. 1 136:25-138:9, SS 32. ` | |
| 64.    CashCall had no contingency plan in place to cover the potential for liability to the Class and a potential adverse judgment.  Ex. 1 42:11-47:2; Ex. 1 49:10-23; see also SS 31, 32, 36, 38; CE Ex. 7; Ex. 6, 8, 10, 11. | |
| 65.    On March 10, 2021, CashCall's General Counsel ████████████ ████████████████████████ ████████████ Levy Ex. 17. | |
| 66.    By March 10, 2022, after the Tentative Decision had been issued and before there | |

- 15 -

404415052.1

**PLAINTIFF'S ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION**

| PLAINTIFF'S ADDITIONAL DISPUTED FACTS AND SUPPORTING EVIDENCE | DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| were any further court proceedings or hearing dates scheduled in the San Mateo Case, ███████████████. Ex. 13. | |
| 67. Reddam did not provide CashCall with reasonable equivalent value in return for the distribution. SS 3, 4, 5; CE Ex. 5, at p. 58 ("Due to Shareholder"); Ex. 6; Ex. 8 at p. 79 ("Distributions"). | |

Dated: April 20, 2026       LAW OFFICE OF ARTHUR D. LEVY

By:
    Arthur D. Levy

Michael A. Gould (SBN 151851)
THE GOULD LAW FIRM

*Attorneys For Plaintiff*
EDUARDO DE LA TORRE

Additional Counsel:

THE STURDEVANT LAW FIRM
James C. Sturdevant (SBN 94551)
jsturdevant@sturdevantlaw.com
A Professional Corporation
P. O. Box 151560
San Rafael, CA 94915
(415) 518-8636

- 16 -

404415052.1

GIBBS LAW GROUP LLP
Steven M. Tindall (SBN 187862)
smt@classlawgroup.com
1111 Broadway, Suite 2100
Oakland, CA 94607
(510) 350-9700
Fax:  510-350-9701

RUKIN HYLAND & RIGGIN LLP
Jessica Riggin (SBN 281712)
jriggin@rukinhyland.com
1939 Harrison Street, Suite 925
Oakland, CA 94612
(415) 421-1800
Fax:  415-421-1700

DAMON CONNOLLY LAW OFFICES
Damon Connolly (SBN 139779)
damon@damonconnollylaw.com
1888 Las Gallinas Ave.
San Rafael, CA 94903
(415) 250-6127

- 17 -

**EXHIBIT 8**

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
NORTH JUSTICE CENTER**

**MINUTE ORDER**

DATE: 07/10/2026                TIME: 04:30:00 PM        DEPT: N15

JUDICIAL OFFICER PRESIDING: Nathan Vu
CLERK: R. Castro
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: J. Campirano

CASE NO: **30-2024-01421309-CU-NP-NJC**    CASE INIT.DATE: 08/21/2024
CASE TITLE: **Torre vs. Reddam**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Non-PI/PD/WD tort - Other

EVENT ID/DOCUMENT ID: 74900864

**EVENT TYPE:** Under Submission Ruling

**APPEARANCES**

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 05/11/2026 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules, a copy which is attached hereto and incorporated herein for reference.

DATE: 07/10/2026                    MINUTE ORDER                        Page 1
DEPT: N15                                                            Calendar No.

## Motion for Summary Judgment and/or Summary Adjudication

Defendants John Paul Reddam's and CashCall, Inc.'s Motion for Summary Judgment or Summary Adjudication is **DENIED.**

Plaintiff Eduardo De La Torre's evidentiary objections to the Declaration of Delbert O. Meeks are **OVERRULED** as to evidentiary objection numbers 1-2.

Defendants John Paul Reddam's and CashCall, Inc.'s evidentiary objections to the Declaration of Arthur D. Levy are **SUSTAINED** as to Paragraph 19 and is **OVERRULED** as to Exhibit 7.

Defendants John Paul Reddam's and CashCall, Inc.'s evidentiary objections to the Declaration of Allen Pfeiffer are **OVERRULED** as to Paragraph 7; Footnote 5; Paragraphs 8, 9, 12, 13, 14, 15, 16 except for the last sentence, and 17; Table 1, Paragraphs 18, 19, 20, and 21, and **SUSTAINED** as to the last sentence of Paragraph 16.

Defendants John Paul Reddam and CashCall, Inc. are reminded that all evidentiary objections "must be referenced by the objection number in the right column." (Cal. Rules of Court, rule 3.1354(b).)

## Pending Motion

Defendant John Paul Reddam (Defendant Reddam) and Defendant CashCall, Inc., (Defendant CashCall) move for summary judgment on the Complaint for Avoidance and Recovery of Voidable Transfer [Civil Code §§ 3934 *et seq.*] (Complaint) filed by Plaintiff Eduardo De La Torre.

In the alternative, Defendants move for summary adjudication as to the 1st and 2nd Causes of Action of the Complaint.

## Standard for Summary Judgment or Summary Adjudication

A party may move for summary judgment, which "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

In addition, "[a] party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if the party contends that the cause of action has no merit, that there is no affirmative defense to the cause of action, that there is no merit to an affirmative defense as to any cause of action, that there is no merit to a claim for damages, . . . or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs." (Code Civ. Proc., § 437c, subd. (f)(1).)

A "party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

A defendant moving for summary judgment or summary adjudication satisfies the initial burden by submitting undisputed evidence "showing that a cause of action has no merit

[because] one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc. § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 850-51.) However, "[t]he defendant *must* indeed present evidence." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 855, italics original.)

If a defendant fails to meet this initial burden, the plaintiff need not oppose the motion and the motion must be denied. (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840.)

If the moving party meets its burden, the burden then shifts to the party opposing summary judgment to show, by reference to specific facts, the existence of a triable, material issue as to a cause of action or an affirmative defense. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 855; *Villacres v. ABM Industries, Inc.* (2010) 189 Cal.App.4th 562, 575.)

The nonmoving party must present substantial evidence in order to avoid summary judgment. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) "In some instances . . ., 'evidence may be so lacking in probative value that it fails to raise any triable issue.'" (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1083-1084, quoting *Advanced Micro Devices, Inc. v. Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791, 795.)

When the moving party has met its initial burden and the responding party fails to file an opposition or establish a triable issues of material fact, the court may grant summary judgment or summary adjudication. (*Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 543.)

Nonetheless, in ruling on a motion for summary judgment or summary adjudication, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom, and must view such evidence and such inferences in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843, citations omitted.) Courts "'construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.'" (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636, quoting *Seo v. All–Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202.)

A court may not make credibility determinations or weigh the evidence on a motion for summary judgment or adjudication, and all evidentiary conflicts are to be resolved against the moving party. (*McCabe v. American Honda Motor Corp.* (2002) 100 Cal.App.4th 1111, 1119.) "The court . . . does not resolve issues of fact. The court seeks to find contradictions in the evidence, or inferences reasonably deducible from the evidence, which raise a triable issue of material fact." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation of Los Angeles and Ventura Counties* (2009) 173 Cal.App.4th 740, 754, citation omitted.) "[S]ummary judgment cannot be granted when the facts are susceptible [of] more than one reasonable inference . . ." (*Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1392.)

1st Cause of Action (Avoidance and Recovery of Actual Fraudulent Transfer Cal Civ. Code §§ 3934 *et. seq.*)

In the 1st Cause of Action, the Complaint alleges that Defendant CashCall transferred

assets to Defendant Reddam with "actual intent to hinder, delay, or defraud Plaintiff and the Class [sic] a creditor of CashCall." (Compl., ¶¶ 18, 30.)

Civil Code section 3439.04 provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(Civil Code, § 3439.04, subd. (a)(1).)

Generally, "whether a conveyance was made with fraudulent intent is a question of fact." (*Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1294, citing *Bulmash v. Davis* (1979) 24 Cal.3d 691, 699.)

In determining this issue on summary judgment, "'the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom . . . .'" (*Annod Corp. v. Hamilton & Samuels, supra,* 100 Cal.App.4th at p. 1298, quoting *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843.)

"[I]n the fraudulent conveyance context, '[p]roof of fraudulent intent often consists of '*inferences* from the circumstances surrounding the transaction . . . ." (*Annod Corp. v. Hamilton & Samuels, supra,* 100 Cal.App.4th at p. 1298, quoting *Eddy v. Temkin* (1985) 167 Cal.App.3d 1115, 1122, italics original.)

"Over the years, courts have considered a number of factors, the 'badges of fraud' described in a Legislative Committee comment to section 3439.04, in determining actual intent." (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 834, citations omitted.)

"[T]hose factors are now codified at section 3439.04, subdivision (b) . . . ." (*Ibid.*)

That provision states that:

> In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1)   Whether the transfer or obligation was to an insider.
>
> (2)   Whether the debtor retained possession or control of the property transferred after the transfer.
>
> (3)   Whether the transfer or obligation was disclosed or concealed.
>
> (4)   Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (5)   Whether the transfer was of substantially all the debtor's assets.
>
> (6)   Whether the debtor absconded.

(7)   Whether the debtor removed or concealed assets.

(8)   Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)   Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)  Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

(Civil Code, § 3439.02, subd. (b).)

As the Court of Appeal has explained:

> [T]hese factors do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other.

(*Filip v. Bucurenciu, supra*, 129 Cal.App.4th at p. 834.)

Here, Defendants point to evidence that the assets that were transferred came from the settlement of a lawsuit that was unrelated to the dispute between Plaintiff and Defendants. (See Def.s' Separate Statement of Undisputed Material Facts (Separate Statement), Undisputed Material Facts 7, 9-13.)

In addition, Defendants submit evidence that the proceeds from the settlement of the unrelated lawsuit were paid to Defendant CashCall in order to minimize tax liability for Defendants. (See *id.*, Undisputed Material Facts 14, 17-18.)

Defendants also show that, because Defendant CashCall is an S-Corporation and Defendant Reddam is the sole shareholder of Defendant CashCall, Defendant Reddam is responsible to pay for vast majority of Defendant CashCall's income taxes. (See *id.*, Undisputed Material Facts 2-5.)

Therefore, Defendant CashCall transferred money to Defendant Reddam so that Defendant Reddam could pay the taxes on the settlement payments that had been received by Defendant CashCall. (See *id.*, Undisputed Material Facts 19-20, 23-24.)

Defendants presented evidence that the litigation between Plaintiff and Defendants (San Mateo Litigation) "played no role in [Defendant] CashCall's decision to make the Tax Distribution to Reddam or the amount of the Tax Distribution" and that "[Defendant] CashCall had made distributions to Reddam on numerous prior occasions to account for anticipated tax obligations arising out of CashCall's taxable income." (*Id.*, Undisputed Material Facts 21, 25.)

Thus, Defendants have made a *prima facie* case that they had no actual intent to hinder, delay, or defraud any creditor when Defendant CashCall made the transfer to Defendant

Reddam.

The burden then shifts to Plaintiff to show, by reference to specific facts, the existence of a triable, material issue whether Defendants had actual intent to hinder, delay, or defraud.

Plaintiff points to evidence of several badges of fraud:

(1) the transfer was made to an insider, Defendant Reddam, who was the sole shareholder Defendant CashCall, (Separate Statement, Undisputed Material Fact 1);

(2) the amount transferred was a significant portion of Defendant CashCall's overall assets and was greater than necessary to pay Defendant Reddam's tax liability, and Defendant CashCall did not request a refund of overpayment, (Pltf.'s Response to Separate Statement and Additional Facts in Opp'n to Def.s' Mot. for Summ. J. (Opp'n Separate Statement), Additional Disputed Facts 44-45, 47, 63);

(3) the transfer was made while litigation was pending between Plaintiff and Defendants, after the parties had completed a trial that spanned more than two months and Plaintiff had requested more than $243 million, and shortly before the parties made closing arguments and the court issued a tentative ruling, (Separate Statement, Undisputed Material Facts 10-11, 23, 31-32; Opp'n Separate Statement, Additional Disputed Fact 57); and

(4) the transfer was made with no consideration, (see *id.*, Undisputed Material Facts 23-24 [Defendants referring to the transfer as a "distribution"; Corp. Code, § 166 [defining "distribution" to mean "the transfer of cash or property by a corporation to its shareholders without consideration"; Opp'n Separate Statement, Additional Disputed Facts 67).

Plaintiff also relies on evidence that casts doubt on Defendant CashCall's ability to pay any substantial judgment arising from the San Mateo Litigation.

For example, while it is undisputed that Defendant CashCall had no plans to cease doing business, (see Separate Statement, Undisputed Material Fact 28), at the time of the transfer of assets to Defendant Reddam, Defendant CashCall had not engaged in its primary business (making consumer loans) in three years, (see Opp'n Separate Statement, Disputed Material Fact 47; Pltf.'s Evid. In Opp'n to Def.'s Mot. for Summ. J. (Pltf.'s Evid.), Exh. 1 at p. 19:19-20:11, 96:2-11; Exh. 4 at p. 27:1-25; Exh. 5 74:8-19), and that even now, Defendant CashCall only originates 5-10 loans per month, (see *id.*, Exh. 5 at p. 74:8-19).

Further, Plaintiff Points to the fact that Defendant CashCall had no plan to pay for the potential liability arising from the San Mateo Litigation. (See Opp'n Separate Statement, Additional Disputed Facts 64.)

Defendants rely upon *Annod Corp. v. Hamilton & Samuels*, in which the Court of Appeal affirmed the trial court's grant of summary judgment even though Plaintiff had pointed to several "badges of fraud." (See *Annod Corp. v. Hamilton & Samuels, supra*, 100 Cal.App.4th at p. 1299 ["Even the existence of several 'badges of fraud' may be insufficient to raise a triable issue of material fact."].)

However, *Annod Corp. v. Hamilton & Samuels* is distinguishable because the evidence supporting an inference of fraud is substantially more robust in this case than in *Annod Corp. v. Hamilton & Samuels*, as shown above.

In addition, Defendants have not presented significant "evidence negativing any inference of fraud," which was present in *Annod Corp. v. Hamilton & Samuels*.

For example, the plaintiff in *Annod Corp. v. Hamilton & Samuels* argued that the payments had been made to insiders (the partners of a law firm) and that the defendant making the payment (the law firm) was insolvent at the time the payments were made. (See *Annod Corp. v. Hamilton & Samuels, supra*, 100 Cal.App.4th at p. 1294.)

However, defendants presented evidence that the payments were made to the partners so that they would continue to work for the law firm, that the partners' work generated revenue for the law firm far in excess of the payments that were made to the partners, and that the payments were less than what the partners earned after leaving the law firm. (See *id.* at pp. 1295-1297; see, e.g., *id.* at p. 1296 [referring to one partner who generated revenues in excess of $480,000; received payment of only $92,144 for that work; and earned $400,000 per year after leaving law firm].)

Thus, any inference of fraud from the fact that payments were made to insiders while the law firm was insolvent was dispelled by the fact that the payments were made to the partners in order to generate more in revenue for the law firm.

By contrast, Plaintiff has presented evidence here that Defendant CashCall received no consideration for the transfer to Defendant Reddam, and that even if the transfer was made to allow Defendant Reddam to pay income tax liabilities on the settlement payment, the amount transferred exceeded the amount needed to pay the income tax liability.

Further, although the plaintiff in *Annod Corp. v. Hamilton & Samuels* pointed to the fact that the defendants were "the target of actual and/or potential lease litigation at the time" of the payments, (*id.* at p. 1294), there was no evidence that the payments were made shortly before the issuance of any ruling imposing liability on the defendants. In fact, it appears that all of the payments were made before or shortly after the plaintiff had filed suit. (See *id.* at p. 1291 [stating that plaintiff sought return of payments made between August 1995 and February 1996, and that plaintiff had filed suit in November 1995].)

Defendants also point to the fact that the distribution occurred before the court's ruling imposing liability on Defendant CashCall in the San Mateo Litigation, and thus, that Defendants could not have known of the liability at the time they made the transfer.

However, in order for a factfinder to draw an inference of fraud, Defendants did not need to be certain of the liability at the time of the distribution. Rather, Defendants only needed to know of the possibility that significant liability would be imposed upon Defendant CashCall as a result of the San Mateo Litigation.

Defendants contend that the San Mateo Litigation was wholly without merit and therefore, Defendants were not concerned that the litigation would lead to the imposition

of any liability.

However, as noted above, Plaintiff has presented evidence which creates a triable issue of material fact whether Defendants were concerned about the San Mateo Litigation, such as the fact that the matter was tried over a period of more than two months, at the end of which Plaintiff requested more than $243 million.

Therefore, the court will deny the motion with respect to the 1st Cause of Action.

2nd Cause of Action (Avoidance and Recovery of Constructive Fraudulent Transfer Cal Civ. Code §§ 3934 *et. seq.*)

In the 2nd Cause of Action, the Complaint pleads that Defendant CashCall made a constructively fraudulent transfer to Defendant Reddam because "[Defendant] CashCall was insolvent on the date that the Transfer was made or became insolvent as a result of the Transfer, or was engaged in a business or transaction or was about to engage in a business or transaction for which any property remaining with [Defendant] CashCall was unreasonably small capital." (Compl., ¶¶ 34-35.)

Civil Code section 3439.04 provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(Civil Code, § 3439.04, subd. (a)(2).)

Further, Civil Code section 3939.05 states that:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(Civil Code, § 3439.05, subd. (a).)

Finally, Civil Code section 3439.02 defines insolvency:

(a)  A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.

(b)  A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent.  The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence.

Here, Defendants contend that there is no triable issue of material fact that, at the time the transfer was made to Defendant Reddam, Defendant CashCall was not insolvent and that remaining assets were not unreasonably small.

Defendants submit the declaration of Defendant CashCall's Chief Financial Officer stating that, at the time of the transfer to Defendant Reddam, Defendant CashCall's debts were not greater than its assets and that it was paying its debts as they came due. (See Decl. of Douglas O. Meeks in Supp. of Def.s' Mot. for Summ. J. (Meeks Decl.), ¶ 10; Separate Statement, Undisputed Material Fact 27.)

Defendants also point to the fact that, at the time of the transfer, Defendant CashCall no plans to initiate bankruptcy proceedings. (See *id.*, Undisputed Material Fact 29.)

Defendants further established that, at the time of the distribution to Defendant Reddam, Defendant CashCall had no plans to cease doing business and that it continues to do business to date. (See *id.*, Undisputed Material Facts 28, 30.)

This might be sufficient to meet Defendants' burden to make out a *prima facie* case with respect to Defendant CashCall's solvency, but it does not meet the burden with respect to establishing that Defendant CashCall was sufficiently capitalized

If a plaintiff has pleaded several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them. (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 889.)

Here, because Defendants have not made a *prima facie* case with respect to one of the two theories underpinning the 2nd Cause of Action, the court will deny the motion with respect to the 2nd Cause of Action.

However, even if Defendants' evidence was sufficient to make out a *prima facie* case, the court would still deny the motion because Plaintiff has provided evidence creating a triable issue of material fact as to both insolvency and capitalization.

Plaintiff submits the declaration of its expert witness, who states that Defendant CashCall's Chief Financial Officer's assessment of its solvency did not properly account for the contingent liability existing due to the pending litigation between Plaintiff and Defendants. (See Decl. of Allen Pfeiffer in Opp'n to CashCall's Mot. for Summ. J. (Pfeiffer Decl.), ¶¶ 7-21.)

For example, Plaintiff's expert witness calculates Defendant CashCall's book assets in September 2021 (shortly before the transfer to Defendant Reddam) to be about $25.8 million, which was only about 10% of the restitution requested by Plaintiff in the San Mateo Litigation. (See Pfeiffer Decl., ¶¶ 10, 16.)

Further, Plaintiff presents evidence that, while the settlement payment brought a large amount of money into Defendant CashCall's "nearly dry financial coffers," Defendant CashCall used the money to pay off significant debts, in addition to transferring a substantial portion to Defendant Reddam. (See Opp'n Separate Statement, Additional Disputed Facts 45, 47-48.)

Defendants argue that they reasonably and properly valued the meritless litigation between Plaintiff and Defendants and that Plaintiff's expert opinion "ignores the novelty" of that litigation, which is evidenced by the fact that the 9th Circuit certified a question of first impression to our Supreme Court. (See Reply Br. In Supp. of Def.s' Mot. for Summ. J. or Summ. Adj. at p. 9:15-17.)

However, this is evidence that should be presented to a factfinder at trial to determine whether Defendants actually believed that the risk of liability from the San Mateo Litigation was zero. It does not negate the fact that there is a dispute of material fact.

In any case, in August 2018, the Supreme Court decided the novel issue. (See *De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 975 [ruling that "[a]n interest rate on consumer loans of $2,500 or more may be deemed unconscionable under Financial Code section 22302."].)

Plaintiff may reasonably argue that, because the distribution to Defendant Reddam occurred more than three years after the Supreme Court's decision, that at the time of the distribution, Defendants valued the contingent liability presented by the San Mateo Litigation at more than zero.

Therefore, the court will deny the motion with respect to the 2nd Cause of Action.

Summary Judgment

Summary judgment, as opposed to summary adjudication, is not proper unless there is no merit or no defense to the entire action or proceeding. (See Code of Civil Procedure section 437c, subd. (a).)

Thus, if any cause of action survives, a grant of summary judgment is improper. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶¶ 10:26 to 10:27, p. 10–9.)

Here, because the court has denied summary adjudication as to both causes of action, the court will deny the motion for summary judgment.

The court clerk shall give notice of this ruling.

**EXHIBIT 9**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE COUNTY SUPERIOR COURT

- - -

| | | |
|---|---|---|
| EDUARDO DE LA TORRE, an individual, | ) ) ) | Case No.: 30-2024-01421309-CU -NP-NJC |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| JOHN PAUL REDDAM; CASHCALL, INC., a California corporation; and DOE 1 through DOE 20, inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) | |

- - -

REMOTE DEPOSITION OF JOHN PAUL REDDAM

VOLUME I

November 6, 2025

10:02 a.m. Pacific Time

Reported By: Maria M. Siatkowski
RDR, CRR, CRC
New Mexico CCR
California CSR #14748
Washington CCR #25003721
New York Notary #01SI0038028

Exhibit 64.· Mr. Reddam, we have 63 previously marked exhibits.· During this deposition, I'll be showing you many of those.· This is a new one so we're going to mark this as Exhibit 64.

· · · · · · ·(Exhibit 64 was marked for identification and is attached to the transcript.)

· · · · ·Q.· (BY MR. LEVY)· And I'm paging through it for you.· And on the last page of the exhibit, I think it's page 9, there's your signature; right?· That you signed on October 30th --

· · · · ·A.· Yes.· That's there.

· · · · ·Q.· So I'm going to go back up to the top and I'll show you the first paragraph and I wanted to ask you about that.

· · · · · · ·So you're currently the sole shareholder of CashCall?

· · · · ·A.· Correct.

· · · · ·Q.· And have you been the only shareholder since the founding in 2003?

· · · · ·A.· Yes.

· · · · ·Q.· Okay.· Are you currently a director of CashCall, Inc.?

· · · · ·A.· Yes.

· · · · ·Q.· Had there ever been any directors of CashCall other than yourself?

A.   No.

Q.   All right.  Are you currently the chief executive officer of CashCall?

A.   Yes.

Q.   How long have you held that position?

A.   Since its inception.

Q.   Okay.  And are you currently being paid a salary as CEO?

A.   I'm not sure which company pays my salary.

Q.   Okay.  Was there a period of time when you were paid a salary as CEO?

A.   Yes.

Q.   How much were you paid annually?

A.   I'm not sure if it was 250,000 or $500,000 annually.

Q.   Was there ever a time when you received a million dollars a year for CEO services?

A.   Possible, but I'm not sure.

Q.   Okay.  And can you give us some estimate of when, if ever, you stopped being paid as CEO?

A.   Well, I might still be getting paid.  I'm not -- I'm not sure which company pays my salary, actually.

Q.   Okay.  And at the present time, who are the other officers of CashCall?

A.  I believe Del Meeks is the CFO.  I'm not sure who the secretary is.

Q.  Okay.  Other than you and Mr. Meeks, can you name any other individuals who held offices with CashCall?

MR. SEILING:  At any time?

Q.  (BY MR. LEVY)  At any time.

A.  I'm not sure who the vice presidents would have been.  I'm sure there's been vice presidents along the way but I don't know.

Q.  And now who at the present time is involved in executive decision-making at CashCall?

A.  Myself and Del.

Q.  Okay.  And at any time since the founding of the corporation, has there been anybody else involved in executive decision-making other than you and Mr. Meeks?

A.  Well, certainly over the years there's been lots of executive discussions, but I don't know. I don't know formally.  No.

Q.  Can you recall anybody other than you and Mr. Meeks who's ever been involved in kind of the executive management of CashCall?

A.  Well, Dan Baren was its counsel -- is its counsel, so he's had a lot of input over the years.  We

A.   Sorry.

Q.   I think it's because, you know, you don't have a microphone other than your computer.  So -- and you're in a room so I'm hearing a little bit of an echo.  I'm generally understanding what you're saying but I'm having just a little bit --

A.   Would it be helpful to turn the volume up or down?

Q.   Why don't you leave it as it is, you know, for the time being.  I was having a special trouble with the names but the other things I could understand.

Okay.  So now I'm going to scroll down to paragraph 3 of your declaration.  It says that CashCall's elected to be a subchapter S-corporation.

Do you see that there?

A.   I do.

Q.   Okay.  And, oh, what does that mean being an S-corporation?

A.   It means that for income tax purposes the tax consequences of the company go to my personal tax return.

Q.   Has that been the case since the founding of the company in 2003?

A.   Yes.

Q.   The company's had subchapter S tax status

JOHN PAUL REDDAM
NOVEMBER 06, 2025

JOB NO. 2100413

since its founding?

A.  Yes.

Q.  And does that mean that the taxable income of CashCall becomes part of your tax return -- personal tax return?

A.  Yes.

Q.  Okay.  And since the founding of CashCall, you've received tax distributions from the company from time to time; correct?

A.  Correct.

Q.  What is the purpose of those distributions?

A.  They pay state and federal income taxes.

Q.  To cover those taxes are you saying?

A.  Yes.  To pay the taxes.

Q.  To pay the taxes.

So it's -- those distributions are intended to pay your tax liability due to income from CashCall; is that correct?

A.  I believe so.

Q.  And do those distributions reflect your tax liability on your income from CashCall?

A.  As far as I know.

Q.  How are those distributions typically handled?  Who initiates them?

JOHN PAUL REDDAM
NOVEMBER 06, 2025

JOB NO. 2100413

A.   Del Meeks.

Q.   And so, what, typically you'd receive a communication from Mr. Meeks about a tax distribution? Is that what you're saying?

A.   Well, he might communicate that with Elizabeth Emrick who handles -- she's kind of my tax internal expert.

Q.   Can you repeat that, please.

A.   Often I would say would be communications between Del Meeks and Elizabeth Emrick.  She handles my -- she's my in-house personal tax person.

Q.   So in arranging those distributions, you'd have a consultation with Mr. Meeks; correct?

A.   No.  Not necessarily.  He might talk to her about it.

Q.   I see.  So there could be a distribution to you without your ever having discussed this with Mr. Meeks?  Is that what you're saying?

A.   Correct.

Q.   Okay.  And what about Ms. Emrick?  What's her -- what customarily has been her involvement in the distributions?

A.   Well, she handles my tax projections. Day-to-day financial issues with me.  She consults with outside tax accountants.

Q.   Why did the CFPB litigation affect CashCall's lending?

A.   Well, because every lender out there is deathly afraid of the CFPB.  So certainly our outside funding sources, I think, dried up.

Q.   Okay.  And the lack of outside funding affected CashCall's ability to make new loans, did it not?

A.   Yes.

Q.   And Mr. Meeks testified that in 2021 CashCall had a wind-down loan portfolio.  Do you agree with that statement?

A.   Sorry?  Could you repeat that.  My phone rang and it distracted me.

Q.   That's okay.  That's all right.

Mr. Meeks testified that in 2021 CashCall had a wind-down loan portfolio, meaning that CashCall was not making new loans at that time.

Would you agree with that statement?

A.   I don't know that that's -- I don't know if that's correct because I thought we were making some loans all the way through.

Q.   When did the CFPB litigation start to affect CashCall's ability to obtain outside funding?

A.   By 2013.

Q.   2015?

A.   '13.

Q.   '13.   That's when that litigation started?

A.   Yes.

Q.   Okay.  So at the current time, what product -- what loan products is CashCall offering?  Unsecured consumer loan products?

A.   It's got several small balance loans that it's doing.  $1,000 loans.  I think 3,100 loans.  Maybe $5,000 loans.  Under certain circumstances $7,000 loans.

Q.   What are the interest rates on those?

A.   I think they are somewhere between 19 and 35.

Q.   Okay.  All right.  Let's go back to your declaration.  Okay.  One -- I want to skip down to paragraph 7.

You state -- this is at line 11:  "But I had no concerns about making these representations because they were true.  CashCall was solvent at the time and I had no plans to initiate bankruptcy or insolvency proceedings at any time prior to January 31, 2022 or at any time."

Now, the time period you're referring to is the time of the Katten settlement.  Okay.

A.   Right.

Q.   And sometimes they would tell you about those beforehand and sometimes they wouldn't?

A.   Right.   I mean, she would tell you that we're gonna send X amount of money to either the franchise tax or the IRS, I guess.

Q.   So she was authorized to make those payments without consulting you first?

A.   Yeah.   I don't think I had a choice.   I mean, the numbers are whatever they are.

Q.   Okay.   Well, I guess my question is did you -- she need to get prior approval from you before making the payments, estimated tax payments?

A.   I don't think so.   I mean, it's not something that's optional.

Q.   You did receive the $45 million distribution on or about October 26, 2021; correct?

A.   I have no idea except for the documents that we've been looking at.

Q.   So you don't recall receiving a $46 million payment from CashCall in the fall of 2021?

A.   I don't -- I don't recall that.   I don't have reason to doubt it from what you're saying.   But, no.

Q.   That could have come into your account,

that amount of money, and you might not have known about it for a long period of time; correct?

A.  Well, I assume if it went in, I don't know when they paid what.  But -- you know?

Q.  Did Ms. Emrick inform you that you'd be getting a distribution of about $45 million in the fall of 2021?

A.  I don't recall.

Q.  You have no recollection of her telling you that?

A.  No.

Q.  What about Mr. Meeks, did he tell you that CashCall was making a distribution to you of 45 million?

A.  Sorry.  I don't remember any of that.

Q.  Okay.  Do you know now that you received a $45 million distribution?

A.  Well, I don't have any reason to doubt it based upon, you know, your questions or what we've been looking at.

Q.  Okay.  What's your understanding of what that distribution was for?

A.  Well, again, from what we've been talking about it was an -- it was some kind of estimated tax on the -- because CashCall was an s-corp and so I would

owe the tax no matter what.

Q.   Okay.   So you thought that the $45 million represented an estimated tax payment at that point?

A.   That's what I gleaned from today, but I don't remember $45 million or what happened.

Q.   Okay.

MR. SEILING:   So, Arthur, you need to be more precise in your questions to ask because it's not clear and I know you want a clear record that, you know, distinguish it in what he knows now and what he understands now versus what he understood back in 2021.

MR. LEVY:   Yeah, I do.   I'm aware of that.

Q.   (BY MR. LEVY)   I want to go back to the declaration.   I think that that's the best thing to do here.

Okay.   So if you look at paragraph 15, in the fourth line, it states, "We decided that CashCall would make a distribution to me to cover potential tax liabilities that would flow to me through CashCall because of the Katten settlement (the tax distribution)"; right?

A.   Yes.

Q.   You signed that statement.   That's true; correct?

A.   Yes.

**EXHIBIT 10**

Reuben Camper Cahn, S.B.N. 255158
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701
Email: rcahn@bklwlaw.com

*Attorneys for Defendants*
CashCall, Inc. and J. Paul Reddam

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORPORATION; and J. PAUL REDDAM, <br><br> Defendants. | Case No. 2:15-cv-07522-JFW (RAOx) <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE POST-REMAND JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(5) AND, IN THE ALTERNATIVE, RULE 60(b)(6); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> *Filed concurrently with the Declarations of R. Cahn, D. Baren, and D. Scharf; and [Proposed] Order* <br><br> Assigned to Hon. John F. Walter <br><br> <u>Hearing Information:</u> <br> Date: September 14, 2026 <br> Time: 1:30 p.m. <br> Dept: 7A |

Case No. 2:15-cv-07522-JFW (RAOx)

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF
FROM THE POST-REMAND JUDGMENT

**TO THE COURT, ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on September 14, 2026, at 1:30 p.m., or as soon thereafter as may be heard before the Honorable John F. Walter in Courtroom 7A of the above captioned court, located at 350 West First Street, Los Angeles, California 90012, Defendants CashCall Inc. and J. Paul Reddam, (collectively, "CashCall" or "Defendants") will and hereby do respectfully move under Federal Rule of Civil Procedure 60(b)(5) and, in the alternative, Rule 60(b)(6), for relief from the post-remand judgment entered against them on the Bureau's amended remedies on February 2, 2023.

This Motion is made pursuant to Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6), and is based on this Notice; the accompanying memorandum of points and authorities; the concurrently filed declarations of counsel and exhibits; all pleadings and records on file; and upon such other oral and/or documentary evidence as may be presented at the time of the hearing and any other matter which the Court chooses to consider in ruling on the motion.

This Motion is made after the conference of counsel under L.R. 7-3.

Respectfully submitted,

Dated: June 25, 2026

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**

By: _____
Reuben Camper Cahn

*Attorneys for Defendants*
*CashCall, Inc. and J. Paul Reddam*

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF
FROM THE POST-REMAND JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .....................................................................................................1

    A.    The Original Judgment and Its Satisfaction. ................................................3

    B.    The Bureau Appealed, Reversed Its Remedial Theory, and Obtained the Post-Remand Judgment. ......................................................................4

    C.    Intervening Authority and the Bureau's Repudiation of the Enforcement Theory at Issue. ...................................................................5

    D.    The Initiated and Then Abandoned Consent-Decree Negotiations. ..............7

LEGAL STANDARD .................................................................................................9

    A.    Rule 60(b)(5) ..............................................................................................9

    B.    Rule 60(b)(6) ............................................................................................10

ARGUMENT ...........................................................................................................11

I.    RULE 60(b)(5) AUTHORIZES RELIEF ON EACH OF THREE INDEPENDENT GROUNDS. .........................................................................11

    A.    The Bureau's Original Judgment Has Been Satisfied, and the Post-Remand Judgment Is "Based On" a Judgment That Was Vacated. .............11

    B.    Continued Prospective Enforcement of the Post-Remand Judgment Is "No Longer Equitable." ...........................................................................12

        1.    Intervening Change in Controlling Law. ..........................................14

        2.    The Bureau Has Formally Repudiated the Enforcement Theory That Produced This Judgment. ........................................................16

        3.    The Parties Negotiated and Reached a Settlement Framework Aligned with the Bureau's Stated Priorities, and the Bureau Then Abandoned It, Creating Grounds for Equitable Estoppel. ........20

II.    IN THE ALTERNATIVE, RULE 60(b)(6) PROVIDES INDEPENDENT GROUNDS FOR VACATUR. ...........................................................................22

A.      The Phelps/Henson Factors Favor Relief.....................................................23

B.      The Bureau's Mid-Litigation Reversal on Remedial Theory and Abandonment of Settlement Negotiations Independently Constitute "Extraordinary Circumstances."...............................................................24

C.      The Equities Favor Relief. .........................................................................25

CONCLUSION ...................................................................................................25

TABLES OF CONTENTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton,*
521 U.S. 203 (1997)..................................................................................................10, 13

*Bellevue Manor Assocs. v. United States,*
165 F.3d 1249 (9th Cir. 1999) .................................................................................20, 22

*Buck v. Davis,*
580 U.S. 100 (2017)..................................................................................................11, 23

*Carroll v. Trump,*
175 F.4th 100,114 fn. 26 (2nd Cir. 2026).....................................................................16

*CFPB v. CashCall, Inc.*, 124 F.4th 1209
(9th Cir. Jan. 3, 2025) .........................................................................................*Passim*

*CFPB v. CashCall, Inc.,*
35 F.4th 734 (9th Cir. 2022)...............................................................................5, 8, 12

*CFPB v. CashCall, Inc.,*
2018 WL 485963 (C.D. Cal. Jan. 19, 2018).........................................................*Passim*

*CFPB v. CashCall, Inc.,*
2016 WL 482063 (C.D. Cal. Aug. 31, 2016) .............................................................4, 9

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984)..........................................................................................................6

*Collins v. Yellen,*
594 U.S. 220 (2021)........................................................................................................15

*Community Financial Services Ass'n of Am., Ltd.,*
601 U.S. 416 (2024)...............................................................................................1, 6, 15

*Compton v. Alton S.S. Co.,*
608 F.2d 96 (4th Cir. 1979)...........................................................................................11

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130 (1967)......................................................................................................16

*FTC v. Hewitt*,
  68 F.4th 461 (9th Cir. 2023) ..............................................................10, 14, 23, 24

*Gonzalez v. Crosby*,
  545 U.S. 524 (2005)......................................................................................................11

*Henson v. Fidelity National Financial, Inc.*,
  943 F.3d 434 (9th Cir. 2019) .............................................................................. *Passim*

*Horne v. Flores*,
  557 U.S. 433 (2009)................................................................................................ *Passim*

*In re Pacific Far East Lines, Inc.*,
  889 F.2d 242 (9th Cir. 1989) ....................................................................................21

*Jeff D. v. Kempthorne*,
  365 F.3d 844 (9th Cir. 2004) ................................................................10, 13, 17

*Johnson v. Zerbst*,
  304 U.S. 458 (1938)......................................................................................................16

*Klapprott v. United States*,
  335 U.S. 601 (1949)................................................................................................11, 26

*Liljeberg v. Health Services Acquisition Corp.*,
  486 U.S. 847 (1988)........................................................................................11, 12, 23

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024)..............................................................................................1, 6, 15

*Oklahoma Press Pub. Co. v. Walling*,
  327 U.S. 186 (1946)........................................................................................................9

*Phelps v. Alameida*,
  569 F.3d 1120 (9th Cir. 2009) ............................................................................. *Passim*

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992)................................................................................10, 13, 17

iv                                          Case No. 2:15-cv-07522-JFW (RAOx)

TABLES OF CONTENTS AND AUTHORITIES

*SEC v. Jarkesy*,

    603 U.S. 109 (2024)........................................................................................1, 6, 16

*Seila Law LLC v. CFPB*,

    591 U.S. 197 (2020)........................................................................................1, 6, 15

*Stokes v. Williams*,

    475 F.3d 732 (6th Cir. 2007) ...................................................................................3

*Twelve John Does v. D.C.*,

    841 F.2d 1133 (D.C. Cir. 1988).............................................................................14

*United States v. Asarco Inc.*,

    430 F.3d 972 (9th Cir. 2005) .................................................................................10

*United States v. Baus*,

    834 F.2d 1114 (1st Cir. 1987)....................................................................12, 23, 25

*United States v. Olano*,

    507 U.S. 725 (1993)...............................................................................................16

*United States v. Sparks*,

    685 F.2d 1128 (9th Cir. 1982) ...............................................................................11

**Statutes**

12 U.S.C. § 5517(o) .............................................................................................7, 18

12 U.S.C. § 5536(a)(1)(B) ........................................................................................15

12 U.S.C. § 5563(b)(3)...............................................................................................19

12 U.S.C. § 5565(c)(2)(A) ...........................................................................................4

Cal. Penal Code § 532.................................................................................................9

**Rules**

Federal Rule of Civil Procedure 60(b)...............................................................*Passim*

## **INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6), Defendants CashCall, Inc., WS Funding, LLC, Delbert Services Corporation, and J. Paul Reddam (collectively, "CashCall" or "Defendants") respectfully move for relief from the February 2, 2023, post-remand judgment entered against them on the Consumer Financial Protection Bureau's (the "Bureau" or the "CFPB") amended remedies request. The motion is grounded in four interlocking developments: (i) Defendants' satisfaction of the original $10,283,886 judgment entered by this Court, *see CFPB v. CashCall, Inc.*, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018); (ii) the Bureau's post-trial about-face to seek legal not equitable restitution; (iii) a series of intervening Supreme Court decisions—*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); *SEC v. Jarkesy*, 603 U.S. 109 (2024); *CFPB v. Community Financial Services Ass'n of Am., Ltd.*, 601 U.S. 416 (2024); and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)—that have materially altered the doctrinal foundation on which the Bureau's liability and remedial theories were constructed; and (iv) the Bureau's own substantive engagement, across nearly a year of discussions, culminating in the Bureau's acceptance of a settlement framework which it then abandoned in bad faith.  The Bureau's willingness to settle in exchange for a Bureau-supervised redress process is itself a meaningful concession such that continued prospective enforcement of the Judgment as entered is no longer equitable.

Compounding those developments, the Bureau has publicly and formally repudiated the enforcement posture that produced this case. On April 16, 2025, the Bureau's Chief Legal Officer Mark R. Paoletta issued a memorandum (the "Paoletta Memorandum") *rescinding* all prior enforcement and supervision priority documents and announcing that the Bureau will (i) "respect Federalism" and avoid duplicating state enforcement, (ii) decline to "pursue supervision under novel legal theories," (iii) "shift resources away from" nonbank enforcement and toward redress of "tangible harm" by returning money to consumers rather than imposing penalties, and (iv) decline to engage in "price controls." Mem. from Mark R. Paoletta, Chief Legal Officer, CFPB, *2025 Supervision and*

MEMORANDUM OF POINTS AND AUTHORITIES

*Enforcement Priorities* (Apr. 16, 2025). Consistent with that revised posture, the Bureau has, since January 2025, voluntarily dismissed enforcement actions or vacated settlements against SoLo Funds, Navy Federal Credit Union, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, and Reliant Holdings. In several of those matters, the Bureau also *returned money to defendants* that earlier leadership had collected. In short, the Bureau has expressly disclaimed the type of action it brought and obtained judgment on here.

Against that backdrop, Defendants and the Bureau entered into resolution discussions beginning in December 2025 directed at a consent disposition under which (a) the Bureau would retain the $10.3 million penalty already paid, (b) the parties would notify the court that they had settled the case, and (c) any consumer relief would be administered through a Bureau-supervised redress process. For instance, on March 5, 2026, Victoria Dorfman, a detailee from the Office of Management and Budget to the Bureau, expressed not only interest in hearing about a settlement proposal but "engag[ing] on the substance of all terms." Scharf Decl. ¶ 6 & Ex. A. By April 1, 2026, the Bureau was actively discussing terms of a settlement. See Scharf Decl. ¶ 7 & Ex. B (stating "we nonetheless offered several accommodations: [ ] Giving the remainder of redress that does not go to consumers back to CashCall, instead of the Treasury [ ] Waiving court-ordered prejudgment interest, which should result in $24M savings to CashCall [ ] Reducing the amount of the civil penalty from $33M by $10M[ ] All these are very substantial savings and concessions to CashCall."). There was extensive back-and-forth between CashCall's counsel and the CFPB. This included multiple in-person meetings in Washington, D.C., e.g., CashCall's counsel arranging to meet with Mr. Paoletta and Ms. Dorfman on February 23, 2026 and additional dates. *See* Ex.'s A & D.

Those discussions culminated in an agreement reflecting agreement to resolve the case in a manner consistent with the policy edicts of the Paoletta Memo, including Defendants' acceptance of the Bureau's demand that the claims commission be administered by a third party of the Bureau's choosing. The discussions were not

2

preliminary or informal; they were advanced through written submissions and meetings with senior Bureau personnel beginning in February 2026. The agreed-upon resolution was consistent with the express terms of the Paoletta Memo but was abruptly abandoned by the Bureau, notwithstanding the parties' agreement in principle, on May 1, 2026. Scharf Decl. ¶ 10 & Ex. C. The Bureau has since maintained an enforcement posture against CashCall that is inconsistent with its position in every materially comparable matter resolved during the same period, acting in disregard of the Paoletta Memo.

The combined effect of those developments—the satisfied original judgment, the Bureau's mid-stream pivot on remedial theory, the supervening Supreme Court authority, the Bureau's own formal repudiation of its prior enforcement priorities, the parallel disposition of comparable actions, and the unexplained abandonment of a settlement—presents the changed legal and factual landscape that Rule 60(b)(5)'s "no longer equitable" clause was designed to address and, in the alternative, the kind of extraordinary circumstances Rule 60(b)(6) reserves for the rare case in which finality must yield to "the incessant command of the court's conscience that justice be done." *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009) (quoting *Stokes v. Williams*, 475 F.3d 732, 736 (6th Cir. 2007)). The Court should grant the motion, vacate the post-remand judgment, and set the matter for a status conference to consider any remaining live issues following vacatur.

## BACKGROUND

### A. The Original Judgment and Its Satisfaction.

On August 31, 2016, this Court granted summary judgment to the Bureau on liability under the Consumer Financial Protection Act ("CFPA"). *CFPB v. CashCall, Inc.*, No. 2:15-7522-JFW (RAOx), 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016). Following a bench trial on remedies, the Court rejected each of the Bureau's requests for enhanced penalties and equitable restitution, and on January 19, 2018, awarded the Bureau a Tier I civil penalty of $10,283,886—the floor authorized by 12 U.S.C. § 5565(c)(2)(A) for non-reckless conduct. *CFPB v. CashCall, Inc.*, 2018 WL 485963, at *11–12 (C.D. Cal. Jan. 19, 2018). The Court expressly found that Defendants "did not knowingly violate the CFPA,"

MEMORANDUM OF POINTS AND AUTHORITIES

that the evidence "failed to demonstrate that Defendants knew at the time they decided to implement the Western Sky Loan Program that the structure of the program would subject them to liability," that Defendants relied on the advice of "highly regarded regulatory counsel," and that the borrowers "received the benefit of their bargain." *Id.* at *3–8. Restitution was denied on those findings. *Id.* at *9–10. In doing so, the Court expressly rejected the Bureau's core remedial theory that the borrowers were owed restitution. It held that the Bureau "did not carry its burden of proving that restitution is appropriate," finding that the consumers "received the benefit of their bargain—i.e., the loan proceeds," that Defendants "plainly and clearly disclosed the material terms of the loans," and that there was no "fraud," "trickery or deception" in the origination of the loans. *Id.* at *7–10. Any restitution award would therefore have conferred a windfall on borrowers who had suffered no cognizable loss.

Defendants paid the $10,283,886 judgment to the Bureau in March 2018. The judgment was satisfied and discharged within the meaning of Rule 60(b)(5).

## B.   The Bureau Appealed, Reversed Its Remedial Theory, and Obtained the Post-Remand Judgment.

Notwithstanding satisfaction of the judgment, the Bureau appealed. Having paid the judgment in March 2018 in the expectation that the matter was at an end, Defendants filed their protective cross-appeal only in April 2018, after and in direct response to the Bureau's notice of appeal; absent the Bureau's decision to reopen a judgment it had already collected upon, Defendants would not have sought further review. On May 23, 2022, the Ninth Circuit affirmed liability but vacated the Tier I civil penalty determination and the denial of restitution, remanding for reconsideration. *CFPB v. CashCall, Inc.* ("*CashCall I*"), 35 F.4th 734 (9th Cir. 2022).

Critical to the present motion: at the trial level, the Bureau had affirmatively represented that the restitution it sought was *equitable* in nature and justiciable only by bench trial. The parties so stipulated, and the District Court conducted the remedies phase as a bench proceeding on that shared understanding. On appeal, the Bureau changed its

MEMORANDUM OF POINTS AND AUTHORITIES

position, directly contradicting its representations to this Court, asserting for the first time that the restitution it sought was *legal* in nature—a category of relief that would have triggered a Seventh Amendment jury-trial right and a fundamentally different procedural posture. The Bureau *conceded* that it "did not make this argument below," *see CashCall I*, 35 F.4th at 758 & n.18, but pressed it on appeal and obtained reversal on that very basis.

On remand, this Court awarded the Bureau approximately $23 million in additional penalties and $134 million in legal restitution, see *CFPB v. CashCall, Inc.*, No. 2:15-cv-07522 (C.D. Cal. Feb. 2, 2023) (the "Post-Remand Judgment"), and the Ninth Circuit affirmed in *CFPB v. CashCall, Inc.* ("*CashCall II*"), 124 F.4th 1209 (9th Cir. Jan. 3, 2025), opinion amended and superseded on denial of reh'g, 135 F.4th 683 (9th Cir. April 24, 2025), cert. denied *sub nom. CashCall, Inc. v. CFPB*, 224 L. Ed. 2d 160 (Mar. 2, 2026).

On appeal, the Ninth Circuit enforced the jury-trial waiver Defendants made in reliance on the Bureau's representation that it sought only equitable relief. *CashCall II*. To appeal that judgment, Defendants were required to post a supersedeas bond in excess of $175 million, supported in large part by Mr. Reddam's assets and personal residences. A bond which has remained in place until today. Scharf Decl. ¶ 2.

**C.  Intervening Authority and the Bureau's Repudiation of the Enforcement Theory at Issue.**

Between the entry of the Post-Remand Judgment and the present motion, the Supreme Court has issued four decisions that bear directly on the doctrinal foundation of the judgment:

First, *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), struck the for-cause removal provision in the Bureau's organic statute and characterized the Bureau as wielding "significant administrative and enforcement authority, including the power to seek daunting monetary penalties against private parties in federal court," *id.* at 199. Second, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and required courts to exercise independent judgment in interpreting statutes that agencies administer. Third, *SEC v.*

*Jarkesy*, 603 U.S. 109 (2024), held that the Seventh Amendment entitles a defendant to a jury trial when a federal agency seeks civil penalties for fraud, and clarified that when an agency seeks *legal* monetary relief, the action is one to which "the Seventh Amendment extends . . . if the claim is 'legal in nature,'" *Id.* at 122. And fourth, *CFPB v. Community Financial Services Ass'n of Am., Ltd.*, 601 U.S. 416 (2024), addressed the constitutionality of the Bureau and again confirmed the Bureau's status as an enforcement, rather than insulated rulemaking, agency.

Collectively, these decisions undermine the agency-favorable interpretive presumptions that encouraged deference to the Bureau's "CashCall theory" which bootstrapped state-law violations into federal Unfair and Deceptive Acts or Practices ("UDAAP") liability and undermine the Ninth Circuit's view of the validity of CashCall's waiver of the right to a jury trial.

On April 16, 2025, the Bureau formally repudiated the enforcement priorities that produced this case. The Paoletta Memorandum expressly rescinds "all prior enforcement and supervision priority documents," redirects the Bureau away from nonbank enforcement and toward direct consumer redress. It disclaims "price controls," reliance on "novel legal theories," and duplication of state enforcement. In the months that followed, the Bureau voluntarily dismissed enforcement actions or unwound settlements against, among others, SoLo Funds, Navy Federal Credit Union, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, and Reliant Holdings—and, in certain instances, returned funds previously collected. The conduct alleged against Defendants in this matter sits squarely within each of the categories the Bureau has now disclaimed: it is a nonbank action, premised on a self-described "novel legal theory," brought to police state-law usury and licensing limits the Bureau is statutorily forbidden from imposing directly, *see* 12 U.S.C. § 5517(o), and parallel to enforcement actions filed by sixteen sovereign states.

**D.      The Initiated and Then Abandoned Consent-Decree Negotiations.**

Beginning on July 23, 2025, Defendants engaged with senior Bureau personnel, including counsel and advisors to the Acting Director, regarding a consensual disposition

of this matter consistent with the Paoletta Memo and with the Bureau's contemporaneous treatment of comparable defendants. The parties exchanged written submissions, including a July 25, 2025 letter from Defendants' General Counsel transmitting a proposed framework under which the Bureau would retain the $10.3 million already paid and the parties would jointly seek vacatur of the Post-Remand Judgment under Rule 60(b).  (See Declaration of Dan Baren ("Baren Decl.") ¶ 8, Ex.  B.)

On December 11, 2025, when Defendants' representatives met with the Bureau's Chief Legal Officer, Mark Paoletta, and his deputy, Victoria Dorfman, Paoletta told Defendants' counsel that he "never would have brought this case," and encouraged submission of a formal proposal. (Baren Decl. ¶ 11.)  On December 12, 2025, CashCall's attorney submitted a proposal to resolve the enforcement matter by having CashCall create a $20.3 million fund (inclusive of the $10.3 million already paid to the Bureau) to pay potential victims. The Bureau responded the next day, indicating it would review the proposal and respond to CashCall. Over the ensuing months, the parties negotiated, and the Bureau provisionally accepted a settlement framework.  Ms. Dorfman confirmed in emails that high-level settlement terms had been agreed upon and that the Bureau was moving through the approval process for the settlement. The Bureau then unexpectedly became unresponsive. (See Declaration of Y. David Scharf ("Scharf Decl.") ¶¶ 3-7 & Ex. A, B, & C.)

On May 1, 2026—the last business day before the date on which the Bureau would have been positioned to move against the collateral securing Defendants' supersedeas bond—Mr. Paoletta informed Defendants' counsel by electronic mail that the Bureau would not proceed with the agreed-upon vacatur and intended instead to commence collection on the Post-Remand Judgment. Mr. Paoletta's response to CashCall's counsel, *see* Scharf Decl. ¶ 9 & Ex. D*,* is replete with misrepresentations. First, Paoletta's response states that CashCall was "repeatedly warned" by its lawyers that "the loans it was making were void under the laws of more than a dozen states." Paoletta cites the Ninth Circuit's *CashCall I* opinion at page 748. Yet his construal of the Ninth Circuit's opinion is as sloppy as it is

wrong. CashCall's lawyers never "warned" CashCall that its loans "were void under the laws of more than a dozen states[.]" Ex. C. Further, that is not what the Court stated or implied. What the Court said was "[c]ounsel had told CashCall that its plan faced 'significant' risk, and one expert advised that the plan 'should work but likely won't' because the 'lower courts will shun our model and ... if we reach the Supreme Court, ... we will lose.'" *CashCall I*, 35 F.4th 734, 748. Counsel advised on CashCall's risk; they never expressed the opinion that CashCall's practices were illegal. In fact, the Ninth Circuit stated that "CashCall had 'secured multiple formal and informal opinions' from legal counsel stating, 'that the structure of the Western Sky Loan Program was viable.'" *Id*. "Viable" is the opposite of "void". Only upon *CashCall I*'s choice-of-law finding did CashCall have notice that its loans were unenforceable. *CashCall I*, 2016 WL 4820635, *supra* at *5-9 (determining tribal law ineffective, applying subject states' law, and determining loans were void).

Second, Mr. Paoletta states that CashCall "demanded payment from consumers under the (false) pretense that the consumers had a valid obligation to pay." This is a gross implication, namely that CashCall committed the crime of false pretenses. Cal. Penal Code § 532. Put aside the fact that CashCall obviously lacked the *mens rea* given the Ninth Circuit's finding that it acted recklessly after 2013 (and not before then)—not with "knowing[ ] or designed[ ]" conduct, *id*.—the fact that the soon-to-be-head of the CFPB, *see e.g.*, A.J.S. Dhaliwal et al., *CFPB Positions Mark Paoletta to Succeed Russell Vought,* Nat'l L. Rev., (June 4, 2026),https://natlawreview.com/article/cfpb-positions-mark-paoletta-succeed-russel-vought?amp  would imply that an enforcement target engaged in criminal acts is repugnant conduct by a lawyer and arbitrary and abusive conduct by a federal agency. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 218 (1946) ("[e][xcessive use or abuse of authority can not only destroy man's instinct for liberty but will eventually undo the administrative processes themselves.'"). As further evidence of Mr. Paoletta's theme of criminalizing CashCall, while the Court found that the loans were "void," *CashCall I*, 35 F.4th at 741, Mr. Paoletta described CashCall's

MEMORANDUM OF POINTS AND AUTHORITIES

products as "illegal loans". Ex. C. Only upon the Court's choice-of-law ruling did CashCall have notice that its loans were unenforceable. See *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at \*5–9 (C.D. Cal. Aug. 31, 2016).

No policy basis—either in the Paoletta Memorandum or otherwise—has been articulated for distinguishing this matter from the actions the Bureau has dismissed or unwound in the same period. Nor has the Bureau identified any factual or legal development between its provisional acceptance of the settlement framework and its May 1, 2026 reversal that would explain its abandonment of an agreement it had itself elicited.

## **LEGAL STANDARD**

### A.    Rule 60(b)(5)

Rule 60(b)(5) permits a court to relieve a party from a final judgment on any of three independent grounds: the judgment "(i) has been satisfied, released, or discharged; (ii) is based on an earlier judgment that has been reversed or vacated; or (iii) applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Horne v. Flores*, 557 U.S. 433, 447 (2009); *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380–84 (1992). The Ninth Circuit reviews orders on Rule 60(b)(5) motions for abuse of discretion. *Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004); *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005).

The "no longer equitable" clause permits courts to "take account of changed circumstances or new law." *Horne*, 557 U.S. at 447. A party seeking relief under that clause needs only to show that "a significant change either in factual conditions or in law" renders "continued enforcement" of the judgment "'detrimental to the public interest.'" *Id.* at 447 (quoting *Rufo*, 502 U.S. at 384). The Ninth Circuit applies a "flexible standard" to such motions, especially in matters affecting the public interest. *Jeff D.*, 365 F.3d at 853–54. While the Ninth Circuit has, in *FTC v. Hewitt*, 68 F.4th 461, 466 (9th Cir. 2023), described certain equitable monetary judgments as lacking "prospective application," *Hewitt* did not foreclose Rule 60(b)(5) relief on the first two grounds (satisfaction; reliance on a reversed earlier judgment), did not address a judgment whose enforcement requires ongoing

MEMORANDUM OF POINTS AND AUTHORITIES

administrative implementation (here, the distribution of a $134 million legal-restitution fund to defined consumer classes through a court-supervised process), and did not consider the unique circumstances of a government party that has formally repudiated, by published memorandum, the enforcement priorities underlying the judgment. The clearest evidence that continued enforcement is no longer equitable comes from the enforcing party itself: the very agency that obtained this judgment has since vociferously repudiated nearly every legal theory it deployed to secure it. Where the government party that procured a public-interest judgment has disavowed the enforcement theory underlying it, the presumption favoring finality is at its weakest, and the "no longer equitable" inquiry is satisfied not by speculation but by the Bureau's own published and litigated positions.

## B.    Rule 60(b)(6)

Rule 60(b)(6) is a "catchall provision" that permits vacatur for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The Supreme Court has long described the rule as a "grand reservoir of equitable power." *Klapprott v. United States*, 335 U.S. 601, 614–15 (1949) (plurality); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 106 (4th Cir. 1979); *United States v. Sparks*, 685 F.2d 1128, 1130 (9th Cir. 1982) (Rule 60(b)(6) is to be "liberally applied to accomplish justice"). Relief is reserved for "extraordinary circumstances." *Buck v. Davis*, 580 U.S. 100, 123 (2017); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988); *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

The Ninth Circuit applies the multifactor test of *Phelps v. Alameida*, 569 F.3d 1120, 1135–40 (9th Cir. 2009), to evaluate motions predicated on intervening developments. The relevant considerations include: (1) the nature of the change in the law; (2) the diligence of the movant; (3) the parties' reliance on the finality of the judgment; (4) the delay between finality and the motion; (5) the closeness of the relationship between the prior decision and the intervening decision; and (6) any comity concerns. *Id.*; *Henson v. Fidelity National Financial, Inc.*, 943 F.3d 434, 444 (9th Cir. 2019) (applying *Phelps* outside the habeas context). The list is not exhaustive; courts must "evaluate the circumstances surrounding the specific motion" and ensure that "justice [is] done in light of all the facts." *Phelps*, 569

F.3d at 1133, 1135; *Henson*, 943 F.3d at 444.

The Ninth Circuit has further recognized that Rule 60(b)(6) "'affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice,'" *Henson*, 943 F.3d at 444 (relying upon *Liljeberg*, 486 U.S. at 864), and that "extraordinary circumstances" may include the conduct of an opposing party that, viewed in light of the totality of the litigation, renders enforcement of the judgment fundamentally unjust, *see, e.g.*, *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987) (60(b)(6) relief warranted where government materially breached settlement understanding).

## ARGUMENT

## I.    RULE 60(b)(5) AUTHORIZES RELIEF ON EACH OF THREE INDEPENDENT GROUNDS.

### A.    The Bureau's Original Judgment Has Been Satisfied, and the Post-Remand Judgment Is "Based On" a Judgment That Was Vacated.

Rule 60(b)(5)'s first two clauses are textual and self-executing. Defendants paid the original $10,283,886 judgment in March 2018, and the Bureau acknowledged satisfaction. The Post-Remand Judgment is the direct lineal product of the Ninth Circuit's decision in *CashCall I,* vacating the original civil penalty and restitution determinations. *See* 35 F.4th at 749–51. By its own terms, the Post-Remand Judgment is "based on an earlier judgment that has been . . . vacated" Fed. R. Civ. P. 60(b)(5), with the  Ninth Circuit's prior vacatur being remedial, rather than determinative on liability. That is sufficient to authorize relief. Defendants do not contend that satisfaction of the original judgment, standing alone, forecloses the Bureau's appeal or the Post-Remand Judgment; the Bureau was, of course, free to appeal. Defendants satisfied the only penalty this Court actually entered after trial (the Tier I penalty). To the extent enforcement rests on that judgment, it has been satisfied. The larger post-remand monetary judgment now sought to be enforced derives from the appellate vacatur of the original remedy and rests on a remedial theory the Bureau

MEMORANDUM OF POINTS AND AUTHORITIES

disclaimed; hence, applying the judgment prospectively is no longer equitable. The satisfaction and vacated-predicate clauses thus operate together with—not in place of—the "no longer equitable" showing developed below.

Where the underlying liability finding has not been disturbed, but the remedial component has been, the text of Rule 60(b)(5) counsels that the derivative remedial judgment may be revisited consistent with the equitable principles that govern the rule. *See* Part I.B., *supra* (discussing *Rufo* and *Horne*).

**B.    Continued Prospective Enforcement of the Post-Remand Judgment Is "No Longer Equitable."**

Rule 60(b)(5)'s third clause authorizes relief where "applying [a judgment] prospectively is no longer equitable." The Supreme Court has repeatedly explained that this clause is not a narrow procedural device but a vehicle for ensuring that judicial decrees keep pace with "changed circumstances or new law." *Horne*, 557 U.S. at 447–48; *Agostini*, 521 U.S. at 215; *Rufo*, 502 U.S. at 380–84. The clause applies whenever the judgment has prospective effects—including ongoing administrative implementation, ongoing supervised distribution, and ongoing collateral consequences—and a significant change in factual or legal conditions renders continued enforcement detrimental to the public interest. *See Horne*, 557 U.S. at 447–48; *Jeff D.*, 365 F.3d at 853–54.

The Post-Remand Judgment has substantial prospective effects. The $134 million legal-restitution award is not a simple money judgment payable from the defendant's general accounts. It is administered through a court-supervised distribution process to a defined consumer class, with claims administration, residual-funds disposition (with any residual funds to be paid not to additional consumer relief but to the United States Treasury—an inequitable diversion away from the consumer class the Bureau's remedial theory ostensibly serves), and ongoing reporting obligations to the Bureau and the Court. A CFPB restitution judgment is not a simple money judgment payable from the defendant's general accounts; it imposes an ongoing, Bureau-supervised administrative regime. *See e.g.,* Stipulated Final Judgment & Order ¶¶ 35–36, 38–42, 45, 55, 71, 76, *CFPB v. Freedom Debt*

12

*Relief, LLC*, No. 3:17-cv-06484-EDL (N.D. Cal. July 9, 2019), ECF No. 91 ("Freedom Debt Relief").

That distinguishes this matter from the simple "order to pay money" at issue in *Hewitt*, 68 F.4th at 467, where the equitable monetary judgment "involved no court supervision . . . other than ordering [defendant] to pay the money awarded." *Id.* The presence of ongoing court-supervised distribution machinery places this judgment within the "prospective application" heartland of Rule 60(b)(5). *See Twelve John Does v. D.C.*, 841 F.2d 1133, 1138 (D.C. Cir. 1988) (per curiam) (Rule 60(b)(5) prospective-application clause encompasses judgments with ongoing supervisory or administrative components). Note further that nearly 13 years have passed since CashCall made its last loan. Tens of millions of dollars in restitution will never be claimed by consumers and will escheat to the United States Treasury as an additional, unwarranted penalty against Defendants. Further, any federal consumer relief will be in addition to the full compensation consumers have received as a result of CashCall's state settlements and class judgments.

These prospective features also render the restitutionary remedy acutely inequitable in operation. More than thirteen years have elapsed since the last Western Sky loan was made in 2013. In the intervening period, members of the consumer class have died, relocated, or become untraceable, and it is virtually certain that a substantial portion of the $134 million fund will never be claimed. Under the Judgment's residual-funds mechanism, those unclaimed sums do not revert to Defendants or reach any consumer; they escheat to the United States Treasury—operating as a further, multimillion-dollar penalty on Defendants under the guise of restitution. The court-supervised distribution will also predictably direct funds to claimants who suffered no loss and, given the passage of time, invites fraudulent and erroneous claims by persons not entitled to recover. And a significant number of the borrowers who do recover have already been made whole through the parallel state settlements and private class actions on the very same loans—the matters for which Defendants paid more than $140 million. For those borrowers, a further distribution is not restitution at all but a double recovery and an undeserved windfall, precisely the result this

Court foreclosed when it found that the consumers "received the benefit of their bargain." *CashCall*, 2018 WL 485963, at *7–8.

Even if the Court were to conclude that the monetary award lacks prospective application under *Hewitt*, the Post-Remand Judgment also imposes the recklessness-based Tier II civil penalty as recalibrated on remand—a forward-looking determination of culpability with continuing collateral consequences in licensing, regulatory disclosure, and corporate-governance contexts. Such reputational and regulatory consequences are squarely prospective. *See* Freedom Debt Relief, *supra*.

Three categories of changed circumstances render continued prospective enforcement of the Post-Remand Judgment "no longer equitable."

### 1. Intervening Change in Controlling Law.

The Post-Remand Judgment rests on three doctrinal pillars, each of which has been materially altered since the judgment was entered.

First, the liability determination rests on the "CashCall theory"—the bootstrapping of state-law usury and licensing violations into federal UDAAP liability under 12 U.S.C. § 5536(a)(1)(B). That theory depended on deferential statutory interpretation of the CFPA in the Bureau's favor and on the Ninth Circuit's deference to the Bureau's construction of the predicate state laws. *Loper Bright*, 603 U.S. at 411–13, has now eliminated *Chevron* deference and requires courts to exercise independent judgment in statutory interpretation. The Bureau's expansive reading of § 5536(a)(1)(B)—a reading the Bureau itself describes as "novel," *see* Paoletta Mem. (Apr. 16, 2025)—cannot now claim the interpretive presumption that informed its acceptance by the trial and appellate courts. *See Phelps*, 569 F.3d at 1135–36 (Rule 60(b) relief warranted where intervening authority repudiates the interpretive premises of the prior judgment); *Henson*, 943 F.3d at 444–55 (same).

Second, *Seila Law*, 591 U.S. at 218–32, and *Community Financial Services Ass'n*, 601 U.S. at 419–25, have reshaped the constitutional and structural posture of the Bureau itself, *see also Collins v. Yellen*, 594 U.S. 220 (2021), and confirm the Bureau's status as an enforcement agency whose extraction of legal monetary relief from private parties is the

Case No. 2:15-cv-07522-JFW (RAOx)

MEMORANDUM OF POINTS AND AUTHORITIES

very "daunting" exercise of executive power *Seila Law* identified, 591 U.S. at 199. That doctrinal shift directly informs the Seventh Amendment analysis in *Jarkesy* and reinforces the inequity of continuing enforcement under the procedural posture obtained below.

Third, the procedural posture by which the Bureau secured legal restitution—a bench trial on a remedy the Bureau later relabeled as legal in nature—has been called into serious question by *Jarkesy*, 603 U.S. at 122–28. *Jarkesy* confirms that when an agency seeks legal monetary relief, the Seventh Amendment attaches, *id.* at 122, and that the relevant inquiry is the substance of the remedy, not the agency's label, *id.* at 123–24. The Bureau here obtained *$134 million in legal restitution* from a bench trial it secured by representing the remedy as *equitable*. Although *CashCall II* held that Defendants' jury-waiver stipulation foreclosed the Seventh Amendment objection on direct appeal, the post-*Jarkesy* framework throws into relief the inequity of binding Defendants to a waiver predicated on a representation the Bureau has since disavowed. *See, e.g., United States v. Olano*, 507 U.S. 725, 733 (1993) (waiver requires the intentional relinquishment of a *known* right). *Olano's* "known right" formulation supports the observation that a purported waiver cannot be a knowing relinquishment of a right that *Jarkesy* later clarified, because at the time the right was not clearly established. *See* "Background" subpart C., *supra* at 11.

That conclusion finds support in recent appellate authority. Dissenting from the denial of rehearing en banc in *Carroll v. Trump*, Judge Menashi explained that "[w]hen an intervening change in law alters the availability of a claim or a defense, an earlier failure to invoke that claim or defense cannot operate as a waiver," because "an effective waiver must . . . be one of a 'known right or privilege.'" *Carroll v. Trump*, 175 F.4th 100, 114 fn. 26 (2nd Cir. 2026) (Menashi, J., dissenting from denial of rehearing en banc) (quoting *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143 (1967), and *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Judge Menashi reached the Seventh Amendment dimension of the denial of a jury trial even though it had not been developed by the parties on appeal, recognizing that a court's resort to a non-jury determination to resolve contested facts "raises Seventh Amendment concerns" and "invaded the province of the jury." *Id.* at 119.  That a judge would reach the

MEMORANDUM OF POINTS AND AUTHORITIES

Case 26-03102-JBM11   Filed 08/12/26   Entered 08/12/26 09:35:58   Doc 53   Pg 188 of 198

jury-trial question notwithstanding its omission from the appellate presentation confirms that the Seventh Amendment right is not lightly deemed surrendered, and it casts doubt on the premise on which *CashCall II* rested—that Defendants' stipulation effected a knowing and valid waiver of that right. The jury-trial protection *Jarkesy* clarified was not a "known right" available to Defendants when they agreed to a bench trial on a remedy the Bureau then represented as equitable; it crystallized only when *Jarkesy* recharacterized agency suits seeking legal monetary relief as triggering the jury-trial guarantee. Defendants' stipulation, therefore, cannot be treated as a knowing relinquishment of a right they had no reason to know was available. Whatever its operation on direct review, that doctrinal transformation is a paradigmatic "significant change . . . in law" for purposes of Rule 60(b)(5). *Horne*, 557 U.S. at 447.

### 2.     The Bureau Has Formally Repudiated the Enforcement Theory That Produced This Judgment.

"[C]hanged circumstances" for Rule 60(b)(5) purposes are not limited to changes in the law; changes in the policy of the government party that procured the judgment are equally cognizable. *See Horne*, 557 U.S. at 447–48 (changed factual conditions, including changes in governing policies and circumstances, may render enforcement inequitable); *Rufo*, 502 U.S. at 384 (consent decrees may be modified where "changed factual conditions make compliance with the decree substantially more onerous" or where enforcement is "detrimental to the public interest"); *Jeff D.*, 365 F.3d at 854 (flexible standard applies to government party where public interest is implicated).

The Paoletta Memo *rescinded* the Bureau's prior enforcement priorities and committed the agency to (i) respecting federalism by minimizing duplicative state-law enforcement, (ii) declining to pursue "novel legal theories," (iii) shifting resources away from nonbank enforcement, (iv) declining to engage in price controls, and (v) prioritizing tangible-harm redress over agency-fund-replenishing penalties. Consistent with the foregoing, the Bureau's Chief Legal Officer expressly informed Defendants' counsel during their first meeting that this case would not have been brought under the Bureau's current

MEMORANDUM OF POINTS AND AUTHORITIES

administration. Baren Decl. ¶ 11. Each prong is directly incompatible with the enforcement posture that produced the Post-Remand Judgment:

a. The case is built on *novel* use of UDAAP authority to enforce state-law usury and licensing limits, *see* Pl.'s Compl. ¶¶ 51-54; 56-59; 61-64 (alleging that consumer harm from state-law invalidity provides the predicate for the UDAAP claim); the Bureau publicly identified this as "the CashCall theory." This is inconsistent with Priority 8 of the Paoletta Memo.

b. Sixteen sovereign states had concurrent authority and concurrent claims over the same conduct; eight elected to bring their own actions and recovered; eight elected not to. Defendants paid more than $140 million to states and private claimants on the same underlying loans.

c. Defendants are nonbank lenders—*precisely* the class of enforcement targets the Bureau has now committed to deprioritize. The second priority announced in the Paoletta Memo is that "[t]he Bureau's focus will shift back to depository institutions, as opposed to non-depository institutions. In 2012, 70% of the Bureau's supervision focused on banks and depository institutions and 30% on nonbanks. Now that proportion has completely flipped, with over 60% on nonbanks and less than 40% on banks and depository institutions. The Bureau must seek to return to the 2012 proportion and focus on the largest banks and depository institutions." CashCall was a classic nonbank lender.

d. The legal-restitution figure tied to consumer interest payments operates as an interest-rate cap by another name and implements the price control the CFPA itself forbids, *see* 12 U.S.C. § 5517(o), and the Paoletta Memo disclaims.

e. This Court found, as a matter of fact, that the borrowers "received the benefit of their bargain," *CashCall*, 2018 WL 485963, at *7–8—a finding the Bureau has not disturbed and that places this matter outside the "tangible harm" redress the Bureau now prioritizes.

The Bureau's subsequent conduct reinforces these principles. In the same months that the Bureau maintained the Post-Remand Judgment against Defendants, it voluntarily dismissed enforcement actions and unwound settlements against materially indistinguishable defendants. *See* CFPB Press Releases (Feb.–Apr. 2025) (SoLo Funds, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, Reliant Holdings); CFPB Termination Notice, Navy Federal Credit Union (July 1, 2025) (waiving non-compliance and reducing or eliminating fine). Other cases closely parallel the facts of the Bureau's enforcement action against CashCall.

In a Bureau enforcement action similar to its action in *CashCall*, the Bureau issued an order against Enova International, Inc., a publicly traded online small-dollar lender headquartered in Chicago, Illinois, that markets, provides, and services loans under the brand names CashNetUSA (CNU) and NetCredit. In 2023, the Bureau issued a Consent Order against Enova based on the Bureau's finding that Enova violated the Consumer Financial Protection Act by debiting consumers' bank accounts without authorization and failing to honor loan extensions it granted to consumers. Pursuant to its authority under 12 U.S.C. § 5563(b)(3), the Bureau terminated the order on September 2, 2025. *See* Order Terminating the Consent Order, In the Matter of Enova International, Inc., File No. 2023-CFPB0014 (September 2, 2025), https://files.consumerfinance.gov/f/documents/cfpb_enova-international-2023_termination-consent-order_2025-09.pdf.

In several matters, the Bureau *returned* funds previously collected. The Bureau has articulated no principled basis for distinguishing Defendants—and, on information and belief, no such basis exists in any Bureau policy directive, internal memorandum, or public statement. In announcing those dismissals, current Bureau leadership repeatedly and publicly characterized the prior administration's enforcement program as a "weaponization" of the consumer-protection laws that "must end," describing matters in which the Bureau had "shockingly" sought to "destroy" defendants that incurred substantial legal fees and were forced to lay off significant portions of their workforce. The action against Defendants—a nonbank prosecuted on an admittedly novel theory, after a finding

MEMORANDUM OF POINTS AND AUTHORITIES

of no fraud, for conduct already addressed by sovereign States—is a paradigmatic example of the very weaponization the Bureau's current leadership has disavowed.

The post-remand judgment enforces legal theories and remedial approaches that the CFPB has since formally repudiated, thereby enforcing rights that no longer exist under the agency's current interpretation of its statutory authority. Under *Bellevue Manor Associates*, the Ninth Circuit recognized that enforcement of rights that the Supreme Court does not recognize and that the statute no longer permits provides good reason for Rule 60(b)(5) modification. *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249 (9th Cir. 1999). In *Horne v. Flores*, 557 U.S. 433 (2009), the Supreme Court established that Rule 60(b)(5) provides relief when a significant change in law renders continued enforcement detrimental to the public interest, emphasizing that courts must take a flexible approach to changed circumstances and consider whether underlying violations have been remedied through policy shifts. Here, the CFPB's 2025 Paoletta Memo explicitly disclaimed the type of enforcement action brought against defendants, committing the agency to respect federalism, decline novel legal theories, shift away from nonbank enforcement, decline price controls, and prioritize tangible-harm redress. Each element directly contradicts the enforcement theory underlying the post-remand judgment. The Bureau's subsequent conduct of voluntarily dismissing similar enforcement actions against other defendants reinforces that the agency no longer recognizes the legal foundation for this type of enforcement. Continued enforcement of a judgment based on legal theories the enforcing agency has formally abandoned creates the precise scenario *Bellevue Manor* identified as warranting equitable relief. [1]

---

[1] The Bureau has itself advocated the appropriateness of vacating judgments pursuant to Rule 60(b) where changed enforcement priorities and other circumstances render continued enforcement inequitable. See, e.g., Cahn Decl. ¶ , Ex. B, Joint Rule 60(B)(6) Motion for Relief from and Vacatur of the Stipulated Final Judgment and Order, filed March 26, 2025, Dkt. 145, *Bureau of Consumer Financial Protection v. Townstone Financial, Inc., et al.*, Case No 1:20-cv-04176 (N.D. Ill.) ("[P]arties jointly move this Court under Rule 60(b)(6) to set aside the judgment . . . as the judgment is inequitable and undermines confidence in the judicial process.").)

Case No. 2:15-cv-07522-JFW (RAOx)

MEMORANDUM OF POINTS AND AUTHORITIES

### 3. The Parties Negotiated and Reached a Settlement Framework Aligned with the Bureau's Stated Priorities, and the Bureau Then Abandoned It, Creating Grounds for Equitable Estoppel.

Beginning in July 2025, the Bureau—following CashCall's initiating contact with the Office of the Acting Director and the opening of a dialogue opened by the Acting Director's advisor and counsel—engaged with Defendants in resolution discussions structured to produce exactly the kind of consent disposition the Paoletta Memo contemplated and that the Bureau accepted in other matters. As detailed in the Background, the Bureau requested and received supplemental information, the parties negotiated over the better part of a year, and the Bureau provisionally accepted a complete settlement framework on terms it itself prescribed—before abandoning that framework, on the eve of moving against Defendants' collateral, without any articulated policy basis.

Standing alone, an abandoned negotiation does not provide a Rule 60(b)(5) ground. *See In re Pacific Far East Lines, Inc.*, 889 F.2d 242, 250 (9th Cir. 1989). These discussions, however, were neither preliminary nor unfinished. The parties negotiated a complete settlement framework with no open terms—including Defendants' acceptance of the Bureau's own demand regarding third-party administration of the claims commission—which the Bureau provisionally accepted and then abandoned. But the Bureau's engagement and abrupt withdrawal is probative on two distinct points relevant to the "no longer equitable" inquiry: (i) the Bureau's own staff, including individuals authorized to act on the Bureau's behalf, concluded the matter warranted reopening on terms favorable to Defendants—reflecting the Bureau's informed assessment that continued enforcement is not aligned with its current priorities; and (ii) the absence of any articulated policy basis for the subsequent withdrawal, in light of the Bureau's contemporaneous treatment of comparable matters, supports the inference that continued enforcement reflects considerations extrinsic to the Bureau's legitimate consumer-protection mandate and is punitive and malicious in character.

MEMORANDUM OF POINTS AND AUTHORITIES

Independent of changes in law or policy, Defendants assert an equitable estoppel defense grounded in the Bureau's substantive engagement with Defendants across nearly a year of settlement discussions, its tentative acceptance of a settlement framework on terms the Bureau itself prescribed, and its abrupt abandonment of that framework on the eve of execution against Defendants' posted collateral. The relevant facts, set out in more detail in the Background, are as follows. Beginning in July 2025, *Defendants* approached senior Bureau personnel regarding a consensual resolution consistent with the Paoletta Memo and the Bureau's contemporaneous treatment of comparable defendants. Defendants transmitted, by letter dated July 25, 2025, a proposed framework under which the Bureau would retain the $10.3 million already paid and the parties would jointly move under Rule 60(b) for vacatur of the Post-Remand Judgment. The Bureau requested, and Defendants furnished, supplemental information regarding the structure of the proposed disposition and Defendants' prior payments to sovereign states and private claimants on the same underlying conduct. On December 11, 2025, Defendants' representatives met with senior Bureau officials and presented a concrete offer of compromise; the Bureau thereafter became unresponsive. On February 22, 2026, Defendants' counsel David Scharf reached out to officials at the White House and met with the Bureau's Chief Legal Officer, Mark Paoletta, and discussions resumed. Over the ensuing two months, the parties negotiated, and the Bureau provisionally accepted, a settlement framework that included Defendants' affirmative acceptance of the Bureau's demand that any consumer-relief claims commission be administered by a third party of the Bureau's choosing. The Bureau then again became unresponsive, and on May 1, 2026—the last business day before the Bureau would have been positioned to move on the collateral securing Defendants' supersedeas bond—Mr. Paoletta wrote that the Bureau would not proceed with the agreed-upon vacatur and would commence collection.

Throughout the nearly eleven-month period of these discussions, Defendants reasonably relied on the Bureau's representations and conduct: they maintained at substantial ongoing cost the $175 million-plus supersedeas bond secured in significant part

MEMORANDUM OF POINTS AND AUTHORITIES

by Mr. Reddam's personal assets and residences; they refrained from pursuing alternative avenues of relief that the negotiations were intended to obviate; and they expended significant resources structuring the disposition on the terms the Bureau itself dictated. The Bureau's abandonment of a settlement framework of its own design, on the eve of execution and without articulated policy basis, is the asymmetric and unexplained governmental conduct equity will not countenance and that the courts have considered probative when evaluating Rule 60(b) relief. *Accord Horne v. Flores*, 557 U.S. at 447–48; *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249 (9th Cir. 1999); *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987).

## II.   IN THE ALTERNATIVE, RULE 60(b)(6) PROVIDES INDEPENDENT GROUNDS FOR VACATUR.

If the Court concludes that Rule 60(b)(5) does not reach the relief sought, Rule 60(b)(6) supplies a separate and sufficient basis. Defendants do not rest on any single development. The aggregate of (i) the Bureau's mid-litigation reversal of its own remedial theory, (ii) the Supreme Court's intervening reshaping of the doctrinal landscape, (iii) the Bureau's formal repudiation of its enforcement priorities, (iv) the parallel disposition of materially indistinguishable matters, and (v) the Bureau's bad-faith abandonment, on the eve of execution against Defendants' collateral, of a concluded settlement framework of its own design, presents the kind of "extraordinary circumstances" the rule was designed to address. *Buck*, 580 U.S. at 123; *Liljeberg*, 486 U.S. at 864; *Phelps*, 569 F.3d at 1133–40; *Henson*, 943 F.3d at 444–55.

### A.   The Phelps/Henson Factors Favor Relief.

*1. Nature of the change in law.* Multiple Supreme Court decisions—*Loper Bright*, *Jarkesy*, *Community Financial Services Ass'n*, and *Seila Law*—have collectively reordered the deference framework, the Seventh Amendment framework for agency remedial actions, and the constitutional posture of the Bureau itself. This is not the case of a single interpretive shift in an isolated area, *cf. Hewitt*, 68 F.4th at 467, but a coordinated doctrinal transformation directly bearing on the foundations of the judgment. The first *Phelps* factor

MEMORANDUM OF POINTS AND AUTHORITIES

strongly favors relief.

*2. Diligence.* Defendants pursued every available avenue of direct review, including a motion for reconsideration in the Ninth Circuit following *CashCall II* and preparation of a petition for a writ of certiorari filed with the Supreme Court following the Ninth Circuit's January 3, 2025 affirmance (filed September 19, 2025, certiorari denied March 2, 2026). Defendants engaged in resolution discussions with the Bureau beginning in 2025 in good faith and at the Bureau's invitation. Where the moving party has pursued every reasonable avenue of relief, the diligence factor weighs in favor of (b)(6) relief. *See Phelps*, 569 F.3d at 1138; *Henson*, 943 F.3d at 450–52.

*3. Reliance on finality.* The Bureau cannot credibly claim a settled reliance interest in the Post-Remand Judgment. Its own published priorities disclaim the type of action; it engaged Defendants in talks aimed at vacatur; it has unwound settlements and dismissed cases on comparable facts. *Compare Henson*, 943 F.3d at 452 (reliance factor weighs against relief only where opposing party has materially relied on judgment), *with Hewitt*, 68 F.4th at 464 (FTC retained reliance interest because it had not repudiated the enforcement theory).

*4. Delay.* This motion is filed promptly after the relevant developments—within months of the Paoletta Memo, the Ninth Circuit's January 2025 affirmance and April 2025 denial of reconsideration, the issuance of *Loper Bright* (June 28, 2024) and *Jarkesy* (June 27, 2024), and the Bureau's May 2026 abandonment of settlement negotiations. The delay factor accordingly weighs in favor of relief. *See Phelps*, 569 F.3d at 1138 & n.21.

*5. Closeness of relationship between governing decisions.* The intervening decisions do not merely touch the doctrinal periphery of this judgment. *Loper Bright* directly governs how the Bureau's statutory authority must be construed; *Jarkesy* directly governs the remedy framework the Bureau invoked on remand; *Seila Law* and *Community Financial Services Ass'n* directly govern the Bureau's structural posture. The closeness factor accordingly weighs heavily in favor of relief. *See Henson*, 943 F.3d at 452–54.

MEMORANDUM OF POINTS AND AUTHORITIES

*6. Comity.* Comity concerns of the kind that animate the habeas factor in *Phelps* are absent here. *See Phelps*, 569 F.3d at 1139 (comity factor inapplicable where motion is directed not at the merits of habeas relief but at correcting an erroneous procedural disposition). The opposite consideration applies—federalism interests favor relief, because the Bureau used federal UDAAP authority to enforce predicate state-law obligations in a manner that bypassed sovereign-state enforcement choices. *Cf. Horne*, 557 U.S. at 448 (federalism concerns may make continued enforcement inequitable).

**B.**      **The Bureau's Mid-Litigation Reversal on Remedial Theory and Abandonment of Settlement Negotiations Independently Constitute "Extraordinary Circumstances."**

Even setting aside the changes in controlling law, two features of the Bureau's conduct independently warrant relief under Rule 60(b)(6).

First, the Bureau secured the bench trial on remedies in this Court by representing that the restitution it sought was equitable in character. Only after this Court denied that relief on the merits did the Bureau pivot to a legal-restitution theory—a theory it expressly conceded had not been raised below. *See CashCall I*, 35 F.4th at 758 & n.18. The Bureau then obtained on appeal what it had been denied at trial, by means of a recharacterization of the very remedy it had earlier disclaimed. That maneuver—procuring a judgment on a theory contradictory to the one on which the procedural posture was secured—is the kind of agency conduct that supports Rule 60(b)(6) relief. *See United States v. Baus*, 834 F.2d at 1124. The Bureau itself conceded, in *CashCall II*, that the parties' jury-waiver stipulation rested on a "shared understanding" that the remedy was equitable—an understanding the Bureau later abandoned to its own benefit. *See CashCall II,* at 1216.

Second, the Bureau's abandonment of resolution discussions—initiated by its own senior personnel, advanced through written submissions consistent with the agency's declared priorities and aligned with the disposition of comparable matters in the same period—presents the very kind of asymmetric, unexplained governmental conduct courts have considered when evaluating extraordinary-circumstances claims. *See Baus*, 834 F.2d

MEMORANDUM OF POINTS AND AUTHORITIES

Case 26-03102-JBM11    Filed 08/12/26    Entered 08/12/26 09:35:58    Doc 53    Pg. 197 of 198

at 1124 (governmental backtracking on settlement understandings may warrant (b)(6) relief).

### C.     The Equities Favor Relief.

Defendants have already paid $10,283,886 to the Bureau on the very claims at issue here and paid an additional $140 million to sovereign states and private claimants on the same underlying loans—amounts that, in combination, exceed the highest restitution figure the Bureau ever credibly identified at trial. The trial Court found, as a matter of fact, that the consumers "received the benefit of their bargain" and that there was "no fraud or deception." *CashCall*, 2018 WL 485963, at *7–8. Enforcement of an additional $23 million in additional penalties and $134 million in legal restitution—obtained through procedural maneuvers the Bureau has since publicly disclaimed—would impose an outcome the Bureau itself would not now select.

The "grand reservoir of equitable power" the Supreme Court has reposed in this Court under Rule 60(b)(6) was designed for the case in which finality, properly cherished, must give way to the more fundamental command that the public's confidence in the just operation of the courts not be sacrificed to the formal closure of a final judgment. *Klapprott*, 335 U.S. at 614–15. This is such a case.

### CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion under Federal Rule of Civil Procedure 60(b)(5) and, in the alternative, Rule 60(b)(6); vacate the Post-Remand Judgment in its entirety; and set the matter for a status conference to address any issues remaining following vacatur. In the further alternative, Defendants respectfully request an evidentiary hearing to develop the record concerning the Bureau's conduct, the abandonment of settlement discussions, and the inequity of continued prospective enforcement.

Respectfully submitted,

Dated: June 25, 2026

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By: _____

Reuben Camper Cahn

*Attorneys for Defendants
CashCall, Inc. and J. Paul Reddam*

MEMORANDUM OF POINTS AND AUTHORITIES